UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

MARIA JACKSON,                                Index No. 08 CV 1064 (LAK)

                         Plaintiff,


         -against-


THE SCOTTS COMPANY,

                         Defendant.
--------------------------------------------------------------X


---

**MEMORANDUM OF LAW IN SUPPORT OF RELIEF FROM ORDER
JUDGE KAPLAN'S FEBRUARY 21, 2008 ORDER**

---


SANDRA D. FRELIX, ESQ. (0421)
110 Wall Street
11th Floor
New York, New York 10005
(212) 859-3509
Attorney for Plaintiff

# TABLE OF CONTENTS

Table of Authorities.................................................................i

Preliminary Statement..............................................................1

Statement of Facts..................................................................1

Procedural History..................................................................1

Argument............................................................................3

    I.    Plaintiff's Motion to Remand the Case to State Court
           Must be Granted................................................3

           A.    Legal Standard................................................3
           B.    The Facts Establish Excusable Neglect...................3
           C.    The Facts Establish that the Default was
               Not Willful, a Meritorious Defense Exists,
               and the Defendant has not Been Prejudiced...........4

Conclusion..........................................................................9

# TABLE OF AUTHORITIES

## FEDERAL CASES

Am. Alliance Ins. Co., Ltd. v. Eagle Ins. Co.,
        92 F.3d 57, 59 (2d Cir. 1983)..............................................4

In re Benhil Shirt Shops, Inc. et al. v. Lynn Inc., et al.
        87 B.R. 275 (S.D.N.Y.).......................................................3

Block v. First Blood Assocs.,
        988 F.2d 344, 350 (2d Cir.1993).......................................8

In re Manning,
        4 B.C.D. 304 (Bankr.D.Conn. 1978).................................3

State Street Bank and Trust Company v. Inversiones Errazuriz et al.,
        230 F.Supp.2d 313 (S.D.N.Y. 2002)..................................8

## STATUTES

Fed.R.Civ. P. 11(b)(2).................................................................2

Fed.R.Civ. P. Rule 11(b)(3).........................................................2

Fed.R.Civ. P. Rule 60b(1)............................................................3

28 U.S.C.A. § 1441(b)..................................................................1

28 U.S.C.A. § 1445(c)...............................................................1,2

## LOCAL RULE

S.D.N.Y. Civ.R.7.1......................................................................1

i

## PRELIMINARY STATEMENT

On February 21, 2008 this court dismissed Plaintiff's Motion and Notice of Motion to Remand Action to State Court under 28 U.S.C.§1445(c) on the grounds that it was not accompanied by a memorandum of law, in violation of S.D.N.Y. Civ.R.7.1. Moreover, this Court assessed the undersigned with sanctions in the amount of $750.00. (Exhibit 1)

## STATEMENT OF FACTS

Maria Jackson ("the Plaintiff") was an employee of The Scotts Company ("the Defendant") from April 2001 until the Defendant unlawfully terminated her in June 2005. As a result of her unlawful termination the Plaintiff filed a summons and verified complaint against the Defendant on December 21, 2007.

## PROCEDURAL HISTORY

On December 21, 2007 Plaintiff filed a summons and complaint in the Supreme Court of the State of New York, County of Bronx. The same was served upon the Defendant on January 4, 2008. The Defendant then moved this Court with a Notice of Removal of Action under 28 U.S.C. §1441(b) dated February 1, 2008. The Plaintiff responded by filing and serving a Motion and Notice of Motion to Remand Action to State Court under 28 U.S.C.§1445(c) of February 20, 2008.

However, during a February 6, 2008 telephone discussion between the undersigned and Craig S. Friedman, Esq. ("Mr. Friedman"), counsel for the Defendant, Mr. Friedman, an attorney of the law firm Jones Day, only requested an extension of time

1

to answer the complaint from February 8, 2008 to March 10, 2008. On February 14, 2008 the Honorable Lewis A. Kaplan ("Judge Kaplan") granted the Defendant's Time to Answer, Move or Otherwise Respond to the Complaint to March 10, 2008.

Defendant served Plaintiff with a Partial Motion to Dismiss on March 10, 2008.

The undersigned never received the electronic notice of Judge Kaplan's February 14, 2008 endorsement letter.

As previously stated the undersigned filed and served a Motion and Notice of Motion to Remand Action to State Court under 28 U.S.C. §1445(c) on February 20, 2008. Also, on or about February 20, 2008 the undersigned began to experiencing flu like symptoms that caused the undersigned to fail to acknowledge and respond timely to Judge Kaplan's February 21, 2008 Order denying Plaintiff's Motion to Remand to State Court. The flu suffered by the undersigned lasted for about two (2) weeks.

As an unfortunate result of the undersigned's excusable neglect to respond due to illness, Judge Kaplan found that the undersigned violated Fed.R.Civ.P. 11(b)(2) and 11(b)(3) and sanctioned the undersigned to $750.00 that is to be paid on or before March 19, 2008.

It is worthy to note that the undersigned did not become aware of Judge Kaplan's February 21, 2008 electronic notice until his March 5, 2008 electronic notice.

## ARGUMENT

I.   **PLAINTIFF'S MOTION TO REMAND THE CASE TO STATE COURT MUST BE GRANTED**

A.  The Legal Standard

(1)    Federal Rule of Civil Procedure 60(b)(1)

Under Rule 60(b)(1) of the Federal Rules of Civil Procedure: On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake; inadvertence, surprise or excusable neglect.

(2)    Default not willful, meritorious defense and no prejudice to either side.

Other important considerations under Fed.R.Civ.P. 60(b)(1) include: 1) whether the default was willful, 2) whether the moving party has a meritorious case and whether the court's decision would unduly prejudice either side.

B.  The Facts Establish Excusable Neglect

The case *In re Benhil Shirt Shops, Inc. et al. v. Lynn Inc., et al.,* 87 B.R. 275 (S.D.N.Y.) relies on the excusable neglect definition provided in *In re Manning,* 4 B.C.D. 304 (Bankr.D.Conn. 1978). Excusable neglect is defined as 'the failure to timely perform a duty due to circumstances which were beyond *278 the reasonable control of the person whose duty it was to perform.' *Id.,* 4 B.C.D. at 305.

The undersigned's attached affirmation submits that she was suffering from the flu for approximately two (2) weeks. This was during the time period that Judge Kaplan entered his February 21, 2008 Order denying Plaintiff's Motion to Remand to

3

State Court and directing the undersigned to Show Cause on or before March 4, 2008

why she should not be sanctioned accordingly. Clearly, it is a reasonable assertion that

suffering from the flu caused the undersigned to miss Judge Kaplan's February 21, 2008

electronic notice. (Exhibit 2)

> C. The Facts Establish that the Default was not Willful, a Meritorious
> Defense Exists, and the Defendant Has Not Been Prejudiced

In assessing a claim of excusable neglect, in context of motion to vacate a

default judgment, courts typically make three inquiries: (1) whether the default was

willful; (2) whether the defendant has a meritorious defense[1]; and (3) the level of

prejudice that may occur to the non-defaulting party if relief is granted. *State Street Bank*

*and Trust Company v. Inversiones Errazuriz et al.,* 230 F.Supp.2d 313 (S.D.N.Y. 2002).

> (1)    Default Was Not Willful

The first inquiry this court must make in assessing defendants' claim of

excusable neglect is whether their default was willful. Mere negligence, even if gross,

does not necessarily rise to the level of willful default. *Am. Alliance Ins. Co., Ltd. V.*

*Eagle Ins. Co.,* 92 F.3d 57, 59 (2d Cir. 1983).

It has not been firmly established that "where the moving party has

apparently made a strategic decision to default" a default judgment should not be vacated.

*Id.* at 60.

The facts espoused in the undersigned's affirmation provide a reasonable

and logical basis for the undersigned's oversight in missing Judge Kaplan's February 21,

2008 electronic notice. Based on the *Am. Alliance* case there is nothing that remotely

suggests that the undersigned acted willfully or strategically in failing to respond to said

---

[1] In the instant case the Plaintiff has a meritorious defense.

4

electronic notice. It is a fact that the undersigned was ill. The inability to perform due to illness does not support, in any way, willful intentions not to perform.

(2)    Plaintiff Has a Meritorious Defense

Judge Kaplan in his February 21, 2008 Order states in part that: "The Motion to Remand is patently frivolous, as the 35-page complaint does not even mention, let alone assert a claim arising under, the New York Workers' Compensation Law. Indeed, the word "worker" does not appear in the entire pleading."

However, the undersigned respectfully disagrees with Judge Kaplan's statement. This respectful disagreement is based on substantive and detailed allegations within the complaint. Notwithstanding, said allegations this discussion must first set forth the employers' responsibilities pursuant to New York State Workers' Compensation guidelines.

The following points are the relevant employer responsibilities promulgated by the New York State Workers' Compensation Board:

- An employer may not discriminate against an employee or applicant because he or she has claimed or attempted to claim workers' compensation.

- An employer must report most injuries to the Board and the insurance company, if insured, on Form C-2, Employer's Report of Accident/Occupational Disease (PDF) [On-line Version] within 10 days after an accident. An employer shall furnish a report of an occupational disease incurred by an employee on the same form. A C-2 report must be filed with the Board and carrier if the

5

accident results in personal injury which has caused or will cause a loss of time from regular duties of one day beyond the working day or shift on which the accident occurred, or which has required or will require medical treatment beyond ordinary first aid or more than two treatments by a person rendering first aid. Failure to file a C-2 or failure to file it timely may result in a penalty of up to $2,500. (Exhibit 3)

The allegations in plaintiff's complaint that are substantive in establishing that the Defendant violated New York State Workers' Compensation Law are paragraphs 47 thru 50; 62 and 63 from the complaint. Allegations 47 thru 50 state the following:

47.    Mrs. Jackson's hernia injury was the result of work related lifting.

48.    Mrs. Jackson called D.M. McGarr from the Gunhill Road Home Depot store located in the Bronx in February 2003 to inform him that she needed to have hernia surgery in March 2003.

49.    During the same telephone conversation D.M. McGarr said no to the timing of her March 2003 hernia surgery and they would discuss the matter later.

50.    Mrs. Jackson also told D.M. McGarr that she was in pain. But D.M. McGarr flippantly told her that she would have to get the job done. (Exhibit 4)

Allegations 47 thru 50 establish that the Plaintiff's injury "...caused or will cause a loss of time from regular duties of one day beyond the working day or shift on which the accident occurred, or which has required or will require medical treatment beyond ordinary first aid or more than two treatments by a person rendering first aid...."

6

Allegations 62 and 63 state the following:

> 62. D.M. McGarr told Mrs. Jackson and her co-workers that they should not inform corporate that she's out recovering from surgery.

> 63. Thus, Mrs. Jackson's surgery was never reported to the Company's human resources department. (Exhibit 5)

Allegations 62 and 63 establish that the Defendant has violated New York State Workers' Compensation Law that demands that: "An employer may not discriminate against an employee or applicant because he or she has claimed or attempted to claim workers' compensation." D.M. McGarr's statement in complaint allegation 62 clearly illustrates that he was acting surreptitiously and operating beyond the boundaries of New York State Workers' Compensation Law. By unlawfully instructing the Plaintiff and her co-workers not to report the Plaintiff's work related injuries by informing the Defendant.

Moreover, the foregoing simply bolsters the Plaintiff's affidavit dated February 19, 2008 in which she swears that she was entitled to Workers' Compensation benefits but was wrongfully denied those benefits by the Defendant. (Exhibit 6)

Although the word "worker" does not appear in the complaint the complaint does assert the claims that (1) the plaintiff suffered a reportable work related injury and; (2) the reportable work related injury was intentionally not reported to Workers' Compensation Board. This demonstrates bad faith on the part of the Defendant and that the Defendant intentionally, grossly, wantonly and voluntarily failed to adhere to

7

New York State Workers' Compensation Law and as a result it should answer to these serious charges in the proper forum, which is the New York State Supreme Court, Bronx County. Justice demands that this case be remanded to New York State Supreme Court, Bronx County

Presumably, based on public policy concerns, the State of New York Workers' Compensation Board has great latitude in determining whether a company has violated its law(s). Accordingly, the fact at hand deserve to fully explored and analyzed.

(3)    Defendant Will Not Be Prejudiced

To settle the question of what establishes a basis for prejudice courts reply on the following: "whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; (iii) prevent the plaintiff from bringing a timely action in another jurisdiction. *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993)

The answer as to whether the Defendant will be prejudiced in relation to the foregoing criteria is a resounding *no*. The Defendant will not have to expend significant additional resources to conduct discovery and prepare for trial since the discovery process has not commenced. Moreover, the case is in its infancy meaning that very little time has transpired since filing and serving the summons and complaint and the case will not be significantly delayed. The issue concerning whether a party will be prevented from bringing a timely action in another jurisdiction has no bearing on this case.

8

## CONCLUSION

For all the reasons set forth above, it is respectfully requested that Plaintiff's

Motion and Notice of Motion for Relief From Order be granted, together with such other

and further relief as to this Court may deem just and proper.

Dated:  New York, New York
       March 18, 2008

                                Yours, etc.,

                                SANDRA D. FRELIX, ESQ.

                                By:    /s/ Sandra D. Frelix
                                      Sandra D. Frelix, Esq. (SF-0421)
                                        110 Wall Street
                                        11th Floor
                                        New York, New York 10005
                                        (212) 859-3509

                                  ATTORNEY FOR PLAINTIFF

To: Craig S. Friedman, Esq. (CF-1988)
     Matthew W. Lampe, Esq. (Pro Hac Vice application pending)
     JONES DAY
     322 East 41st Street
     New York, New York 10017

     ATTORNEY FOR DEFENDANT

# EXHIBIT INDEX
# FOR PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF RELIEF FROM ORDER

1.    Judge Kaplan's February 21, 2008 Order.

2.    Affirmation for Sandra D. Frelix, Esq.

3.    New York State Workers' Compensation: Employers' Rights and Responsibilities.

4.    A portion of the Complaint highlighting allegations 47 – 50.

5.    A portion of the Complaint highlighting allegations 62 and 63.

6.    Plaintiff's February 19, 2008 affidavit.

EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARIA JACKSON,

                 Plaintiff,

          -against-

THE SCOTTS COMPANY,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/21/2008

08 Civ. 1064 (LAK)

## ORDER

LEWIS A. KAPLAN, *District Judge.*

       This action was commenced by Maria Jackson against The Scotts Company ("Scott") in New York Supreme Court, Bronx County. Scott removed it to this Court on the basis of diversity of citizenship.

       This is an employment discrimination case. The complaint contains nine claims for relief. The first six are for discrimination and retaliation, and aiding and abetting violations of the New York State and New York City Human Rights Laws. The last three are for common law defamation, "economic discrimination in violation of New York State law," and breach of an implied contract to act in good faith.

       Plaintiff has moved to remand the action to the state court under 28 U.S.C. § 1445(c), which precludes the removal from a state court of a civil action "arising under the workmen's compensation laws of such State." The notice of motion, signed by plaintiff's counsel, Sandra D. Frelix, Esq., states that "[t]he plaintiff in this case has claims of disparate treatment and retaliation against the defendant arising under New York state worker's compensation laws." In violation of S.D.N.Y. Civ. R. 7.1, the motion is unaccompanied by a memorandum of law.

       The motion to remand is patently frivolous, as the 35-page complaint does not even mention, let alone assert a claim arising under, the New York Worker's Compensation Law. Indeed, the word "worker" does not appear in the entire pleading.

       In consequence, the motion to remand [docket item 7] is denied. In addition, it appears to the Court that the quoted statement in the notice of motion is so devoid of legal or factual

2

support as to suggest that plaintiff's counsel, Ms. Frelix, violated Fed. R. Civ. P. 11(b)(2) and/or 11(b)(3). Accordingly, Ms. Frelix shall show cause, on or before March 4, 2008, why she should not be sanctioned accordingly.

It must also be said that our Clerk's Office erred in entering this case on the docket with The Scotts Company as the plaintiff and Ms. Jackson as the defendant. The caption is amended to conform to that on this order. The Clerk shall make the necessary changes.

SO ORDERED.

Dated:        February 21, 2008

Lewis A. Kaplan
United States District Judge

EXHIBIT 2

SANDRA D. FRELIX, ESQ. (0421)
110 Wall Street
11th Floor
New York, New York 10005
(212) 859-3509
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MARIA JACKSON,                                   Index No. 08 CV 1064 (LAK)

                    Plaintiff,                   AFFIRMATION IN SUPPORT
                                                 OF RELIEF FROM ORDER

        -against-


THE SCOTTS COMPANY,

                    Defendant.
-------------------------------------------------------------X

    1.      I, Sandra D. Frelix, Esq. am the attorney for the plaintiff in the above-

referenced caption.  I affirm the following under the penalty of perjury.

    2.      On or about February 20, 2008 the undersigned began suffering from the

flu.

    3.      As a result of suffering from the flu the undersigned failed to respond to

Judge Kaplan's February 21, 2008 Order.

    4.      The undersigned suffered from the flu for approximately two (2) weeks.

    5.      The undersigned did not learn of Judge Kaplan's February 21, 2008 Order

until he transmitted his March 5, 2008 electronic notice.

Dated: March 18, 2008
        New York, New York

_Sandra C. Frelix_

SANDRA D. FRELIX (SF-0421)
110 Wall Street
11th Floor
New York, New York 10005
(212) 859-3509

ATTORNEY FOR PLAINTIFF


To: Craig S. Friedman, Esq. (CF-1988)
    Matthew W. Lampe, Esq. (Pro Hac Vice application pending)
    JONES DAY
    322 East 41st Street
    New York, New York 10017

    ATTORNEY FOR DEFENDANT

2

EXHIBIT 3

# *Your Business and Workers' Compensation*

# Employers' Rights and Responsibilities

## Employers' Responsibilities

- Employers must obtain and keep in effect workers' compensation coverage for their employees; there must be no lapse in coverage even when switching insurance carriers.

  *The law requires almost all employers operating in New York State to have workers' compensation coverage for their employees. This requirement can be fulfilled by purchasing insurance coverage through an insurance carrier or by obtaining authorization from the Board to be self-insured.*

- Employers must post a notice of workers' compensation coverage and employee rights.

  *This notice is in a form prescribed by the Workers' Compensation Board. Employers obtain the notice from their insurance carrier or, if self-insured, from the Board. The notice includes the name and address of the insurance carrier and the policy number of the employer. It must be posted in a conspicuous place in the employer's place of business. Violations of this requirement can result in a fine of up to $250 per violation.*

- An employer may not discriminate against an employee or applicant because he or she has claimed or attempted to claim workers' compensation.

- An employer must report most injuries to the Board and the insurance company, if insured, on **Form C-2, Employer's Report of Accident/Occupational Disease**(PDF) [ **On-line Version** ] within 10 days after an accident. An employer shall furnish a report of an occupational disease incurred by an employee on the same form.

  *A C-2 report must be filed with the Board and carrier if the accident results in personal injury which has caused or will cause a loss of time from regular duties of one day beyond the working day or shift on which the accident*

*occurred, or which has required or will require medical treatment beyond ordinary first aid or more than two treatments by a person rendering first aid. Failure to file a C-2 or failure to file it timely may result in a penalty of up to $2,500.*

- C-2 forms (Employer's Report of Work-Related Accident/ Occupational Disease) must be maintained by the employer or designated third party for at least 18 years and are subject to review by the Board at any time.

- A record must be made and maintained on Form C-2 of any injury or illness incurred by an employee in the course of employment, even if the extent of the injury does not require that the C-2 be filed with the Board or carrier.

- An employer must report an injured worker's wages or other compensation to the Board. **Form C-240, Employer's Statement of Wage Earnings**(PDF) [ **On-line Version** ].

- An employer must report any changes in an injured worker's pay or work status to the Board. **Form C-11, Employer's Report of Injured Employee's Change in Employment Status Resulting from Injury**(PDF) [ **On-line Version** ].

- Certain employers must undergo safety consultations if directed to do so.

  *If an employer has an experience modification factor of greater than 1.2 and a payroll in excess of $800,000, they must participate in a mandatory safety and loss prevention program, as outlined by the New York State Department of Labor.*

- An employer must provide the Workers' Compensation Board with access to all books, records and payrolls related to employees upon request.

## Employers' Rights

- An employer has the right to request that the insurance carrier contest the compensability of a claim.

  *A claim can be contested for a variety of reasons, including, for example, that the injury was not related to work or that the employee is not injured to the extent he or she is claiming. An employer can request that the insurance carrier contest the claim, but since the carrier has assumed liability for the claim, it is not required to comply with the employer's request. In addition, employers or carriers who engage in dilatory tactics will be penalized.*

- An employer has the right to attend any hearings related to a claim filed by

one of the employer's workers.

- An employer has the right to electronically access the Board's case file for a claim filed by the employer's worker by visiting one of the Board's customer service centers.

*The Board's __Electronic Case Folder (eCase)__ allows parties of interest to view the documents in the claim file electronically. Employers should go to one of the eleven district offices or 30 Customer Service Centers with identification to obtain a password to access the files. Based on the confidentiality of workers' compensation records, please be prepared to offer proof that you are the employer of record in the claim.*

- A self-insured employer, or an employer who has failed his or her obligation to secure workers' compensation coverage, has the right to participate in the hearing and present relevant evidence about disputed issues at a hearing.

*Employers may request that a hearing be scheduled on a particular issue by writing to the appropriate district office in a timely manner. Corporations must be represented by counsel in proceedings before the Board. Certain defenses will be waived if they are not promptly raised or if the employer or carrier does not timely file a Form C-7, Notice that Right to Compensation is Controverted.*

- An employer has the right to report suspected workers' compensation fraud to the Fraud Inspector General.

*Fraud Referral Hotline: 1-888-363-6001.*

- An employer has the right to appeal or, if insured, to request that the insurance carrier appeal on appropriate grounds a decision of a Workers' Compensation Law Judge regarding a claim filed by an employee.

*Any party may appeal a notice of decision within 30 days by writing to the Board requesting Board review; however, a party filing a frivolous appeal will be penalized.*

*The Board recommends using the __latest version of Adobe Reader__ which is available as a free download from Adobe's web site.*

EXHIBIT 4

40.    The event is held on Long Island and after the showing a lavish luncheon is provided for those in attendance.

41.    All of Mrs. Jackson's colleagues were allowed to take the day off and attend the event and the luncheon that followed.

42.    However, Mrs. Jackson was not allowed to attend the event.

43.    But, the Company invited a white woman from an entirely different district (Philadelphia, PA) to attend the event and luncheon with all her expenses paid by the Company.

44.    This incident was extremely insulting to Mrs. Jackson and it too displayed the grossly disparate treatment she was subjected to.

45.    Mrs. Jackson was a dedicated and loyal employee of the Company.

46.    Her act of dedication and loyalty was demonstrated in March of 2003 when she was scheduled to have a hernia operation in March 2003.

47.    Mrs. Jackson's hernia injury was the result of work related lifting.

48.    Mrs. Jackson called D.M. McGarr from the Gunhill Road Home Depot store located in the Bronx in February 2003 to inform him that she needed to have hernia surgery in March 2003.

49.    During the same telephone conversation D.M. McGarr said no to the timing of her March 2003 hernia surgery and they would discuss the matter later.

50.    Mrs. Jackson also told D.M. McGarr that she was in pain. But D.M. McGarr flippantly told her that she would have to get the job done.

51.    However, Mike Garbiele ("Mr. Garbiele"), a co-worker of Mrs. Jackson, required medical treatment for a torn rotor cup in his arm.

6

EXHIBIT 5

52.    D.M. McGarr not only allowed Mr. Garbiele time off for medical treatment of his injury but also provided coverage for his stores.

53.    Clearly, D.M. McGarr treated Mrs. Jackson disparately from Mr. Garbiele.

54.    D.M. McGarr did not require Mr. Garbiele to postpone his treatment.

55.    Additionally, D.M. McGarr provided coverage for Mr. Garbiele and allowed him time off for his treatment.

56.    Prior to learning about how D.M. McGarr accommodated Mr. Garbiele she decided to postpone it to accommodate D.M. McGarr even though her physician advised her against postponing the operation.

57.    D.M. McGarr requested that she delay the surgery because the season had just begun and he could not afford to have her out.

58.    D.M. McGarr finally agreed that she could have her surgery in June 2003.

59.    Although Mrs. Jackson has been totally dedicated and loyal to the Company these sentiments were not reciprocated back to her.

60.    Two days after her surgery D.M. McGarr called Mrs. Jackson on her hospital bedside telephone to discuss Scotts' business.

61.    Mrs. Jackson's physician Matthew Kilgo, M.D. answered her hospital bedside telephone and upon learning that D.M. McGarr wanted to discuss Scotts' business he told D.M. McGarr to call back.

62.    D.M. McGarr told Mrs. Jackson and her co-workers that they should not inform corporate that she's out recovering from surgery.

63.    Thus, Mrs. Jackson's surgery was never reported to the Company's human resources department.

EXHIBIT 6

SANDRA D. FRELIX, ESQ. (0421)
110 Wall Street
11th Floor
New York, New York 10005
(212) 859-3509
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MARIA JACKSON,                                  Index No. 08 CV 1064 (LAK)

              Plaintiff,                        AFFIDAVIT IN SUPPORT OF
                                         MOTION TO REMAND
                                       ACTION TO STATE COURT

      -against-

THE SCOTTS COMPANY,

              Defendant.
-------------------------------------------------------------X

1.    I, Maria Jackson, am the plaintiff in the above-referenced caption.

2.    I am a former employee of The Scotts Company (the "Company").

3.    I was injured on or about January 10, 2005 while executing my duties as
an employee of the Company.

4.    The Company subjected me to disparate treatment and retaliated against
me by denying me my worker's compensation benefits when I was and
still am entitled to them.

5.    I am also entitled to retroactive worker's compensation benefits.

6.    I intend to litigate, in my present suit against the Company, how the

Company subjected me to disparate treatment and retaliated against me by

denying me my worker's compensation benefits.

Dated:  February 19, 2008
       New York, New York

_____
MARIA JACKSON

Subscribed and sworn to

before me this _____19_____ day

of February, _____2008_____

_____
Notary Public for the State of New York

ALLAN HERZLICH
NOTARY PUBLIC State of New York
NO. 6676320
QUALIFIED IN QUEENS COUNTY
Commission Expires Dec. 31, 20 10

2

SUPREME COURT OF TSHE STATE OF NEW YORK
COUNTY OF BRONX
----------------------------------------------------------------------X
MARIA JACKSON

*Plaintiff,*

   -against-

THE SCOTTS COMPANY

*Defendant.*
----------------------------------------------------------------------X

**VERIFIED
COMPLAINT**

**INDEX No.:**

      Plaintiff, MARIA JACKSON ("Mrs. Jackson", "Plaintiff" or "plaintiff"), by and through her attorney, SANDRA D. FRELIX, for her Complaint against THE SCOTTS COMPANY ("the Company", "Defendant Scotts", "Defendant" or "defendant"), thereby states and alleges as follows:

**NATURE OF THE CLAIMS**

      1.     This action is for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendant's unlawful employment practices and retaliation against Plaintiff, including the discriminatory treatment, racial harassment, and retaliation against Plaintiff due to her Race and/or Color (African-American/Black), gender, deprivation of property without due process of law and equal protection of laws, in violation of the New York State Human Rights Law, New York Executive Law §§ 290 et seq.; and the New York City Human Rights Law, Administrative Code of the City of New York §§ 8-101 et seq. and the New York State Constitution. Additionally, Mrs. Jackson was subjected to defamation: slander per se and libel per se, being placed in a false light and was forced to endure the breach of an implied contract to act in good faith in violation of New York State Law. Moreover, the defendant caused her to suffer

economic discrimination and failed to provide her a reasonable accommodation pursuant to her disability in violation of 9 New York Code of Rules and Regulations (NYCRR) §466.11.

## JURISDICTION AND VENUE

2.      The Court has personal jurisdiction over Defendant pursuant to Sections 301 and/or 302 of the New York Civil Practice Law and Rules ("CPLR") in that the Defendant transacts and/or solicits business within the state from which they derive substantial revenues.

3.      The Court has personal jurisdiction over Defendant because a significant portion of the unlawful employment practices and events giving rise to the claims herein occurred in New York.

4.      The Court has subject matter jurisdiction over this action by virtue of the New York State Human Rights Law, New York Executive Law § 279(9); the New York City Human Rights Law, Administrative Code of the City of New York § 8-502(a); and the Constitution of the State of New York.

5.      Venue is proper in this county pursuant to CPLR § 503(c) because the Defendant conducted business in Bronx County at the relevant times described in this Complaint and continues to conduct business in Bronx County.

6.      Prior to the commencement of this action, a copy of this Complaint was served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

2

## PARTIES

7.      Plaintiff Maria Jackson is an African-American citizen female who resides in Springfield Gardens, New York. At all relevant times, Plaintiff has met the definition of an "employee" under all applicable statutes.

8.      Defendant Scotts conducts business throughout New York State as well as in all the other forty-nine states and internationally.

9.      The Scotts Company is located at 14111 Scottslawn Road, Marysville, OH 43041.

## FACTUAL ALLEGATIONS

10.     Defendant hired Mrs. Jackson in April 2001 as a Seasonal Merchandiser.

11.     She was immediately promoted to the position of Sales Merchandising Manager on or about December 14, 2001.

12.     Mrs. Jackson worked diligently for the Company for four (4) years at the time of her June 2005 unlawful termination.

13.     Mrs. Jackson excelled at her responsibilities pursuant to each of her positions.

14.     Mrs. Jackson also received exemplary job performance appraisals.

15.     In the Spring of 2002 Mrs. Jackson suffered extreme embarrassment and humiliation when District Manager Patrick McGarr ("D.M. McGarr") stated that: "Maria's not Black she is Italian!"

16.     This incident took place at the Liberty Diner in Farmingdale, N.Y.

17.     There was never an occasion witnessed by Mrs. Jackson where a white person's core identity was challenged and violated.

3

18.    In the spring of 2002 Mrs. Jackson became aware that the Defendant was being sued for discrimination for not hiring women in the 04 region.

19.    She further learned that the Defendant had specifically directed D.M. McGarr to hire a black woman.

20.    D.M. McGarr shared this information with James Fitch ("Mr. Fitch"), a Sales Merchandising Manager ("SMM").

21.    Mr. Fitch wanted D.M. McGarr to hire his friend, a Caucasian male, who had previously resigned from the Defendant but wanted his old position back.

22.    At the December 2002 conference in Naples, Florida Mrs. Jackson, D.M. McGarr, and co-workers were attending a class.

23.    Mrs. Jackson went the ladies room upon her return the seats were taken in her class' section.

24.    The only seat available in the section with her co-workers was located at the far end of the table where her co-workers were seated.

25.    The closest unoccupied seat was located in an area occupied by another district.

26.    The district manager of that region Patrick Flagherty ("D.M. Patrick Flagherty) stated that she could sit with his district.

27.    However, D.M. McGarr tapped her on the shoulder and told her that she could not sit there.

28.    D.M. McGarr then signaled one of their co-workers to move down so she could sit with them.

4

29.    Mrs. Jackson then heard Mr. Flagherty state to his SMM's: "What is this? Is she too good to sit with us? Oh yeah, that's right that's Pat's token."

30.    This racist comment was not only hurtful but it was extremely embarrassing to Mrs. Jackson.

31.    Another area where Mrs. Jackson was subjected to disparate treatment pertains to storage facilities.

32.    Point of Purchase is advertising that is sent to managers in great quantity.

33.    Therefore, it is customary for the Company to pay for the storage facility utilized by the managers to house and maintain the advertising materials.

34.    Unfortunately, Mrs. Jackson was informed in no uncertain terms by D.M. McGarr that his budget did not permit him to go over the $75.00 per month for storage.

35.    Consequently, she was forced to store the materials in her home, which greatly inconvenienced her family.

36.    Mrs. Jackson eventually learned that D.M. McGarr paid well over $100.00 for storage for Mrs. Jackson's co-workers who operated in eastern Long Island.

37.    This is an undeniable illustration of the humiliating, embarrassing, disparate as well as racist treatment imposed upon Mrs. Jackson by the Company.

38.    Moreover, even though D.M. McGarr was absolutely aware that Mrs. Jackson was out on a work related disability (herniated and bulging discs) he still spitefully sent Point of Purchase advertising materials to her home.

39.    In the spring of 2003 Ivy Acres held its annual flower show and invited the Company along with other lawn and garden professionals.

40.    The event is held on Long Island and after the showing a lavish luncheon is provided for those in attendance.

41.    All of Mrs. Jackson's colleagues were allowed to take the day off and attend the event and the luncheon that followed.

42.    However, Mrs. Jackson was not allowed to attend the event.

43.    But, the Company invited a white woman from an entirely different district (Philadelphia, PA) to attend the event and luncheon with all her expenses paid by the Company.

44.    This incident was extremely insulting to Mrs. Jackson and it too displayed the grossly disparate treatment she was subjected to.

45.    Mrs. Jackson was a dedicated and loyal employee of the Company.

46.    Her act of dedication and loyalty was demonstrated in March of 2003 when she was scheduled to have a hernia operation in March 2003.

47.    Mrs. Jackson's hernia injury was the result of work related lifting.

48.    Mrs. Jackson called D.M. McGarr from the Gunhill Road Home Depot store located in the Bronx in February 2003 to inform him that she needed to have hernia surgery in March 2003.

49.    During the same telephone conversation D.M. McGarr said no to the timing of her March 2003 hernia surgery and they would discuss the matter later.

50.    Mrs. Jackson also told D.M. McGarr that she was in pain.  But D.M. McGarr flippantly told her that she would have to get the job done.

51.    However, Mike Garbiele ("Mr. Garbiele"), a co-worker of Mrs. Jackson, required medical treatment for a torn rotor cup in his arm.

52.    D.M. McGarr not only allowed Mr. Garbiele time off for medical treatment of his injury but also provided coverage for his stores.

53.    Clearly, D.M. McGarr treated Mrs. Jackson disparately from Mr. Garbiele.

54.    D.M. McGarr did not require Mr. Garbiele to postpone his treatment.

55.    Additionally, D.M. McGarr provided coverage for Mr. Garbiele and allowed him time off for his treatment.

56.    Prior to learning about how D.M. McGarr accommodated Mr. Garbiele she decided to postpone it to accommodate D.M. McGarr even though her physician advised her against postponing the operation.

57.    D.M. McGarr requested that she delay the surgery because the season had just begun and he could not afford to have her out.

58.    D.M. McGarr finally agreed that she could have her surgery in June 2003.

59.    Although Mrs. Jackson has been totally dedicated and loyal to the Company these sentiments were not reciprocated back to her.

60.    Two days after her surgery D.M. McGarr called Mrs. Jackson on her hospital bedside telephone to discuss Scotts' business.

61.    Mrs. Jackson's physician Matthew Kilgo, M.D. answered her hospital bedside telephone and upon learning that D.M. McGarr wanted to discuss Scotts' business he told D.M. McGarr to call back.

62.    D.M. McGarr told Mrs. Jackson and her co-workers that they should not inform corporate that she's out recovering from surgery.

63.    Thus, Mrs. Jackson's surgery was never reported to the Company's human resources department.

64.     During her surgery she had an emergency blood transfusion and was hospitalized once again in July 2003.

65.     Mrs. Jackson was not only forced to submit to a hostile work environment and disparate treatment but she had to bear the indignity of inhumane treatment as well.

66.     The inhumane treatment manifested itself while she was at home recuperating from surgery and the relapse.

67.     D.M. McGarr had the unmitigated audacity to continue to burden Mrs. Jackson by having the Point of Purchase advertising material sent to her home.

68.     D.M. McGarr demanded that she follow-up on reports.

69.     D.M. McGarr also demanded that she answer calls on her cell phone from her home while she was recovering.

70.     Upon Mrs. Jackson's return to work in October 2003 D.M. McGarr was undaunted and unfazed by the fact that she had major surgery four months earlier.

71.     D.M. McGarr insisted that she work at the same level and pace that she worked at prior to her surgery.

72.     D.M. McGarr's actions were so detrimental to her recovery that in 2004 Mrs. Jackson's surgeon wrote two letters addressed to D.M. McGarr requesting a reasonable accommodation for his patient, Mrs. Jackson.

73.     The physician clearly expressed that lifting for Mrs. Jackson was unacceptable.

74.     D.M. McGarr failed to give Mrs. Jackson a reasonable accommodation.

75.     D.M. McGarr expected Mrs. Jackson to perform in the same manner that she had prior to her major surgery.

8

76.    D.M. McGarr informed Mrs. Jackson in no uncertain terms that she would have to find a way to get the job done.

77.    Another instance of discrimination against Mrs. Jackson occurred in the spring of 2004 when she requested to take her son to the dentist for a serious procedure.

78.    D.M. McGarr denied Mrs. Jackson's request to take her son to the dentist for the serious procedure.

79.    However, D.M. McGarr allowed Mrs. Jackson's co-worker, Jimmy Fitch, to take his son to a baseball game.

80.    Mrs. Jackson was also a victim of economic discrimination.

81.    During her October 2003 yearly evaluation D.M. McGarr raved about her performance and she was given a $900.00 raise.

82.    D.M. McGarr informed her that he had to fight to get her and her colleagues the $900.00 raises from Mike Carbanara ("Mr. Carbanara") the Regional Sales Director.

83.    D.M. McGarr requested that Mrs. Jackson not discuss her raise with her Caucasian male co-workers because he had gotten her a little more based on the fact that she was assigned to the Jericho Home Depot.

84.    However, shortly thereafter, she learned that her Caucasian male co-workers had each received a $1500.00 raise.

85.    This too illustrates the economic discrimination and disparate treatment she was subjected to and the hostile environment she worked in.

86.    It also demonstrates that D.M. McGarr acted in bad faith with Mrs. Jackson.

87.   The discriminatory and disparate treatment continued in that in the spring of 2004 Mrs. Jackson was servicing nine (9) Home Depots stores.

88.   She was firmly instructed that the Jericho Home Depot was to have one (1) dedicated merchandiser whose job was to service that store only.

89.   The individual who was the dedicated merchandiser to the Jericho Home Depot was a Caucasian male named Dominic Balducci ("Mr. Balducci").

90.   Mrs. Jackson was responsible for servicing eight (8) other Home Depot stores.

91.   However, she was assigned only one merchandiser to service the other eight Home Depot stores his name was Tyrone Jackson, ("Mr. Jackson") an African-American male.

92.   Mrs. Jackson's Caucasian male co-workers were assigned six to seven Home Depot stores.

93.   Moreover, her Caucasian male co-workers were assigned as many as four (4) merchandisers to service the stores they were responsible for.

94.   In 2003 Mr. Carbanara allocated Mrs. Jackson an additional twenty (20) hours of merchandising.

95.   But, D.M. McGarr instructed Mrs. Jackson to assign all the twenty (20) hours to the Jericho Home Depot store.

96.   During the gardening season of 2004 Mr. Balducci was prone to make many mistakes.

97.   Mrs. Jackson counseled him regarding his poor and disruptive work habits on numerous occasions, but to no avail.

10

98.    Mr. Balducci's poor and disruptive work habits included stealing time from the Company.

99.    Furthermore, Mr. Balducci threatened to cause bodily harm to department heads at Home Depot because someone borrowed "his" jack.

100.    Mr. Balducci, was known to use perverted language and engaged in inappropriate discussions about his girlfriend's sex life in the presence of customers.

101.    Additionally, Mrs. Jackson received numerous calls from Home Depot management about his violent behavior.

102.    Mr. Balducci has been banished from three (3) other Home Depot stores and was sternly instructed not to return.

103.    D.M. McGarr's response to the foregoing was: "Dominic did not have to go back to those Home Depots that put him out and that they did not deserve his services to begin with."

104.    It is quite obvious that D.M. McGarr placed the personal feelings he had for Mr. Balducci before his obligations to the Company.

105.    However, Mrs. Jackson by sharing the real threat that Mr. Balducci posed with D.M. McGarr shows that she recognized that Mr. Balducci's unprofessional and violent behavior had a negative reflection on the Company as well as exposed the Company to unnecessary and avoidable liability.

106.    Moreover, Mrs. Jackson understood that he had clearly become a present liability and that the Company had been placed on notice about his unprofessional and violent behavior.

107.    The liability that D.M. McGarr exposed the Company to is enormous.

11

108.    It is common knowledge that Mr. Balducci had to attend court ordered anger management courses for threatening to kill his neighbor over a parking space.

109.    But, D.M. McGarr remained a staunch supporter of Mr. Balducci without considering the legal ramifications such blinding support could have on the Company or to Mrs. Jackson's safety and well-being.

110.    D.M. McGarr refused to re-hire Henry Williams ("Mr. Williams"), a black man, who worked for the Company for more than five years.

111.    The grounds that D.M. McGarr refused Mr. Williams employment was that he allegedly was not present in the store at a particular time.

112.    D.M. McGarr mercilessly defamed Mr. Williams with the tag "the Phantom" and often made jokes about him during meetings in the presence of a number of co-workers.

113.    Clearly, D.M. McGarr's disparate treatment of Mr. Williams and the unwavering support of Mr. Balducci were based on race and color.

114.    Mrs. Jackson was again forced to endure and witness this racially motivated injustice creating a hostile work environment.

115.    The discrimination and abuse suffered by Mrs. Jackson was unrelenting, discriminatory and racist.

116.    In 2004 Mr. Carbanara gave Mrs. Jackson an additional twenty (20) hours to service her other home depot stores.

117.    Mr. Carbanara realized that she was overwhelmed with servicing each of the Home Depot stores under her authority.

12

118.   Mrs. Jackson hired Ms. Snow in 2004 and Mr. Jackson was hired in 2001 to assist her servicing the other Home Depot stores she was responsible for.

119.   Based on information and belief there were no black merchandisers until Mrs. Jackson hired Kisha Snow ("Ms. Snow") and Mr. Jackson.

120.   Mrs. Jackson's sales numbers were growing by an incredible rate in her other Home Depot stores.

121.   Her sales numbers were increasing so rapidly that the Vice President of Miracle Gro flew in from Ohio to verify her sales numbers.

122.   However, Mr. McGarr transferred Ms. Snow and Mr. Jackson to the Jericho Home Depot store to help Mr. Balducci.

123.   The hours attributed to Ms. Snow and Mr. Jackson were the additional hours that Mr. Carbanara provided Mrs. Jackson with to service her seven (7) other Home Depot stores.

124.   This unfortunate arrangement allowed Mr. Balducci six (6) additional hours or more on a daily basis.

125.   Based on information and belief Mr. Balducci engaged in stealing time from the Company and Mrs. Jackson's budget by working in other departments at the Jericho Home Depot store.

126.   By reassigning hours specifically designated to Mrs. Jackson's seven (7) other Home Depot stores, Mr. McGarr methodically set her up to fail.

127.   Mrs. Jackson took pride in her job and used her creative skills when it was necessary.

13

128.    In 2003 the Company provided Mrs. Jackson and her colleagues with displays known as Cakes.

129.    The specs for the Cakes did not fit in the area they were to be displayed.

130.    Therefore, Mrs. Jackson took it upon herself to successfully re-configure and redesign the Cakes.

131.    Her efforts were so successful that D.M. McGarr gave her a $100.00 incentive for each Cake she built in her stores.

132.    D.M. McGarr instructed Mrs. Jackson to build the Cake displays in her co-workers' stores.

133.    However, Mrs. Jackson received no compensation or incentives for building the Cake displays in her co-workers stores.

134.    Another instance of unfair and disparate treatment Mrs. Jackson suffered occurred with the building of the Field Goal Post contest in 2004.

135.    Mrs. Jackson was the first of her Caucasian male co-workers to e-mail photos of her completed Field Goal Post to D.M. McGarr.

136.    D. M. McGarr admitted that Mrs. Jackson was the first to complete the Field Goal Post contest.

137.    D.M. McGarr further stated that he knew that she would be the first to complete the contest based on previous incentive driven assignments.

138.    However, D.M. McGarr insisted that she resubmit the photos because there was a piece of cardboard in one of the photos she sent.

139.    The piece of cardboard was the property of Home Depot and placed there by a Home Depot employee.

14

140.    Due to other commitments Mrs. Jackson was unable to resubmit the photos immediately.

141.    Another co-worker, Mike Gabriele won the $100.00 contest.

142.    Mike Gabriele won even though he sent his photos in after Mrs. Jackson sent her photos in.

143.    Mrs. Jackson in 2004 created and designed the Bookcase display.

144.    The Book Case display was created and designed by Mrs. Jackson specifically for the Miracle Gro product line.

145.    At the December 2004 National Conference, those in attendance were encouraged to adopt and use the Book Case display.

146.    Even though Mrs. Jackson created and designed the Book Case display concept, the raise she received was less than the raise received by her Caucasian male co-workers.

147.    The events surrounding the December 2004 National Conference in Naples, Florida were particularly public, brutal and extremely humiliating for Mrs. Jackson.

148.    At the conference the Company's employees were encouraged to take the Miracle-Gro since there were several new items in the product line.

149.    Mrs. Jackson began taking one of each sku and realized that Keith Conard ("Mr. Conard"), Regional Vice President, was watching her.

150.    A short time later, Mr. Conard approached Mrs. Jackson and asked her: "What are you doing with the Miracle-Gro?"

151.    Mrs. Jackson, although perplexed by his peculiar inquiry, respectfully explained: "It is my understanding that we could take the Miracle-Gro, everyone is taking the product."

152.    Mr. Conard responded by stating: "Yes we were told we could take it, however, you can not because you are going on an airplane and will not be allowed on the flight with the product."

153.    Mrs. Jackson approached Rob Lamp ("Mr. Lamp") to obtain clarification on airline travel constraints associated with the Miracle-Gro.

154.    Mr. Lamp stated: "I have been addressing that issue all morning and you can take the Miracle-Gro but you must check it in and not take it in your carry-on luggage.

155.    Mr. Lamp then escorted Mrs. Jackson to the Miracle-Gro table and began assisting her with boxing up the products.

156.    Mr. Conard continued to watch Mrs. Jackson's every move from a distance.

157.    Mr. Lamp carried the box to the elevator and waited with her until the elevator arrived.

158.    When the elevator arrived she stepped on the elevator and he handed her the box and said: "Farewell, until next year."

159.    Prior to the elevator doors closing Mr. Conard stepped onto the elevator.

160.    Mr. Conard then asked Mrs. Jackson: "Have you ever been thrown into jail?"

161.  There were other representatives from the Company on the elevator having a conversation.

162.  But, all discussions ceased when Mr. Conard singled out Mrs. Jackson and asked her that question.

163.  He further stated that: "If you take the Miracle-Gro you are going to be thrown into jail and Scotts is not going to be here in Naples to get you out of jail."

164.  He then said: "What are you going to do?"

165.  Mrs. Jackson was shocked and flabbergasted by such a question.

166.  She immediately felt that Mr. Conard was motivated by racism since she was the only Company representative he made this inquiry to.

167.  Mrs. Jackson responded by stating that: "If I am arrested Marion Silber of Gordon & Silber will represent me."

168.  Flippantly, Mr. Conard said: "Is that right?"

169.  Mrs. Jackson steeled herself in order to hold back the tears.

170.  When she got to her room she cried hysterically due to the unbearable embarrassment and humiliation Mr. Conard had subjected her to.

171.  Mrs. Jackson called D.M. McGarr but was far too upset to leave a message the first time she called but called again and left a message.

172.  She then called her colleague Mr. Botz.  Mr. Botz had previously been Mrs. Jackson's direct supervisor.

173.  Mrs. Jackson explained what had occurred with Mr. Conard and how she had tried to call D.M. McGarr unsuccessfully.

17

174.   Mr. Botz told Mrs. Jackson that D.M. McGarr was on the patio in the pool area.

175.   Mr. Botz was very angry about the incident with Mr. Conard and advised Mrs. Jackson to take the product.

176.   Mr. Botz said it was unfair and cited the fact that everyone was taking the product and that she was the only Scotts representative singled out.

177.   D.M. McGarr returned her call and told her to meet him in the hotel lobby. Mrs. Jackson explained what had occurred and D.M. McGarr appeared to be in shock.

178.   He continued to ask Mrs. Jackson over and over again what had transpired between her and Mr. Conard.

179.   D.M. McGarr stated: "I'm in shock because I saw people leaving the hotel with tons of the stuff in their suitcases.  Boxes of stuff I saw them leave with."

180.   Mrs. Jackson expressed to D.M. McGarr that due the actions of Mr. Conard she had been discriminated against.

181.   D.M. McGarr stated that when they get back to New York he would purchase all the Miracle-Gro that she wanted.

182.   But he voiced his concerns that he feared that if she did not put the Miracle-Gro back she would be fired for insubordination.

183.   He further stated that she should apologize to Mr. Conard for taking the Miracle-Gro.

184.   Mrs. Jackson began to cry because the harassment and humiliation had been compounded exponentially as a result of D.M. McGarr's reaction to the discrimination and the disparate treatment she had unfairly experienced.

18

185.    Nevertheless, she returned the Miracle-Gro and apologized to Mr. Conard for taking the product.

186.    Mr. Conard replied: "It was a wise thing to do because the Scotts Company would not have been available and that other incidents could have arose from the matter had you taken the Miracle-Gro."

187.    It is evident that those in a position to rightfully object to the wrongful and unlawful actions of Mr. Conard chose to act in concert with him by ignoring his blatant acts of discrimination.

188.    Mrs. Jackson was told to provide Mr. Cabanara with a formal report about the racist incident with Mr. Conard.

189.    However, when she broached the matter with him he stated curtly: "I'm not interested and forget the matter."

190.    D.M. McGarr acted in a similar fashion when he snapped: "Forget the entire matter. Just forget about it."

191.    It is obvious that both Mr. Cabanara and D.M. McGarr covered and condoned the unlawful actions of Mr. Conard.

192.    On or about January 10, 2005 Mrs. Jackson's back went completely out which forced her to go out on short-term disability.

193.    However, unbeknownst to her, sometime during the month of June 2005 she was unceremoniously and unlawfully terminated.

194.    Mrs. Jackson's unlawful termination was contrary to the Company's policies and procedures.

195.    Moreover, the Company failed to provide her with a reasonable accommodation for her work related injury.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Discrimination and Harassment
### In Violation of New York State Human Rights Law)

196.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 195, inclusive as if fully set forth herein.

197.    Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York State Human Rights Law by denying to plaintiff equal terms and conditions of employment, including but not limited to failing to provide plaintiff with a reasonable accommodation as a result to plaintiff's disability and subjecting plaintiff to disparate working conditions and performance standards, gender discrimination, denying plaintiff the opportunity to work in an employment setting free of unlawful harassment, denying plaintiff opportunities for professional growth, denying plaintiff compensation and other terms and conditions of employment equal to that of Caucasian employees, and terminating plaintiff unlawfully from plaintiff 's employment with defendant.

198.    Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York State Human Rights Law by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that

has included, among other things, severe and pervasive racial harassment of plaintiff by plaintiff's superiors.

199.   As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

200.   As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Retaliation in Violation of New York State Human Rights Law)

201.   Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 200, inclusive, as if fully set forth herein.

202.   Defendant has retaliated against plaintiff by, inter alia, by treating her with unmitigated contempt when she complained about how she was treated regarding the Mr. Conard/Miracle Gro incident and subjecting plaintiff to wrongful termination, subjecting plaintiff to an unfair and hostile work environment and failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability this is clearly

in violation of New York State Human Rights Law for: (a) plaintiff's opposition to defendant's discriminatory practices; (b) being wrongfully subjected to harassment and a hostile work environment.

203.    As a direct and proximate result of defendant's unlawful and retaliatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

204.    As a direct and proximate result of defendant's unlawful retaliatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.


## AS AND FOR A THIRD CAUSE OF ACTION

### (Aiding and Abetting Violations of New York State Human Rights Law)

205.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 204, inclusive, as if fully set forth herein.

206.    Defendants knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law by actively participating in the unlawful conduct set forth above.

22

207.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

208.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Discrimination and Harassment
### In Violation of New York City Human Rights Law)

209.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 208, inclusive, as if fully set forth herein.

210.    Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York City Human Rights Law by denying to plaintiff equal terms and conditions of employment, including but not limited to, failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability, subjecting plaintiff to disparate working conditions and performance standards, gender discrimination, economic discrimination, denying plaintiff the opportunity to work in an employment

23

setting free of unlawful harassment, denying plaintiff opportunities for professional growth, denying plaintiff compensation and other terms and conditions of employment equal to that of Caucasian employees, and terminating plaintiff unlawfully from plaintiff's employment at the Defendant's.

211.    Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of her Race and/or Color (African-American/Black), in violation of the New York City Human Rights Law by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive racial harassment of plaintiff by plaintiff's superiors.

212.    As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

213.    As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of damages.

214.    Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Retaliation in Violation of New York City Human Rights Law)

215.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 214, inclusive, as if fully set forth herein.

216.    Defendant retaliated against plaintiff by, inter alia, by treating her with unmitigated contempt when she complained about how she was treated regarding the Mr. Conard/Miracle Gro incident and subjecting plaintiff to wrongful termination, subjecting plaintiff to an unfair and hostile work environment and failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability this is clearly in violation of New York State Human Rights Law for: (a) plaintiff's opposition to defendant's discriminatory practices; (b) being wrongfully subjected to harassment and a hostile work environment.

217.    As a direct and proximate result of defendant's unlawful and retaliatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

218.    As a direct and proximate result of defendant's unlawful retaliatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered and

continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

219.    Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.

## AS AND FOR THE SIXTH CAUSE OF ACTION

### (Aiding and Abetting Violations of New York City Human Rights Law)

220.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 219, inclusive, as if fully set forth herein.

221.    Defendant knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against plaintiff in violation of the New York City Human Rights Law by actively participating in the unlawful conduct set forth above.

222.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

223.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York City Human

Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

224.    Defendants unlawful actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.

## AS AND FOR THE SEVENTH CAUSE OF ACTION

### (Defamation)

225.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 224, inclusive, as if fully set forth herein.

226.    Defendant unlawfully subjected plaintiff to defamation: libel per se and slander per se, placed plaintiff in a false light, and engaged in acts that caused the invasion of plaintiff's privacy.

227.    Defendant knowingly or recklessly subjected plaintiff to defamation: libel per se and slander per se, placed her in a false light, and engaged in acts that caused the invasion of plaintiff's privacy in violation of New York State law.

228.    As a direct and proximate result of defendant's unlawful acts of defamation: libel per se and slander per se, placing plaintiff in a false light, and the invasion of plaintiff's privacy, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income,

compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

229.    As a direct and proximate result of defendant's unlawful acts of defamation: libel per se and slander per se, placing plaintiff in a false light, and the invasion of plaintiff's privacy, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

230.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

## AS AND FOR THE EIGHTH CAUSE OF ACTION

### (Economic Discrimination)

231.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 230, inclusive, as if fully set forth herein.

232.    Defendant unlawfully subjected plaintiff to economic discrimination in violation of New York State Law.

233.    Defendant knowingly or recklessly subjected plaintiff to economic discrimination in violation of New York State Law.

234.    As a direct and proximate result of the defendant subjecting plaintiff to economic discrimination, plaintiff has suffered, and continues to suffer, monetary and/or

economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

235.    As a direct and proximate result of the defendant subjecting plaintiff to economic discrimination, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

236.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

## AS AND FOR THE NINETH CAUSE OF ACTION

### (Breach of Implied Contract to Act in Good Faith)

237.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 236, inclusive, as if fully set forth herein.

238.    Defendant unlawfully breached its implied contract to plaintiff to act in good faith in violation of New York State Law.

239.    Defendant knowingly or recklessly breached its implied contract to plaintiff to act in good faith in violation of New York State Law.

240.    As a direct and proximate result of defendant's breach of the implied contract to plaintiff to act in good faith, plaintiff has suffered, and continues to suffer,

monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

241.    As a direct and proximate result of defendant's breach of the implied contract to act in good faith, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

242.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

## AS AND FOR THE TENTH CAUSE OF ACTION

### (Failure to Provide a Reasonable Accommodation)

243.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 242, inclusive, as if fully set forth herein.

244.    Defendant unlawfully failed to provide plaintiff with a reasonable accommodation as a result of plaintiff's work related injury.

245.    Defendant knowingly and/or recklessly failed to provide plaintiff with a reasonable accommodation as a result of plaintiff's work related injury in violation of 9 New York Code of Rules and Regulations (NYCRR) §466.11.

246.    As a direct and proximate result of defendant's failure to provide plaintiff with a reasonable accommodation of plaintiff's work related injury, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

247.    As a direct and proximate result of defendant's failure to provide plaintiff with a reasonable accommodation of her work related injury, plaintiff has suffered, and continues to suffer, severe physical and mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

248.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

## AS AND FOR THE ELEVENTH CAUSE OF ACTION

### (Violation of Equal Protection of Laws)

249.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 248, inclusive, as if fully set forth herein.

250.    Defendant unlawfully violated plaintiff's Equal Protection of Laws rights.

251.    Defendant knowingly or recklessly violated plaintiff's Equal Protection of Laws rights under Article 1 § 11 of the New York State Constitution (Bill of Rights) by

31

subjecting plaintiff to treatment that no Caucasian employee of the defendants' has been subjected to.

252.    As a direct and proximate result of defendant's violating plaintiff's Equal Protection of Laws, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

253.    As a direct and proximate result of defendant's violating plaintiff's Equal Protection of Laws, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of defendant complained of herein violate the laws of the State of New York and the City of New York;

B.    An order directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and otherwise unlawful conduct are eliminated and do not continue to affect plaintiff;

32

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, seniority and other benefits of employment;

D.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for plaintiff's severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

E.    An award of damages for any and all other monetary and/or non-monetary losses suffered by plaintiff in an amount to be determined at trial, plus prejudgment interest;

F.    An award of punitive damages;

G.    An award of costs that plaintiff has incurred in this action, as well as plaintiff's reasonable attorney's fees to the fullest extent permitted by law; and

H.    Such other and further relief as the Court may deem just and proper.

33

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated:  New York, New York
       December 21, 2007

                                Respectfully submitted,

                                SANDRA D. FRELIX, P.C.

                        By: _____
                                Sandra D. Frelix
                                Attorney for Plaintiff
                                110 Wall Street, 11th Floor
                                New York, New York 10005
                                Telephone:  212-859-3509
                                Facsimile:  212-862-8212

## VERIFICATION

State of New York     )
                      )  ss :
County of Queens      )

MARIA JACKSON, being duly sworn, states:

I am the Plaintiff in the action herein. I have read the annexed SUMMONS AND

VERIFIED COMPLAINT, know the contents thereof and the same are true to my

knowledge, except those matters therein which, are stated to be alleged on information

and belief, and as to those matters I believe them to be true.

_____
                MARIA JACKSON

Sworn to before me
this 1 2 day of December, 2007

_____
        NOTARY PUBLIC

35