Craig S. Friedman (CF-1988)
csfriedman@joneday.com
Matthew W. Lampe (*pro hac vice*)
mwlampe@jonesday.com
JONES DAY
222 East 41st Street
New York, New York 10017
(212) 326-3939
Attorneys for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIA JACKSON,<br><br>            Plaintiff,<br><br>    -against-<br><br>THE SCOTTS COMPANY<br><br>            Defendant. | 08 Civ. 1064 (LAK)<br><br>**DECLARATION OF CRAIG S. FRIEDMAN IN SUPPORT OF MOTION FOR SANCTIONS PURSUANT TO 28 U.S.C. § 1927 AND THE <u>COURT'S INHERENT POWER</u>** |

CRAIG S. FRIEDMAN declares as follows:

1.      I am a member of the bar of this Court and an associate of Jones Day, counsel to Defendant The Scotts Company LLC (incorrectly named in the Complaint "The Scotts Company") ("Defendant" or "Scotts"). I am fully familiar with this proceeding as well as the specific matters set forth herein. I submit this declaration in support of Defendant's motion for sanctions pursuant to 28 U.S.C. § 1927 and the Court's inherent power.

2.      Attached as Exhibit A is a copy of the Notice Of Removal Of Action Under 28 U.S.C. Section 1441(b) in the instant action, filed in the United States District Court for the Southern District of New York on February 1, 2008. A copy of the Complaint, filed in the Supreme Court of the State of New York, Bronx County, is an exhibit to the Notice Of Removal.

3.       Attached as Exhibit B is the Motion And Notice Of Motion To Remand Action To State Court, filed by Plaintiff on February 20, 2008.

4.       Attached as Exhibit C is a copy of the Court's February 21, 2008 Order denying Plaintiff's February 20 motion to remand.

5.       Attached as Exhibit D is a copy of the Amended Motion And Notice Of Motion For Leave To Amend Pleading, filed by Plaintiff on March 27, 2008.

6.       Attached as Exhibit E is a copy of the Proposed Amended Verified Complaint, filed by Plaintiff on March 27, 2008.

7.       Attached as Exhibit F is a copy of the Court's April 1, 2008 Order denying Plaintiff's March 27 motion to remand and ordering Plaintiff to show cause why her Twelfth Cause Of Action should not be dismissed.

8.       Attached as Exhibit G is a copy of the Memorandum Of Law In Support Of New York Workers' Compensation Law Bars Discrimination On The [sic] Of Race, filed by Plaintiff on April 8, 2008.

9.       Attached as Exhibit H is a copy of the Court's April 30, 2008 Order granting Defendant's partial motion to dismiss.

10.       Attached as Exhibit I is a copy of the Court's Scheduling Order of April 11, 2008.

11.       Attached as Exhibit J is a copy of the transcript of the oral argument held before the Court on May 2, 2008.

12.       Attached as Exhibit K is a copy of the Motion And Notice Of Motion For Leave To Amend Complaint And Remand Action To State Court, filed by Plaintiff on May 21, 2008.

13.     Attached as Exhibit L is a copy of the Proposed Amended Verified Complaint, filed by Plaintiff on May 21, 2008 as an attachment to her Motion And Notice Of Motion For Leave To Amend Complaint And Remand Action To State Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 4th day of June, 2008.
New York, New York

/s/ Craig S. Friedman

_____
Craig S. Friedman

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEB 0 1 2008
U.S.D.C. S.D.N.Y.
CASHIERS

JUDGE KAPLAN

**08 CV 1064**

| | |
|---|---|
| MARIA JACKSON, | ) |
| Plaintiff, | ) |
| - against - | ) |
| THE SCOTTS COMPANY, | ) 08 Civ. No. ____ |
| Defendant. | ) |

## <u>NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. SECTION 1441(b)</u>

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE that Defendant The Scotts Company LLC ("Scotts" or "Defendant") (incorrectly named in the Complaint as "The Scotts Company") hereby removes to this Court the above-captioned state court action, and states as follows:

1.     Defendant is the only named defendant in the action bearing Index No. 303890/07 filed in the Supreme Court of the State of New York, Bronx County (the "State Court Action").

2.     The Complaint in the State Court Action was filed with the Clerk of the Supreme Court of the State of New York, Bronx County, on or about December 21, 2007. Defendant was served with a copy of the Complaint on January 4, 2008 by delivery to the Secretary of State of the State of New York as agent for Defendant.

3.     This Notice of Removal is being filed with this Court within thirty (30) days after Defendant received a copy of Plaintiff's initial pleading setting forth the alleged claims for relief upon which Plaintiff's action is based.

4.      A copy of all process, pleadings, and orders served upon Defendant in the State Court Action is attached hereto as Exhibit A.

5.      At the present time and at the time of the commencement of the State Court Action, as alleged in the Complaint, Plaintiff Maria Jackson is and was a citizen and resident of the State of New York, County of Queens.  Upon information and belief, Plaintiff resides at 184-12 144th Road, Springfield Gardens, New York 11413.

6.      At the present time and at the time of the commencement of the State Court Action, Scotts is and was a corporation incorporated under the laws of the State of Ohio, with its principal place of business at 14111 Scottslawn Road, Marysville, Ohio 43041.

7.      This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. §1332, and is one which may be properly removed to this Court by Defendant pursuant to the provisions of 28 U.S.C. §1441(b), in that it is a civil action between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.

8.      The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, in that Plaintiff, who had an annual base salary of approximately $33,600 at the time of her termination in June 2005, seeks to recover back pay and front pay as well as compensatory and punitive damages and attorneys' fees totaling in excess of $75,000.

9.      Defendant reserves all rights including defenses and objections as to venue, personal jurisdiction, and service, and the filing of this Notice of Removal is subject to, and without waiver of, any such defenses and objections.

10.      Promptly after the filing of this Notice of Removal, Defendant shall provide written notice of the Removal to Plaintiff through her attorney of record in the State Court

Action and to the Clerk of the Court in the State Court Action, as required by 28 U.S.C.

§1446(d).

Dated:  February 1, 2008

JONES DAY

Craig S. Friedman (CF-1988)
Matthew W. Lampe (*pro have vice* application
to be filed)
JONES DAY
222 East 41st Street
New York, New York 10017-6702
(212) 326-3939
(212) 755-7306 (facsimile)

Attorneys for Defendant

# EXHIBIT A

Form 28 - BACKING

SUPREME  COURT OF THE STATE OF NEW YORK
COUNTY OF  BRONX

Index No.:  303890/07

================================================================================

MARIA JACKSON                         PLAINTIFF


                    - against -

THE SCOTTS COMPANY                     DEFENDANT


================================================================================

SUMMONS AND VERIFIED COMPLAINT



================================================================================

                    SANDRA D. FRELIX, P.C.

                    110 WALL ST (11TH FL)
                    NEW YORK, NY 10005

================================================================================

SUPREME COURT OF TSHE STATE OF NEW YORK
COUNTY OF BRONX
-------------------------------------------------------------------X

MARIA JACKSON

                              *Plaintiff,*

        -against-                                    SUMMONS


THE SCOTTS COMPANY                                   INDEX No.: .

                              *Defendant.*
-------------------------------------------------------------------X

To the above-named defendants:

        You are hereby summoned and requested to serve upon plaintiff's attorney an

answer to the complaint in this action within twenty days after the service of this

summons, exclusive of the day of service, or within thirty days after service is complete

if this summons is not personally delivered to you within the State of New York.  In case

of your failure to answer, judgment will be taken against you by default for the relief

demanded in the complaint.

        The basis of the venue designated is based on the location where the defendant

transacts and/or solicits business within the county from which it derives substantial

revenues pursuant to CPLR § 503(c).

Dated: December 21, 2007
        New York, New York

                                        Respectfully submitted,

                                        SANDRA D. FRELIX, P.C.

                                        By: _____
                                            Sandra D. Frelix
                                            Attorney for Plaintiff
                                            110 Wall Street, 11th Floor
                                            New York, New York 10005
                                            Telephone:  212-859-3509
                                            Facsimile:  212-862-8212

SUPREME COURT OF TSHE STATE OF NEW YORK
COUNTY OF BRONX
------------------------------------------------------------------------X
MARIA JACKSON

                        *Plaintiff,*

    -against-

THE SCOTTS COMPANY

                        *Defendant.*
------------------------------------------------------------------------X

**VERIFIED
COMPLAINT**

INDEX No.:

Plaintiff, MARIA JACKSON ("Mrs. Jackson", "Plaintiff" or "plaintiff"), by and

through her attorney, SANDRA D. FRELIX, for her Complaint against THE SCOTTS

COMPANY ("the Company", "Defendant Scotts", "Defendant" or "defendant"), thereby

states and alleges as follows:

## NATURE OF THE CLAIMS

1.      This action is for declaratory. injunctive and equitable relief, as well as

monetary damages, to redress Defendant's unlawful employment practices and retaliation

against Plaintiff, including the discriminatory treatment, racial harassment, and retaliation

against Plaintiff due to her Race and/or Color (African-American/Black), gender,

deprivation of property without due process of law and equal protection of laws, in

violation of the New York State Human Rights Law, New York Executive Law §§ 290 et

seq.: and the New York City Human Rights Law, Administrative Code of the City of

New York §§ 8-101 et seq.  and the New York State Constitution.  Additionally, Mrs.

Jackson was subjected to defamation: slander per se and libel per se, being placed in a

false light and was forced to endure the breach of an implied contract to act in good faith

in violation of New York State Law.  Moreover, the defendant caused her to suffer

economic discrimination and failed to provide her a reasonable accommodation pursuant to her disability in violation of 9 New York Code of Rules and Regulations (NYCRR) §466.11.

## JURISDICTION AND VENUE

2.     The Court has personal jurisdiction over Defendant pursuant to Sections 301 and/or 302 of the New York Civil Practice Law and Rules ("CPLR") in that the Defendant transacts and/or solicits business within the state from which they derive substantial revenues.

3.     The Court has personal jurisdiction over Defendant because a significant portion of the unlawful employment practices and events giving rise to the claims herein occurred in New York.

4.     The Court has subject matter jurisdiction over this action by virtue of the New York State Human Rights Law, New York Executive Law § 279(9); the New York City Human Rights Law, Administrative Code of the City of New York § 8-502(a); and the Constitution of the State of New York.

5.     Venue is proper in this county pursuant to CPLR § 503(c) because the Defendant conducted business in Bronx County at the relevant times described in this Complaint and continues to conduct business in Bronx County.

6.     Prior to the commencement of this action, a copy of this Complaint was served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

2

## PARTIES

7.     Plaintiff Maria Jackson is an African-American citizen female who resides in Springfield Gardens, New York. At all relevant times, Plaintiff has met the definition of an "employee" under all applicable statutes.

8.     Defendant Scotts conducts business throughout New York State as well as in all the other forty-nine states and internationally.

9.     The Scotts Company is located at 14111 Scottslawn Road, Marysville, OH 43041.

## FACTUAL ALLEGATIONS

10.     Defendant hired Mrs. Jackson in April 2001 as a Seasonal Merchandiser.

11.     She was immediately promoted to the position of Sales Merchandising Manager on or about December 14, 2001.

12.     Mrs. Jackson worked diligently for the Company for four (4) years at the time of her June 2005 unlawful termination.

13.     Mrs. Jackson excelled at her responsibilities pursuant to each of her positions.

14.     Mrs. Jackson also received exemplary job performance appraisals.

15.     In the Spring of 2002 Mrs. Jackson suffered extreme embarrassment and humiliation when District Manager Patrick McGarr ("D.M. McGarr") stated that: "Maria's not Black she is Italian!"

16.     This incident took place at the Liberty Diner in Farmingdale, N.Y.

17.     There was never an occasion witnessed by Mrs. Jackson where a white person's core identity was challenged and violated.

3

18.    In the spring of 2002 Mrs. Jackson became aware that the Defendant was being sued for discrimination for not hiring women in the 04 region.

19.    She further learned that the Defendant had specifically directed D.M. McGarr to hire a black woman.

20.    D.M. McGarr shared this information with James Fitch ("Mr. Fitch"), a Sales Merchandising Manager ("SMM").

21.    Mr. Fitch wanted D.M. McGarr to hire his friend, a Caucasian male, who had previously resigned from the Defendant but wanted his old position back.

22.    At the December 2002 conference in Naples, Florida Mrs. Jackson, D.M. McGarr, and co-workers were attending a class.

23.    Mrs. Jackson went the ladies room upon her return the seats were taken in her class' section.

24.    The only seat available in the section with her co-workers was located at the far end of the table where her co-workers were seated.

25.    The closest unoccupied seat was located in an area occupied by another district.

26.    The district manager of that region Patrick Flagherty ("D.M. Patrick Flagherty) stated that she could sit with his district.

27.    However, D.M. McGarr tapped her on the shoulder and told her that she could not sit there.

28.    D.M. McGarr then signaled one of their co-workers to move down so she could sit with them.

4

29.    Mrs. Jackson then heard Mr. Flagherty state to his SMM's: "What is this? Is she too good to sit with us? Oh yeah, that's right that's Pat's token."

30.    This racist comment was not only hurtful but it was extremely embarrassing to Mrs. Jackson.

31.    Another area where Mrs. Jackson was subjected to disparate treatment pertains to storage facilities.

32.    Point of Purchase is advertising that is sent to managers in great quantity.

33.    Therefore, it is customary for the Company to pay for the storage facility utilized by the managers to house and maintain the advertising materials.

34.    Unfortunately, Mrs. Jackson was informed in no uncertain terms by D.M. McGarr that his budget did not permit him to go over the $75.00 per month for storage.

35.    Consequently, she was forced to store the materials in her home, which greatly inconvenienced her family.

36.    Mrs. Jackson eventually learned that D.M. McGarr paid well over $100.00 for storage for Mrs. Jackson's co-workers who operated in eastern Long Island.

37.    This is an undeniable illustration of the humiliating, embarrassing, disparate as well as racist treatment imposed upon Mrs. Jackson by the Company.

38.    Moreover, even though D.M. McGarr was absolutely aware that Mrs. Jackson was out on a work related disability (herniated and bulging discs) he still spitefully sent Point of Purchase advertising materials to her home.

39.    In the spring of 2003 Ivy Acres held its annual flower show and invited the Company along with other lawn and garden professionals.

5

40.    The event is held on Long Island and after the showing a lavish luncheon is provided for those in attendance.

41.    All of Mrs. Jackson's colleagues were allowed to take the day off and attend the event and the luncheon that followed.

42.    However, Mrs. Jackson was not allowed to attend the event.

43.    But, the Company invited a white woman from an entirely different district (Philadelphia, PA) to attend the event and luncheon with all her expenses paid by the Company.

44.    This incident was extremely insulting to Mrs. Jackson and it too displayed the grossly disparate treatment she was subjected to.

45.    Mrs. Jackson was a dedicated and loyal employee of the Company.

46.    Her act of dedication and loyalty was demonstrated in March of 2003 when she was scheduled to have a hernia operation in March 2003.

47.    Mrs. Jackson's hernia injury was the result of work related lifting.

48.    Mrs. Jackson called D.M. McGarr from the Gunhill Road Home Depot store located in the Bronx in February 2003 to inform him that she needed to have hernia surgery in March 2003.

49.    During the same telephone conversation D.M. McGarr said no to the timing of her March 2003 hernia surgery and they would discuss the matter later.

50.    Mrs. Jackson also told D.M. McGarr that she was in pain. But D.M. McGarr flippantly told her that she would have to get the job done.

51.    However, Mike Garbiele ("Mr. Garbiele"), a co-worker of Mrs. Jackson, required medical treatment for a torn rotor cup in his arm.

6

52.    D.M. McGarr not only allowed Mr. Garbiele time off for medical treatment of his injury but also provided coverage for his stores.

53.    Clearly, D.M. McGarr treated Mrs. Jackson disparately from Mr. Garbiele.

54.    D.M. McGarr did not require Mr. Garbiele to postpone his treatment.

55.    Additionally, D.M. McGarr provided coverage for Mr. Garbiele and allowed him time off for his treatment.

56.    Prior to learning about how D.M. McGarr accommodated Mr. Garbiele she decided to postpone it to accommodate D.M. McGarr even though her physician advised her against postponing the operation.

57.    D.M. McGarr requested that she delay the surgery because the season had just begun and he could not afford to have her out.

58.    D.M. McGarr finally agreed that she could have her surgery in June 2003.

59.    Although Mrs. Jackson has been totally dedicated and loyal to the Company these sentiments were not reciprocated back to her.

60.    Two days after her surgery D.M. McGarr called Mrs. Jackson on her hospital bedside telephone to discuss Scotts' business.

61.    Mrs. Jackson's physician Matthew Kilgo, M.D. answered her hospital bedside telephone and upon learning that D.M. McGarr wanted to discuss Scotts' business he told D.M. McGarr to call back.

62.    D.M. McGarr told Mrs. Jackson and her co-workers that they should not inform corporate that she's out recovering from surgery.

63.    Thus, Mrs. Jackson's surgery was never reported to the Company's human resources department.

7

64.     During her surgery she had an emergency blood transfusion and was hospitalized once again in July 2003.

65.     Mrs. Jackson was not only forced to submit to a hostile work environment and disparate treatment but she had to bear the indignity of inhumane treatment as well.

66.     The inhumane treatment manifested itself while she was at home recuperating from surgery and the relapse.

67.     D.M. McGarr had the unmitigated audacity to continue to burden Mrs. Jackson by having the Point of Purchase advertising material sent to her home.

68.     D.M. McGarr demanded that she follow-up on reports.

69.     D.M. McGarr also demanded that she answer calls on her cell phone from her home while she was recovering.

70.     Upon Mrs. Jackson's return to work in October 2003 D.M. McGarr was undaunted and unfazed by the fact that she had major surgery four months earlier.

71.     D.M. McGarr insisted that she work at the same level and pace that she worked at prior to her surgery.

72.     D.M. McGarr's actions were so detrimental to her recovery that in 2004 Mrs. Jackson's surgeon wrote two letters addressed to D.M. McGarr requesting a reasonable accommodation for his patient, Mrs. Jackson.

73.     The physician clearly expressed that lifting for Mrs. Jackson was unacceptable.

74.     D.M. McGarr failed to give Mrs. Jackson a reasonable accommodation.

75.     D.M. McGarr expected Mrs. Jackson to perform in the same manner that she had prior to her major surgery.

8

76.    D.M. McGarr informed Mrs. Jackson in no uncertain terms that she would have to find a way to get the job done.

77.    Another instance of discrimination against Mrs. Jackson occurred in the spring of 2004 when she requested to take her son to the dentist for a serious procedure.

78.    D.M. McGarr denied Mrs. Jackson's request to take her son to the dentist for the serious procedure.

79.    However, D.M. McGarr allowed Mrs. Jackson's co-worker, Jimmy Fitch, to take his son to a baseball game.

80.    Mrs. Jackson was also a victim of economic discrimination.

81.    During her October 2003 yearly evaluation D.M. McGarr raved about her performance and she was given a $900.00 raise.

82.    D.M. McGarr informed her that he had to fight to get her and her colleagues the $900.00 raises from Mike Carbanara ("Mr. Carbanara") the Regional Sales Director.

83.    D.M. McGarr requested that Mrs. Jackson not discuss her raise with her Caucasian male co-workers because he had gotten her a little more based on the fact that she was assigned to the Jericho Home Depot.

84.    However, shortly thereafter, she learned that her Caucasian male co-workers had each received a $1500.00 raise.

85.    This too illustrates the economic discrimination and disparate treatment she was subjected to and the hostile environment she worked in.

86.    It also demonstrates that D.M. McGarr acted in bad faith with Mrs. Jackson.

9

87.    The discriminatory and disparate treatment continued in that in the spring of 2004 Mrs. Jackson was servicing nine (9) Home Depots stores.

88.    She was firmly instructed that the Jericho Home Depot was to have one (1) dedicated merchandiser whose job was to service that store only.

89.    The individual who was the dedicated merchandiser to the Jericho Home Depot was a Caucasian male named Dominic Balducci ("Mr. Balducci").

90.    Mrs. Jackson was responsible for servicing eight (8) other Home Depot stores.

91.    However, she was assigned only one merchandiser to service the other eight Home Depot stores his name was Tyrone Jackson, ("Mr. Jackson") an African-American male.

92.    Mrs. Jackson's Caucasian male co-workers were assigned six to seven Home Depot stores.

93.    Moreover, her Caucasian male co-workers were assigned as many as four (4) merchandisers to service the stores they were responsible for.

94.    In 2003 Mr. Carbanara allocated Mrs. Jackson an additional twenty (20) hours of merchandising.

95.    But, D.M. McGarr instructed Mrs. Jackson to assign all the twenty (20) hours to the Jericho Home Depot store.

96.    During the gardening season of 2004 Mr. Balducci was prone to make many mistakes.

97.    Mrs. Jackson counseled him regarding his poor and disruptive work habits on numerous occasions, but to no avail.

10

98.   Mr. Balducci's poor and disruptive work habits included stealing time from the Company.

99.   Furthermore, Mr. Balducci threatened to cause bodily harm to department heads at Home Depot because someone borrowed "his" jack.

100.   Mr. Balducci was known to use perverted language and engaged in inappropriate discussions about his girlfriend's sex life in the presence of customers.

101.   Additionally, Mrs. Jackson received numerous calls from Home Depot management about his violent behavior.

102.   Mr. Balducci has been banished from three (3) other Home Depot stores and was sternly instructed not to return.

103.   D.M. McGarr's response to the foregoing was: "Dominic did not have to go back to those Home Depots that put him out and that they did not deserve his services to begin with."

104.   It is quite obvious that D.M. McGarr placed the personal feelings he had for Mr. Balducci before his obligations to the Company.

105.   However, Mrs. Jackson by sharing the real threat that Mr. Balducci posed with D.M. McGarr shows that she recognized that Mr. Balducci's unprofessional and violent behavior had a negative reflection on the Company as well as exposed the Company to unnecessary and avoidable liability.

106.   Moreover, Mrs. Jackson understood that he had clearly become a present liability and that the Company had been placed on notice about his unprofessional and violent behavior.

107.   The liability that D.M. McGarr exposed the Company to is enormous.

11

108.    It is common knowledge that Mr. Balducci had to attend court ordered anger management courses for threatening to kill his neighbor over a parking space.

109.    But, D.M. McGarr remained a staunch supporter of Mr. Balducci without considering the legal ramifications such blinding support could have on the Company or to Mrs. Jackson's safety and well-being.

110.    D.M. McGarr refused to re-hire Henry Williams ("Mr. Williams"), a black man, who worked for the Company for more than five years.

111.    The grounds that D.M. McGarr refused Mr. Williams employment was that he allegedly was not present in the store at a particular time.

112.    D.M. McGarr mercilessly defamed Mr. Williams with the tag "the Phantom" and often made jokes about him during meetings in the presence of a number of co-workers.

113.    Clearly, D.M. McGarr's disparate treatment of Mr. Williams and the unwavering support of Mr. Balducci were based on race and color.

114.    Mrs. Jackson was again forced to endure and witness this racially motivated injustice creating a hostile work environment.

115.    The discrimination and abuse suffered by Mrs. Jackson was unrelenting, discriminatory and racist.

116.    In 2004 Mr. Carbanara gave Mrs. Jackson an additional twenty (20) hours to service her other home depot stores.

117.    Mr. Carbanara realized that she was overwhelmed with servicing each of the Home Depot stores under her authority.

12

118.    Mrs. Jackson hired Ms. Snow in 2004 and Mr. Jackson was hired in 2001 to assist her servicing the other Home Depot stores she was responsible for.

119.    Based on information and belief there were no black merchandisers until Mrs. Jackson hired Kisha Snow ("Ms. Snow") and Mr. Jackson.

120.    Mrs. Jackson's sales numbers were growing by an incredible rate in her other Home Depot stores.

121.    Her sales numbers were increasing so rapidly that the Vice President of Miracle Gro flew in from Ohio to verify her sales numbers.

122.    However, Mr. McGarr transferred Ms. Snow and Mr. Jackson to the Jericho Home Depot store to help Mr. Balducci.

123.    The hours attributed to Ms. Snow and Mr. Jackson were the additional hours that Mr. Carbanara provided Mrs. Jackson with to service her seven (7) other Home Depot stores.

124.    This unfortunate arrangement allowed Mr. Balducci six (6) additional hours or more on a daily basis.

125.    Based on information and belief Mr. Balducci engaged in stealing time from the Company and Mrs. Jackson's budget by working in other departments at the Jericho Home Depot store.

126.    By reassigning hours specifically designated to Mrs. Jackson's seven (7) other Home Depot stores, Mr. McGarr methodically set her up to fail.

127.    Mrs. Jackson took pride in her job and used her creative skills when it was necessary.

13

128.   In 2003 the Company provided Mrs. Jackson and her colleagues with displays known as Cakes.

129.   The specs for the Cakes did not fit in the area they were to be displayed.

130.   Therefore, Mrs. Jackson took it upon herself to successfully re-configure and redesign the Cakes.

131.   Her efforts were so successful that D.M. McGarr gave her a $100.00 incentive for each Cake she built in her stores.

132.   D.M. McGarr instructed Mrs. Jackson to build the Cake displays in her co-workers' stores.

133.   However, Mrs. Jackson received no compensation or incentives for building the Cake displays in her co-workers stores.

134.   Another instance of unfair and disparate treatment Mrs. Jackson suffered occurred with the building of the Field Goal Post contest in 2004.

135.   Mrs. Jackson was the first of her Caucasian male co-workers to e-mail photos of her completed Field Goal Post to D.M. McGarr.

136.   D. M. McGarr admitted that Mrs. Jackson was the first to complete the Field Goal Post contest.

137.   D.M. McGarr further stated that he knew that she would be the first to complete the contest based on previous incentive driven assignments.

138.   However, D.M. McGarr insisted that she resubmit the photos because there was a piece of cardboard in one of the photos she sent.

139.   The piece of cardboard was the property of Home Depot and placed there by a Home Depot employee.

14

140.    Due to other commitments Mrs. Jackson was unable to resubmit the photos immediately.

141.    Another co-worker, Mike Gabriele won the $100.00 contest.

142.    Mike Gabriele won even though he sent his photos in after Mrs. Jackson sent her photos in.

143.    Mrs. Jackson in 2004 created and designed the Bookcase display.

144.    The Book Case display was created and designed by Mrs. Jackson specifically for the Miracle Gro product line.

145.    At the December 2004 National Conference, those in attendance were encouraged to adopt and use the Book Case display.

146.    Even though Mrs. Jackson created and designed the Book Case display concept, the raise she received was less than the raise received by her Caucasian male co-workers.

147.    The events surrounding the December 2004 National Conference in Naples, Florida were particularly public, brutal and extremely humiliating for Mrs. Jackson.

148.    At the conference the Company's employees were encouraged to take the Miracle-Gro since there were several new items in the product line.

149.    Mrs. Jackson began taking one of each sku and realized that Keith Conard ("Mr. Conard"), Regional Vice President, was watching her.

150.    A short time later, Mr. Conard approached Mrs. Jackson and asked her: "What are you doing with the Miracle-Gro?"

15

151.    Mrs. Jackson, although perplexed by his peculiar inquiry, respectfully explained: "It is my understanding that we could take the Miracle-Gro, everyone is taking the product."

152.    Mr. Conard responded by stating: "Yes we were told we could take it, however, you can not because you are going on an airplane and will not be allowed on the flight with the product."

153.    Mrs. Jackson approached Rob Lamp ("Mr. Lamp") to obtain clarification on airline travel constraints associated with the Miracle-Gro.

154.    Mr. Lamp stated: "I have been addressing that issue all morning and you can take the Miracle-Gro but you must check it in and not take it in your carry-on luggage.

155.    Mr. Lamp then escorted Mrs. Jackson to the Miracle-Gro table and began assisting her with boxing up the products.

156.    Mr. Conard continued to watch Mrs. Jackson's every move from a distance.

157.    Mr. Lamp carried the box to the elevator and waited with her until the elevator arrived.

158.    When the elevator arrived she stepped on the elevator and he handed her the box and said: "Farewell, until next year."

159.    Prior to the elevator doors closing Mr. Conard stepped onto the elevator.

160.    Mr. Conard then asked Mrs. Jackson: "Have you ever been thrown into jail?"

16

161. There were other representatives from the Company on the elevator having a conversation.

162. But, all discussions ceased when Mr. Conard singled out Mrs. Jackson and asked her that question.

163. He further stated that: "If you take the Miracle-Gro you are going to be thrown into jail and Scotts is not going to be here in Naples to get you out of jail."

164. He then said: "What are you going to do?"

165. Mrs. Jackson was shocked and flabbergasted by such a question.

166. She immediately felt that Mr. Conard was motivated by racism since she was the only Company representative he made this inquiry to.

167. Mrs. Jackson responded by stating that: "If I am arrested Marion Silber of Gordon & Silber will represent me."

168. Flippantly, Mr. Conard said: "Is that right?"

169. Mrs. Jackson steeled herself in order to hold back the tears.

170. When she got to her room she cried hysterically due to the unbearable embarrassment and humiliation Mr. Conard had subjected her to.

171. Mrs. Jackson called D.M. McGarr but was far too upset to leave a message the first time she called but called again and left a message.

172. She then called her colleague Mr. Botz. Mr. Botz had previously been Mrs. Jackson's direct supervisor.

173. Mrs. Jackson explained what had occurred with Mr. Conard and how she had tried to call D.M. McGarr unsuccessfully.

17

174.    Mr. Botz told Mrs. Jackson that D.M. McGarr was on the patio in the pool area.

175.    Mr. Botz was very angry about the incident with Mr. Conard and advised Mrs. Jackson to take the product.

176.    Mr. Botz said it was unfair and cited the fact that everyone was taking the product and that she was the only Scotts representative singled out.

177.    D.M. McGarr returned her call and told her to meet him in the hotel lobby. Mrs. Jackson explained what had occurred and D.M. McGarr appeared to be in shock.

178.    He continued to ask Mrs. Jackson over and over again what had transpired between her and Mr. Conard.

179.    D.M. McGarr stated: "I'm in shock because I saw people leaving the hotel with tons of the stuff in their suitcases. Boxes of stuff I saw them leave with."

180.    Mrs. Jackson expressed to D.M. McGarr that due the actions of Mr. Conard she had been discriminated against.

181.    D.M. McGarr stated that when they get back to New York he would purchase all the Miracle-Gro that she wanted.

182.    But he voiced his concerns that he feared that if she did not put the Miracle-Gro back she would be fired for insubordination.

183.    He further stated that she should apologize to Mr. Conard for taking the Miracle-Gro.

184.    Mrs. Jackson began to cry because the harassment and humiliation had been compounded exponentially as a result of D.M. McGarr's reaction to the discrimination and the disparate treatment she had unfairly experienced.

185.    Nevertheless, she returned the Miracle-Gro and apologized to Mr. Conard for taking the product.

186.    Mr. Conard replied: "It was a wise thing to do because the Scotts Company would not have been available and that other incidents could have arose from the matter had you taken the Miracle-Gro."

187.    It is evident that those in a position to rightfully object to the wrongful and unlawful actions of Mr. Conard chose to act in concert with him by ignoring his blatant acts of discrimination.

188.    Mrs. Jackson was told to provide Mr. Cabanara with a formal report about the racist incident with Mr. Conard.

189.    However, when she broached the matter with him he stated curtly: "I'm not interested and forget the matter."

190.    D.M. McGarr acted in a similar fashion when he snapped: "Forget the entire matter. Just forget about it."

191.    It is obvious that both Mr. Cabanara and D.M. McGarr covered and condoned the unlawful actions of Mr. Conard.

192.    On or about January 10, 2005 Mrs. Jackson's back went completely out which forced her to go out on short-term disability.

193.    However, unbeknownst to her, sometime during the month of June 2005 she was unceremoniously and unlawfully terminated.

194.    Mrs. Jackson's unlawful termination was contrary to the Company's policies and procedures.

19

195.   Moreover, the Company failed to provide her with a reasonable accommodation for her work related injury.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Discrimination and Harassment
### In Violation of New York State Human Rights Law)

196.   Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 195, inclusive as if fully set forth herein.

197.   Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York State Human Rights Law by denying to plaintiff equal terms and conditions of employment, including but not limited to failing to provide plaintiff with a reasonable accommodation as a result to plaintiff's disability and subjecting plaintiff to disparate working conditions and performance standards, gender discrimination, denying plaintiff the opportunity to work in an employment setting free of unlawful harassment, denying plaintiff opportunities for professional growth, denying plaintiff compensation and other terms and conditions of employment equal to that of Caucasian employees, and terminating plaintiff unlawfully from plaintiff 's employment with defendant.

198.   Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York State Human Rights Law by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that

20

has included, among other things, severe and pervasive racial harassment of plaintiff by plaintiff's superiors.

199.    As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

200.    As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Retaliation in Violation of New York State Human Rights Law)

201.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 200, inclusive, as if fully set forth herein.

202.    Defendant has retaliated against plaintiff by, inter alia, by treating  her with unmitigated contempt when she complained about how she was treated regarding the Mr. Conard/Miracle Gro incident and subjecting plaintiff to wrongful termination, subjecting plaintiff to an unfair and hostile work environment and failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability this is clearly

21

in violation of New York State Human Rights Law for: (a) plaintiff's opposition to defendant's discriminatory practices; (b) being wrongfully subjected to harassment and a hostile work environment.

203.    As a direct and proximate result of defendant's unlawful and retaliatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

204.    As a direct and proximate result of defendant's unlawful retaliatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Aiding and Abetting Violations of New York State Human Rights Law)

205.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 204, inclusive, as if fully set forth herein.

206.    Defendants knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law by actively participating in the unlawful conduct set forth above.

22

207.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

208.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Discrimination and Harassment
### In Violation of New York City Human Rights Law)

209.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 208, inclusive, as if fully set forth herein.

210.    Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York City Human Rights Law by denying to plaintiff equal terms and conditions of employment, including but not limited to, failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability, subjecting plaintiff to disparate working conditions and performance standards, gender discrimination, economic discrimination, denying plaintiff the opportunity to work in an employment

23

setting free of unlawful harassment, denying plaintiff opportunities for professional growth, denying plaintiff compensation and other terms and conditions of employment equal to that of Caucasian employees, and terminating plaintiff unlawfully from plaintiff's employment at the Defendant's.

211. Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of her Race and/or Color (African-American/Black), in violation of the New York City Human Rights Law by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive racial harassment of plaintiff by plaintiff's superiors.

212. As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

213. As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of damages.

24

214.    Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Retaliation in Violation of New York City Human Rights Law)

215.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 214, inclusive, as if fully set forth herein.

216.    Defendant retaliated against plaintiff by, inter alia, by treating her with unmitigated contempt when she complained about how she was treated regarding the Mr. Conard/Miracle Gro incident and subjecting plaintiff to wrongful termination, subjecting plaintiff to an unfair and hostile work environment and failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability this is clearly in violation of New York State Human Rights Law for: (a) plaintiff's opposition to defendant's discriminatory practices; (b) being wrongfully subjected to harassment and a hostile work environment.

217.    As a direct and proximate result of defendant's unlawful and retaliatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

218.    As a direct and proximate result of defendant's unlawful retaliatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered and

25

continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

219.    Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.


## AS AND FOR THE SIXTH CAUSE OF ACTION

### (Aiding and Abetting Violations of New York City Human Rights Law)

220.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 219, inclusive, as if fully set forth herein.

221.    Defendant knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against plaintiff in violation of the New York City Human Rights Law by actively participating in the unlawful conduct set forth above.

222.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

223.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York City Human

Filed On - 12/21/07 4:29:08 PM Bronx County Clerk

Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and

emotional distress, including but not limited to depression, humiliation, embarrassment,

stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and

suffering for which plaintiff is entitled to an award of monetary damages and other relief.

224.    Defendants unlawful actions constitute malicious, willful and wanton

violations of the New York City Human Rights Law for which plaintiff is entitled to an

award of punitive damages.


## AS AND FOR THE SEVENTH CAUSE OF ACTION

### (Defamation)

225.    Plaintiff hereby repeats and re-alleges each and every allegation in

paragraphs 1 through 224, inclusive, as if fully set forth herein.

226.    Defendant unlawfully subjected plaintiff to defamation: libel per se and

slander per se, placed plaintiff in a false light, and engaged in acts that caused the

invasion of plaintiff's privacy.

227.    Defendant knowingly or recklessly subjected plaintiff to defamation: libel

per se and slander per se, placed her in a false light, and engaged in acts that caused the

invasion of plaintiff's privacy in violation of New York State law.

228.    As a direct and proximate result of defendant's unlawful acts of

defamation: libel per se and slander per se, placing plaintiff in a false light, and the

invasion of plaintiff's privacy, plaintiff has suffered, and continues to suffer, monetary

and/or economic damages, including but not limited to loss of past and future income,

27

compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

229.    As a direct and proximate result of defendant's unlawful acts of defamation: libel per se and slander per se, placing plaintiff in a false light, and the invasion of plaintiff's privacy, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

230.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

## AS AND FOR THE EIGHTH CAUSE OF ACTION

### (Economic Discrimination)

231.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 230, inclusive, as if fully set forth herein.

232.    Defendant unlawfully subjected plaintiff to economic discrimination in violation of New York State Law.

233.    Defendant knowingly or recklessly subjected plaintiff to economic discrimination in violation of New York State Law.

234.    As a direct and proximate result of the defendant subjecting plaintiff to economic discrimination, plaintiff has suffered, and continues to suffer, monetary and/or

28

economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

235.    As a direct and proximate result of the defendant subjecting plaintiff to economic discrimination, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

236.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

## AS AND FOR THE NINETH CAUSE OF ACTION

### (Breach of Implied Contract to Act in Good Faith)

237.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 236, inclusive, as if fully set forth herein.

238.    Defendant unlawfully breached its implied contract to plaintiff to act in good faith in violation of New York State Law.

239.    Defendant knowingly or recklessly breached its implied contract to plaintiff to act in good faith in violation of New York State Law.

240.    As a direct and proximate result of defendant's breach of the implied contract to plaintiff to act in good faith, plaintiff has suffered, and continues to suffer,

29

monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

241.    As a direct and proximate result of defendant's breach of the implied contract to act in good faith, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

242.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

## AS AND FOR THE TENTH CAUSE OF ACTION

### (Failure to Provide a Reasonable Accommodation)

243.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 242, inclusive, as if fully set forth herein.

244.    Defendant unlawfully failed to provide plaintiff with a reasonable accommodation as a result of plaintiff's work related injury.

245.    Defendant knowingly and/or recklessly failed to provide plaintiff with a reasonable accommodation as a result of plaintiff's work related injury in violation of 9 New York Code of Rules and Regulations (NYCRR) §466.11.

30

246.    As a direct and proximate result of defendant's failure to provide plaintiff with a reasonable accommodation of plaintiff's work related injury, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

247.    As a direct and proximate result of defendant's failure to provide plaintiff with a reasonable accommodation of her work related injury, plaintiff has suffered, and continues to suffer, severe physical and mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

248.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

## AS AND FOR THE ELEVENTH CAUSE OF ACTION

### (Violation of Equal Protection of Laws)

249.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 248, inclusive, as if fully set forth herein.

250.    Defendant unlawfully violated plaintiff's Equal Protection of Laws rights.

251.    Defendant knowingly or recklessly violated plaintiff's Equal Protection of Laws rights under Article 1 § 11 of the New York State Constitution (Bill of Rights) by

31

subjecting plaintiff to treatment that no Caucasian employee of the defendants' has been subjected to.

252.    As a direct and proximate result of defendant's violating plaintiff's Equal Protection of Laws, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

253.    As a direct and proximate result of defendant's violating plaintiff's Equal Protection of Laws, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of defendant complained of herein violate the laws of the State of New York and the City of New York;

B.    An order directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and otherwise unlawful conduct are eliminated and do not continue to affect plaintiff;

32

C.    An award of damages in an amount to be determined at trial, plus

prejudgment interest, to compensate plaintiff for all monetary and/or economic damages,

including but not limited to, the loss of past and future income, wages, compensation,

seniority and other benefits of employment;

D.    An award of damages in an amount to be determined at trial, plus

prejudgment interest, to compensate plaintiff for all non-monetary and/or compensatory

damages, including but not limited to, compensation for plaintiff's severe mental anguish

and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss

of self-esteem, self-confidence and personal dignity, and emotional pain and suffering

and any other physical and mental injuries;

E.    An award of damages for any and all other monetary and/or non-monetary

losses suffered by plaintiff in an amount to be determined at trial, plus prejudgment

interest;

F.    An award of punitive damages;

G.    An award of costs that plaintiff has incurred in this action, as well as

plaintiff's reasonable attorney's fees to the fullest extent permitted by law; and

H.    Such other and further relief as the Court may deem just and proper.

33

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated:  New York, New York
        December 21, 2007

                                    Respectfully submitted,

                                    SANDRA D. FRELIX, P.C.


                                    By: _____
                                        Sandra D. Frelix
                                        Attorney for Plaintiff
                                        110 Wall Street, 11th Floor
                                        New York, New York 10005
                                        Telephone:  212-859-3509
                                        Facsimile:  212-862-8212

34

## VERIFICATION

State of New York    )
                     )  ss.:
County of Queens     )


MARIA JACKSON, being duly sworn, states:

I am the Plaintiff in the action herein. I have read the annexed SUMMONS AND

VERIFIED COMPLAINT, know the contents thereof and the same are true to my

knowledge, except those matters therein which, are stated to be alleged on information

and belief, and as to those matters I believe them to be true.


_____
MARIA JACKSON


Sworn to before me
this 12 day of December, 2007


_____
NOTARY PUBLIC

35

Form 19 · SECRETARY OF STATE    106

**SANDRA D. FRELIX, P.C.**
**ATTN:**

SUPREME COURT    BRONX   COUNTY    .    , STATE OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|                                        |            |
|----------------------------------------|------------|
| MARIA JACKSON                          | plaintiff  |

Index No. 303890/07

Date Filed  . . . . . . . . . . . .

- against -

Office No.

THE SCOTTS COMPANY                           defendant

Court Date:    /  /

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STATE OF NEW YORK, COUNTY OF NEW YORK :SS:
**STEVE AVERY**                being duly sworn, deposes and says that
he is over the age of 18 years, resides in the State of New York and is
not a party to this action.    That on the
    **4th   of January,   2008 at   08:50 am**
at the Office of the Secretary of State of the State of New York in the
City of Albany, New York, he served the
    **SUMMONS AND VERIFIED COMPLAINT**
**UPON: THE SCOTTS COMPANY**
**the DEFENDANT** in this action, by delivering to and leaving with
    **DONNA CHRISTIE, AGENT**

in the office of the Secretary of State of New York, two true copies
thereof and at the same time of making such service, deponent paid said
Secretary of State, a fee of **$40**. That said service was made pursuant to
Section 306 of the BCL.

Deponent further describes the person actually served as follows:

        SEX: **FEMALE**        COLOR: **WHITE**        HAIR: **BLONDE**
        APP. AGE: **35**        APP. HT: **5:5**        APP. WT: **130**
OTHER IDENTIFYING FEATURES:

SWORN TO BEFORE ME THIS
9th  DAY OF  January, 2008

KENNETH WISSNER
Notary Public, State of New York
    No.01WI4744130
Qualified in NEW YORK COUNTY
Commission Expires 03/30/2010

. . . . . . . . . . . . . . . . . . . . . . .
STEVE AVERY
AETNA  CENTRAL  JUDICIAL  SERVICES
225 BROADWAY, SUITE 1802
NEW YORK, NY, 10007
Reference No: 3SDF102471

CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and correct copy of the foregoing

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. SECTION 1441(b), and attached

exhibit, to be served on the following counsel of record this 1st day of February, 2008 by

forwarding a copy, by First Class Mail, addressed to:

> Sandra D. Frelix, Esq.
> 110 Wall Street, 11th Floor
> New York, New York 10005
> (212) 859-3509

Craig S. Friedman

# EXHIBIT B

SANDRA D. FRELIX, ESQ. (0421)
110 Wall Street
11ᵗʰ Floor
New York, New York 10005
(212) 859-3509
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MARIA JACKSON,                                    Index No. 08 CV 1064 (LAK)

                    Plaintiff,                    MOTION AND NOTICE OF
                                                  MOTION TO REMAND
                                                  ACTION TO STATE COURT
        -against-

THE SCOTTS COMPANY,

                    Defendant.
-------------------------------------------------------------X

        PLEASE TAKE NOTICE that on a date to be determined by this Court, or as

soon thereafter as counsel can be heard, plaintiff will move the Court, at Courtroom No.

12D, United States Courthouse, 500 Pearl Street, New York, New York 10007, for an

order remanding this action to state court.  This motion and attached affidavit is based on

28 U.S.C.A. §1445(c) which states the following:

        1.      "A civil action in any State court arising under the workmen's

                compensation laws of such State may not be removed to any district court

                of the United States."

        2.      The plaintiff in this case has claims of disparate treatment and retaliation

                against the defendant arising under New York state worker's

                compensation laws.

        3.      No other basis for federal jurisdiction exists or has been claimed.

4.    This Court therefore has no original jurisdiction over this action.

Plaintiff will also move this Court for an order directing defendant to pay all costs

plaintiff has incurred as a result of defendant's removal of this action.

Dated: New York, New York
       February 20, 2008

                              Respectfully submitted,

                              SANDRA D. FRELIX, ESQ.

                              By:  _____
                                   Sandra D. Frelix, Esq. (SF-0421)
                                   110 Wall Street, 11th Floor
                                   New York, NY 10005
                                   Telephone: (212) 859-3509
                                   Facsimile:  (212) 862-8212

                              ATTORNEY FOR PLAINTIFF

To:    Craig S. Friedman, Esq. (CF-1988)
       Matthew W. Lampe, Esq. (*pro hac vice* application pending)
       JONES DAY
       322 East 41st Street
       New York, New York 10017

       ATTORNEYS FOR DEFENDANT

2

SANDRA D. FRELIX, ESQ. (0421)
110 Wall Street
11th Floor
New York, New York 10005
(212) 859-3509
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MARIA JACKSON,                                Index No. 08 CV 1064 (LAK)

           Plaintiff,                        AFFIDAVIT IN SUPPORT OF
                                              MOTION TO REMAND
                                              ACTION TO STATE COURT
    -against-


THE SCOTTS COMPANY,

          Defendant.
------------------------------------------------------------X

1.    I, Maria Jackson, am the plaintiff in the above-referenced caption.

2.    I am a former employee of The Scotts Company (the "Company").

3.    I was injured on or about January 10, 2005 while executing my duties as
an employee of the Company.

4.    The Company subjected me to disparate treatment and retaliated against
me by denying me my worker's compensation benefits when I was and
still am entitled to them.

5.    I am also entitled to retroactive worker's compensation benefits.

6.     I intend to litigate, in my present suit against the Company, how the

Company subjected me to disparate treatment and retaliated against me by

denying me my worker's compensation benefits.

Dated:  February 19, 2008
        New York, New York

_Maria Jackson_
MARIA JACKSON

Subscribed and sworn to

before me this _____19_____ day

of February, _2008_

_____
Notary Public for the State of New York

ALLAN HERZLICH
NOTARY PUBLIC State of New York
NO. 6876320
QUALIFIED IN QUEENS COUNTY
Commission Expires Dec. 31, 20 _10_

2

SANDRA D. FRELIX. ESQ. (0421)
110 Wall Street
11th Floor
New York, New York 10005
(212) 859-3509
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MARIA JACKSON,

                Plaintiff,

     -against-

THE SCOTTS COMPANY,

                Defendant.
------------------------------------------------------------X

Index No. 08 CV 1064 (LAK)

ORDER GRANTING MOTION
TO REMAND
ACTION TO STATE COURT

A hearing will been held at the discretion of this Court on the plaintiff's motion to remand and it appearing to the Court that the Court has no jurisdiction over this action, it is ORDERED that:

1.    Plaintiff's motion to remand is granted.

2.    This action is remanded to the Supreme Court of the State of New York County of Bronx.

3.    Plaintiff is awarded all costs incurred as a result of the defendant's removal of this action from state court.

Dated: February     , 2008
       New York, New York

                                     _____
                                  The Honorable Lewis A. Kaplan
                                  United States District Judge

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARIA JACKSON,

                Plaintiff,

          -against-

                                        08 Civ. 1064 (LAK)

THE SCOTTS COMPANY,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/21/2008

**ORDER**

LEWIS A. KAPLAN, *District Judge.*

        This action was commenced by Maria Jackson against The Scotts Company ("Scott") in New York Supreme Court, Bronx County. Scott removed it to this Court on the basis of diversity of citizenship.

        This is an employment discrimination case. The complaint contains nine claims for relief. The first six are for discrimination and retaliation, and aiding and abetting violations of the New York State and New York City Human Rights Laws. The last three are for common law defamation, "economic discrimination in violation of New York State law," and breach of an implied contract to act in good faith.

        Plaintiff has moved to remand the action to the state court under 28 U.S.C. § 1445(c), which precludes the removal from a state court of a civil action "arising under the workmen's compensation laws of such State." The notice of motion, signed by plaintiff's counsel, Sandra D. Frelix, Esq., states that "[t]he plaintiff in this case has claims of disparate treatment and retaliation against the defendant arising under New York state worker's compensation laws." In violation of S.D.N.Y. Civ. R. 7.1, the motion is unaccompanied by a memorandum of law.

        The motion to remand is patently frivolous, as the 35-page complaint does not even mention, let alone assert a claim arising under, the New York Worker's Compensation Law. Indeed, the word "worker" does not appear in the entire pleading.

        In consequence, the motion to remand [docket item 7] is denied. In addition, it appears to the Court that the quoted statement in the notice of motion is so devoid of legal or factual

2

support as to suggest that plaintiff's counsel, Ms. Frelix, violated Fed. R. Civ. P. 11(b)(2) and/or 11(b)(3). Accordingly, Ms. Frelix shall show cause, on or before March 4, 2008, why she should not be sanctioned accordingly.

It must also be said that our Clerk's Office erred in entering this case on the docket with The Scotts Company as the plaintiff and Ms. Jackson as the defendant. The caption is amended to conform to that on this order. The Clerk shall make the necessary changes.

SO ORDERED.

Dated:        February 21, 2008

Lewis A. Kaplan
United States District Judge

# EXHIBIT D



SANDRA D. FRELIX, ESQ. (SF-0421)
110 Wall Street
11th Floor
New York, New York 10005
(212) 859-3509
(212) 862-8212 (facsimile)
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MARIA JACKSON,

                       Plaintiff,

      -against-

THE SCOTTS COMPANY,

                     Defendant.
-----------------------------------------------------------X

Index No. 08 CV 1064 (LAK)
AMENDED
MOTION AND NOTICE OF
MOTION FOR LEAVE
TO AMEND PLEADING

To:    Craig S. Friedman, Esq. (CF-1988)
       Matthew W. Lampe, Esq. (*pro hac vice* application pending)
       Attorneys for Defendant
       Jones Day
       222 East 41st Street
       New York, New York 10017-6702
       (212) 326-3939
       (212) 755-7306 (facsimile)

     PLEASE TAKE NOTICE that on a date to be determined by this Court, or as

soon thereafter as counsel can be heard, plaintiff will move the Court, at Courtroom No.

12D, United States Courthouse, 500 Pearl Street, New York, New York 10007, for leave

to amend Complaint pursuant to Fed. R. Civ. P. 15(a). This motion will be made on the

grounds that:

     1.     The amendment is necessary to repair jurisdictional allegations and add

            claims.

     2.     The amendment will not prejudice any party to this action.



3.    A copy of the proposed amended Complaint is attached as Exhibit 1.

This motion is accompanied by the attached memorandum of law in

support of this motion.

Dated: New York, New York
        March 27, 2008

Respectfully submitted,

SANDRA D. FRELIX, ESQ.


By:    /s/ Sandra D. Frelix
        Sandra D. Frelix, Esq. (SF-0421)
        110 Wall Street, 11th Floor
        New York, NY  10005
Telephone:  (212) 859-3509
Facsimile:   (212) 862-8212

ATTORNEY FOR PLAINTIFF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
MARIA JACKSON,                              Index No. 08 CV 1064 (LAK)

        Plaintiff,

   -against-

THE SCOTTS COMPANY,

        Defendant.
-------------------------------------------------------X

---

## MEMORANDUM OF LAW IN SUPPORT OF AMENDING COMPLAINT

---

SANDRA D. FRELIX, ESQ. (SF-0421)
110 Wall Street
11th Floor
New York, New York 10005
(212) 859-3509
Attorney for Plaintiff



## PRELIMINARY STATEMENT

On February 21, 2008 this court dismissed Plaintiff's Motion and Notice of

Motion to Remand Action to State Court under 28 U.S.C.§1445(c) on the grounds that it

was not accompanied by a memorandum of law, in violation of S.D.N.Y. Civ.R.7.1.

Moreover, this Court assessed the undersigned with sanctions in the amount of $750.00.

(Exhibit 1)

## STATEMENT OF FACTS

Maria Jackson ("the Plaintiff") was an employee of The Scotts Company ("the

Defendant") from April 2001 until the Defendant unlawfully terminated her in June 2005.

As a result of her unlawful termination the Plaintiff filed a summons and verified

complaint against the Defendant on December 21, 2007.

## PROCEDURAL HISTORY

On December 21, 2007 Plaintiff filed a summons and complaint in the Supreme

Court of the State of New York, County of Bronx. The same was served upon the

Defendant on January 4, 2008. The Defendant then moved this Court with a Notice of

Removal of Action under 28 U.S.C. §1441(b) dated February 1, 2008. The Plaintiff

responded by filing and serving a Motion and Notice of Motion to Remand Action to

State Court under 28 U.S.C.§1445(c) of February 20, 2008.

However, during a February 6, 2008 telephone discussion between the

undersigned and Craig S. Friedman, Esq. ("Mr. Friedman"), counsel for the Defendant,

Mr. Friedman, an attorney of the law firm Jones Day, only requested an extension of time



1



to answer the complaint from February 8, 2008 to March 10, 2008. On February 14,

2008 the Honorable Lewis A. Kaplan ("Judge Kaplan") granted the Defendant's Time to

Answer, Move or Otherwise Respond to the Complaint to March 10, 2008.

Defendant served Plaintiff with a Partial Motion to Dismiss on March 10, 2008.

The undersigned never received the electronic notice of Judge Kaplan's February

14, 2008 endorsement letter.

As previously stated the undersigned filed and served a Motion and Notice of

Motion to Remand Action to State Court under 28 U.S.C.§1445(c) on February 20, 2008.

Also, on February 20, 2008 the undersigned began to experiencing flu like symptoms that

caused the undersigned to fail to acknowledge and respond timely to Judge Kaplan's

February 21, 2008 Order denying Plaintiff's Motion to Remand to State Court. The flu

suffered by the undersigned lasted for about two (2) weeks.

As an unfortunate result of the undersigned's excusable neglect to respond due to

illness, Judge Kaplan found that the undersigned violated Fed.R.Civ.P. 11(b)(2) and

11(b)(3) and sanctioned the undersigned to $750.00 that is to be paid on or before March

19, 2008.

It is worthy to note that the undersigned did not become aware of Judge Kaplan's

February 21, 2008 electronic notice until his March 5, 2008 electronic notice.

2

**ARGUMENT**

I.    **PLAINTIFF'S MOTION TO AMEND THE COMPLAINT MUST BE GRANTED**

A.    The Legal Standard

Federal Rule of Civil Procedure 15

(a) AMENDMENTS. States in part: "… Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires…."

Moreover, Federal Rule of Civil Procedure 15(a) "provides that leave to amend 'shall be freely given.' Reasons for a proper denial of leave to amend include undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party." *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir.1981); *see also Richardson Greenshields Securities, Inc. v. Lau*, 825 F.2d 647, 653 n. 6 (2d Cir.1987); *Tokio Marine & Fire Ins. Co. v. Employers Ins. of Wausau*, 786 F.2d 101, 103 (2d Cir.1986).

"Although grant or denial of leave to amend is within the discretion of district court, a decision without any justifying reason may be an abuse of that discretion and inconsistent with spirit of federal rules." *Evans v. Syracuse City School District*, 704 F.2d 44 (C.A.N.Y., 1983).

Since this case is in its infancy it does not meet any of the requirements that would allow a basis for a proper denial. There is no evidence of "undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party."

3



On the contrary, the Plaintiff respectfully requests the opportunity to amend her complaint based on 28 U.S.C.A. §1445(c) which states the following: "A civil action in any State court arising under the workmen's compensation laws of such State may not be removed to any district court of the United States."

The Plaintiff's February 19, 2008 affidavit provides the evidence that this case must be remanded to state court in order to litigate her substantive Workers' Compensation claims.  (Exhibit 1)

## CONCLUSION

For all the reasons set forth above, it is respectfully requested that Plaintiff's Motion and Notice of Motion for Leave to Amend Pleading be granted, together with such other and further relief as to this Court may deem just and proper.

It is worthy to note that by granting this request justice will be achieved.

Dated: New York, New York
      March 27, 2008

                                             Yours, etc.,

                                             SANDRA D. FRELIX, ESQ.

                                           By:    /s/ Sandra D. Frelix
                                                Sandra D. Frelix, Esq. (SF-0421)
                                                110 Wall Street
                                                11th Floor
                                                New York, New York 10005
                                                (212) 859-3509

                                                ATTORNEY FOR PLAINTIFF

To: Craig S. Friedman, Esq. (CF-1988)
     Matthew W. Lampe, Esq. (Pro Hac Vice application pending)
     JONES DAY
     322 East 41st Street
     New York, New York 10017

     ATTORNEY FOR DEFENDANT

**SUPREME COURT OF TSHE STATE OF NEW YORK**
**COUNTY OF BRONX**
-------------------------------------------------------------------------X
**MARIA JACKSON**

*Plaintiff,*

**PROPOSED**
**AMENDED**
**VERIFIED**
**COMPLAINT**

   -against-

**THE SCOTTS COMPANY**

**INDEX No.:**

*Defendant*.

-------------------------------------------------------------------------X

      Plaintiff, MARIA JACKSON ("Mrs. Jackson", "Plaintiff" or "plaintiff"), by and through her attorney, SANDRA D. FRELIX, for her Complaint against THE SCOTTS COMPANY ("the Company", "Defendant Scotts", "Defendant" or "defendant"), thereby states and alleges as follows:

## NATURE OF THE CLAIMS

      1.    This action is for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendant's unlawful employment practices and retaliation against Plaintiff, including the discriminatory treatment, racial harassment, and retaliation against Plaintiff due to her Race and/or Color (African-American/Black), gender, deprivation of property without due process of law and equal protection of laws, in violation of the New York State Human Rights Law, New York Executive Law §§ 290 et seq.: and the New York City Human Rights Law, Administrative Code of the City of New York §§ 8-101 et seq.  and the New York State Constitution.  Additionally, Mrs. Jackson was subjected to defamation: slander per se and libel per se, being placed in a false light and was forced to endure the breach of an implied contract to act in good faith in violation of New York State Law.  Moreover, the defendant caused her to suffer

economic discrimination and failed to provide her a reasonable accommodation pursuant to her disability in violation of 9 New York Code of Rules and Regulations (NYCRR) §466.11.

## JURISDICTION AND VENUE

2.       The Court has personal jurisdiction over Defendant pursuant to Sections 301 and/or 302 of the New York Civil Practice Law and Rules ("CPLR") in that the Defendant transacts and/or solicits business within the state from which they derive substantial revenues.

3.       The Court has personal jurisdiction over Defendant because a significant portion of the unlawful employment practices and events giving rise to the claims herein occurred in New York.

4.       The Court has subject matter jurisdiction over this action by virtue of the New York State Human Rights Law, New York Executive Law § 279(9); the New York City Human Rights Law, Administrative Code of the City of New York § 8-502(a); and the Constitution of the State of New York.

5.       Venue is proper in this county pursuant to CPLR § 503(c) because the Defendant conducted business in Bronx County at the relevant times described in this Complaint and continues to conduct business in Bronx County.

6.       Prior to the commencement of this action, a copy of this Complaint was served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

## PARTIES

7.      Plaintiff Maria Jackson is an African-American citizen female who resides in Springfield Gardens, New York.  At all relevant times, Plaintiff has met the definition of an "employee" under all applicable statutes.

8.      Defendant Scotts conducts business throughout New York State as well as in all the other forty-nine states and internationally.

9.      The Scotts Company is located at 14111 Scottslawn Road, Marysville, OH 43041.

## FACTUAL ALLEGATIONS

10.      Defendant hired Mrs. Jackson in April 2001 as a Seasonal Merchandiser.

11.      She was immediately promoted to the position of Sales Merchandising Manager on or about December 14, 2001.

12.      Mrs. Jackson worked diligently for the Company for four (4) years at the time of her June 2005 unlawful termination.

13.      Mrs. Jackson excelled at her responsibilities pursuant to each of her positions.

14.      Mrs. Jackson also received exemplary job performance appraisals.

15.      In the Spring of 2002 Mrs. Jackson suffered extreme embarrassment and humiliation when District Manager Patrick McGarr ("D.M. McGarr") stated that: "Maria's not Black she is Italian!"

16.      This incident took place at the Liberty Diner in Farmingdale, N.Y.

17.      There was never an occasion witnessed by Mrs. Jackson where a white person's core identity was challenged and violated.

18.    In the spring of 2002 Mrs. Jackson became aware that the Defendant was being sued for discrimination for not hiring women in the 04 region.

19.    She further learned that the Defendant had specifically directed D.M. McGarr to hire a black woman.

20.    D.M. McGarr shared this information with James Fitch ("Mr. Fitch"), a Sales Merchandising Manager ("SMM").

21.    Mr. Fitch wanted D.M. McGarr to hire his friend, a Caucasian male, who had previously resigned from the Defendant but wanted his old position back.

22.    At the December 2002 conference in Naples, Florida Mrs. Jackson, D.M. McGarr, and co-workers were attending a class.

23.    Mrs. Jackson went the ladies room upon her return the seats were taken in her class' section.

24.    The only seat available in the section with her co-workers was located at the far end of the table where her co-workers were seated.

25.    The closest unoccupied seat was located in an area occupied by another district.

26.    The district manager of that region Patrick Flagherty ("D.M. Patrick Flagherty) stated that she could sit with his district.

27.    However, D.M. McGarr tapped her on the shoulder and told her that she could not sit there.

28.    D.M. McGarr then signaled one of their co-workers to move down so she could sit with them.

29.     Mrs. Jackson then heard Mr. Flagherty state to his SMM's: "What is this? Is she too good to sit with us?  Oh yeah, that's right that's Pat's token."

30.     This racist comment was not only hurtful but it was extremely embarrassing to Mrs. Jackson.

31.     Another area where Mrs. Jackson was subjected to disparate treatment pertains to storage facilities.

32.     Point of Purchase is advertising that is sent to managers in great quantity.

33.     Therefore, it is customary for the Company to pay for the storage facility utilized by the managers to house and maintain the advertising materials.

34.     Unfortunately, Mrs. Jackson was informed in no uncertain terms by D.M. McGarr that his budget did not permit him to go over the $75.00 per month for storage.

35.     Consequently, she was forced to store the materials in her home, which greatly inconvenienced her family.

36.     Mrs. Jackson eventually learned that D.M. McGarr paid well over $100.00 for storage for Mrs. Jackson's co-workers who operated in eastern Long Island.

37.     This is an undeniable illustration of the humiliating, embarrassing, disparate as well as racist treatment imposed upon Mrs. Jackson by the Company.

38.     Moreover, even though D.M. McGarr was absolutely aware that Mrs. Jackson was out on a work related disability (herniated and bulging discs) he still spitefully sent Point of Purchase advertising materials to her home.

39.     In the spring of 2003 Ivy Acres held its annual flower show and invited the Company along with other lawn and garden professionals.

40.    The event is held on Long Island and after the showing a lavish luncheon is provided for those in attendance.

41.    All of Mrs. Jackson's colleagues were allowed to take the day off and attend the event and the luncheon that followed.

42.    However, Mrs. Jackson was not allowed to attend the event.

43.    But, the Company invited a white woman from an entirely different district (Philadelphia, PA) to attend the event and luncheon with all her expenses paid by the Company.

44.    This incident was extremely insulting to Mrs. Jackson and it too displayed the grossly disparate treatment she was subjected to.

45.    Mrs. Jackson was a dedicated and loyal employee of the Company.

46.    Her act of dedication and loyalty was demonstrated in March of 2003 when she was scheduled to have a hernia operation in March 2003.

47.    Mrs. Jackson's hernia injury was the result of work related lifting.

48.    Mrs. Jackson called D.M. McGarr from the Gunhill Road Home Depot store located in the Bronx in February 2003 to inform him that she needed to have hernia surgery in March 2003.

49.    During the same telephone conversation D.M. McGarr said no to the timing of her March 2003 hernia surgery and they would discuss the matter later.

50.    Mrs. Jackson also told D.M. McGarr that she was in pain.  But D.M. McGarr flippantly told her that she would have to get the job done.

51.    However, Mike Garbiele ("Mr. Garbiele"), a co-worker of Mrs. Jackson, required medical treatment for a torn rotor cup in his arm.

52.    D.M. McGarr not only allowed Mr. Garbiele time off for medical treatment of his injury but also provided coverage for his stores.

53.    Clearly, D.M. McGarr treated Mrs. Jackson disparately from Mr. Garbiele.

54.    D.M. McGarr did not require Mr. Garbiele to postpone his treatment.

55.    Additionally, D.M. McGarr provided coverage for Mr. Garbiele and allowed him time off for his treatment.

56.    Prior to learning about how D.M. McGarr accommodated Mr. Garbiele she decided to postpone it to accommodate D.M. McGarr even though her physician advised her against postponing the operation.

57.    D.M. McGarr requested that she delay the surgery because the season had just begun and he could not afford to have her out.

58.    D.M. McGarr finally agreed that she could have her surgery in June 2003.

59.    Although Mrs. Jackson has been totally dedicated and loyal to the Company these sentiments were not reciprocated back to her.

60.    Two days after her surgery D.M. McGarr called Mrs. Jackson on her hospital bedside telephone to discuss Scotts' business.

61.    Mrs. Jackson's physician Matthew Kilgo, M.D. answered her hospital bedside telephone and upon learning that D.M. McGarr wanted to discuss Scotts' business he told D.M. McGarr to call back.

62.    D.M. McGarr told Mrs. Jackson and her co-workers that they should not inform corporate that she's out recovering from surgery.

63.    Thus, Mrs. Jackson's surgery was never reported to the Company's human resources department.

64.    During her surgery she had an emergency blood transfusion and was hospitalized once again in July 2003.

65.    Mrs. Jackson was not only forced to submit to a hostile work environment and disparate treatment but she had to bear the indignity of inhumane treatment as well.

66.    The inhumane treatment manifested itself while she was at home recuperating from surgery and the relapse.

67.    D.M. McGarr had the unmitigated audacity to continue to burden Mrs. Jackson by having the Point of Purchase advertising material sent to her home.

68.    D.M. McGarr demanded that she follow-up on reports.

69.    D.M. McGarr also demanded that she answer calls on her cell phone from her home while she was recovering.

70.    Upon Mrs. Jackson's return to work in October 2003 D.M. McGarr was undaunted and unfazed by the fact that she had major surgery four months earlier.

71.    D.M. McGarr insisted that she work at the same level and pace that she worked at prior to her surgery.

72.    D.M. McGarr's actions were so detrimental to her recovery that in 2004 Mrs. Jackson's surgeon wrote two letters addressed to D.M. McGarr requesting a reasonable accommodation for his patient, Mrs. Jackson.

73.    The physician clearly expressed that lifting for Mrs. Jackson was unacceptable.

74.    D.M. McGarr failed to give Mrs. Jackson a reasonable accommodation.

75.    D.M. McGarr expected Mrs. Jackson to perform in the same manner that she had prior to her major surgery.

76.     D.M. McGarr informed Mrs. Jackson in no uncertain terms that she would have to find a way to get the job done.

77.     Another instance of discrimination against Mrs. Jackson occurred in the spring of 2004 when she requested to take her son to the dentist for a serious procedure.

78.     D.M. McGarr denied Mrs. Jackson's request to take her son to the dentist for the serious procedure.

79.     However, D.M. McGarr allowed Mrs. Jackson's co-worker, Jimmy Fitch, to take his son to a baseball game.

80.     Mrs. Jackson was also a victim of economic discrimination.

81.     During her October 2003 yearly evaluation D.M. McGarr raved about her performance and she was given a $900.00 raise.

82.     D.M. McGarr informed her that he had to fight to get her and her colleagues the $900.00 raises from Mike Carbanara ("Mr. Carbanara") the Regional Sales Director.

83.     D.M. McGarr requested that Mrs. Jackson not discuss her raise with her Caucasian male co-workers because he had gotten her a little more based on the fact that she was assigned to the Jericho Home Depot.

84.     However, shortly thereafter, she learned that her Caucasian male co-workers had each received a $1500.00 raise.

85.     This too illustrates the economic discrimination and disparate treatment she was subjected to and the hostile environment she worked in.

86.     It also demonstrates that D.M. McGarr acted in bad faith with Mrs. Jackson.

87.    The discriminatory and disparate treatment continued in that in the spring of 2004 Mrs. Jackson was servicing nine (9) Home Depots stores.

88.    She was firmly instructed that the Jericho Home Depot was to have one (1) dedicated merchandiser whose job was to service that store only.

89.    The individual who was the dedicated merchandiser to the Jericho Home Depot was a Caucasian male named Dominic Balducci ("Mr. Balducci").

90.    Mrs. Jackson was responsible for servicing eight (8) other Home Depot stores.

91.    However, she was assigned only one merchandiser to service the other eight Home Depot stores his name was Tyrone Jackson, ("Mr. Jackson") an African-American male.

92.    Mrs. Jackson's Caucasian male co-workers were assigned six to seven Home Depot stores.

93.    Moreover, her Caucasian male co-workers were assigned as many as four (4) merchandisers to service the stores they were responsible for.

94.    In 2003 Mr. Carbanara allocated Mrs. Jackson an additional twenty (20) hours of merchandising.

95.    But, D.M. McGarr instructed Mrs. Jackson to assign all the twenty (20) hours to the Jericho Home Depot store.

96.    During the gardening season of 2004 Mr. Balducci was prone to make many mistakes.

97.    Mrs. Jackson counseled him regarding his poor and disruptive work habits on numerous occasions, but to no avail.

98.     Mr. Balducci's poor and disruptive work habits included stealing time from the Company.

99.     Furthermore, Mr. Balducci threatened to cause bodily harm to department heads at Home Depot because someone borrowed "his" jack.

100.    Mr. Balducci was known to use perverted language and engaged in inappropriate discussions about his girlfriend's sex life in the presence of customers.

101.    Additionally, Mrs. Jackson received numerous calls from Home Depot management about his violent behavior.

102.    Mr. Balducci has been banished from three (3) other Home Depot stores and was sternly instructed not to return.

103.    D.M. McGarr's response to the foregoing was: "Dominic did not have to go back to those Home Depots that put him out and that they did not deserve his services to begin with."

104.    It is quite obvious that D.M. McGarr placed the personal feelings he had for Mr. Balducci before his obligations to the Company.

105.    However, Mrs. Jackson by sharing the real threat that Mr. Balducci posed with D.M. McGarr shows that she recognized that Mr. Balducci's unprofessional and violent behavior had a negative reflection on the Company as well as exposed the Company to unnecessary and avoidable liability.

106.    Moreover, Mrs. Jackson understood that he had clearly become a present liability and that the Company had been placed on notice about his unprofessional and violent behavior.

107.    The liability that D.M. McGarr exposed the Company to is enormous.

108. It is common knowledge that Mr. Balducci had to attend court ordered anger management courses for threatening to kill his neighbor over a parking space.

109. But, D.M. McGarr remained a staunch supporter of Mr. Balducci without considering the legal ramifications such blinding support could have on the Company or to Mrs. Jackson's safety and well-being.

110. D.M. McGarr refused to re-hire Henry Williams ("Mr. Williams"), a black man, who worked for the Company for more than five years.

111. The grounds that D.M. McGarr refused Mr. Williams employment was that he allegedly was not present in the store at a particular time.

112. D.M. McGarr mercilessly defamed Mr. Williams with the tag "the Phantom" and often made jokes about him during meetings in the presence of a number of co-workers.

113. Clearly, D.M. McGarr's disparate treatment of Mr. Williams and the unwavering support of Mr. Balducci were based on race and color.

114. Mrs. Jackson was again forced to endure and witness this racially motivated injustice creating a hostile work environment.

115. The discrimination and abuse suffered by Mrs. Jackson was unrelenting, discriminatory and racist.

116. In 2004 Mr. Carbanara gave Mrs. Jackson an additional twenty (20) hours to service her other home depot stores.

117. Mr. Carbanara realized that she was overwhelmed with servicing each of the Home Depot stores under her authority.

118.    Mrs. Jackson hired Ms. Snow in 2004 and Mr. Jackson was hired in 2001 to assist her servicing the other Home Depot stores she was responsible for.

119.    Based on information and belief there were no black merchandisers until Mrs. Jackson hired Kisha Snow ("Ms. Snow") and Mr. Jackson.

120.    Mrs. Jackson's sales numbers were growing by an incredible rate in her other Home Depot stores.

121.    Her sales numbers were increasing so rapidly that the Vice President of Miracle Gro flew in from Ohio to verify her sales numbers.

122.    However, Mr. McGarr transferred Ms. Snow and Mr. Jackson to the Jericho Home Depot store to help Mr. Balducci.

123.    The hours attributed to Ms. Snow and Mr. Jackson were the additional hours that Mr. Carbanara provided Mrs. Jackson with to service her seven (7) other Home Depot stores.

124.    This unfortunate arrangement allowed Mr. Balducci six (6) additional hours or more on a daily basis.

125.    Based on information and belief Mr. Balducci engaged in stealing time from the Company and Mrs. Jackson's budget by working in other departments at the Jericho Home Depot store.

126.    By reassigning hours specifically designated to Mrs. Jackson's seven (7) other Home Depot stores, Mr. McGarr methodically set her up to fail.

127.    Mrs. Jackson took pride in her job and used her creative skills when it was necessary.

128.    In 2003 the Company provided Mrs. Jackson and her colleagues with displays known as Cakes.

129.    The specs for the Cakes did not fit in the area they were to be displayed.

130.    Therefore, Mrs. Jackson took it upon herself to successfully re-configure and redesign the Cakes.

131.    Her efforts were so successful that D.M. McGarr gave her a $100.00 incentive for each Cake she built in her stores.

132.    D.M. McGarr instructed Mrs. Jackson to build the Cake displays in her co-workers' stores.

133.    However, Mrs. Jackson received no compensation or incentives for building the Cake displays in her co-workers stores.

134.    Another instance of unfair and disparate treatment Mrs. Jackson suffered occurred with the building of the Field Goal Post contest in 2004.

135.    Mrs. Jackson was the first of her Caucasian male co-workers to e-mail photos of her completed Field Goal Post to D.M. McGarr.

136.    D. M. McGarr admitted that Mrs. Jackson was the first to complete the Field Goal Post contest.

137.    D.M. McGarr further stated that he knew that she would be the first to complete the contest based on previous incentive driven assignments.

138.    However, D.M. McGarr insisted that she resubmit the photos because there was a piece of cardboard in one of the photos she sent.

139.    The piece of cardboard was the property of Home Depot and placed there by  a Home Depot employee.

140.    Due to other commitments Mrs. Jackson was unable to resubmit the photos immediately.

141.    Another co-worker, Mike Gabriele won the $100.00 contest.

142.    Mike Gabriele won even though he sent his photos in after Mrs. Jackson sent her photos in.

143.    Mrs. Jackson in 2004 created and designed the Bookcase display.

144.    The Book Case display was created and designed by Mrs. Jackson specifically for the Miracle Gro product line.

145.    At the December 2004 National Conference, those in attendance were encouraged to adopt and use the Book Case display.

146.    Even though Mrs. Jackson created and designed the Book Case display concept, the raise she received was less than the raise received by her Caucasian male co-workers.

147.    The events surrounding the December 2004 National Conference in Naples, Florida were particularly public, brutal and extremely humiliating for Mrs. Jackson.

148.    At the conference the Company's employees were encouraged to take the Miracle-Gro since there were several new items in the product line.

149.    Mrs. Jackson began taking one of each sku and realized that Keith Conard ("Mr. Conard"), Regional Vice President, was watching her.

150.    A short time later, Mr. Conard approached Mrs. Jackson and asked her: "What are you doing with the Miracle-Gro?"

151.    Mrs. Jackson, although perplexed by his peculiar inquiry, respectfully explained: "It is my understanding that we could take the Miracle-Gro, everyone is taking the product."

152.    Mr. Conard responded by stating: "Yes we were told we could take it, however, you can not because you are going on an airplane and will not be allowed on the flight with the product."

153.    Mrs. Jackson approached Rob Lamp ("Mr. Lamp") to obtain clarification on airline travel constraints associated with the Miracle-Gro.

154.    Mr. Lamp stated: "I have been addressing that issue all morning and you can take the Miracle-Gro but you must check it in and not take it in your carry-on luggage.

155.    Mr. Lamp then escorted Mrs. Jackson to the Miracle-Gro table and began assisting her with boxing up the products.

156.    Mr. Conard continued to watch Mrs. Jackson's every move from a distance.

157.    Mr. Lamp carried the box to the elevator and waited with her until the elevator arrived.

158.    When the elevator arrived she stepped on the elevator and he handed her the box and said: "Farewell, until next year."

159.    Prior to the elevator doors closing Mr. Conard stepped onto the elevator.

160.    Mr. Conard then asked Mrs. Jackson: "Have you ever been thrown into jail?"

161.    There were other representatives from the Company on the elevator having a conversation.

162.    But, all discussions ceased when Mr. Conard singled out Mrs. Jackson and asked her that question.

163.    He further stated that: "If you take the Miracle-Gro you are going to be thrown into jail and Scotts is not going to be here in Naples to get you out of jail."

164.    He then said: "What are you going to do?"

165.    Mrs. Jackson was shocked and flabbergasted by such a question.

166.    She immediately felt that Mr. Conard was motivated by racism since she was the only Company representative he made this inquiry to.

167.    Mrs. Jackson responded by stating that: "If I am arrested Marion Silber of Gordon & Silber will represent me."

168.    Flippantly, Mr. Conard said: "Is that right?"

169.    Mrs. Jackson steeled herself in order to hold back the tears.

170.    When she got to her room she cried hysterically due to the unbearable embarrassment and humiliation Mr. Conard had subjected her to.

171.    Mrs. Jackson called D.M. McGarr but was far too upset to leave a message the first time she called but called again and left a message.

172.    She then called her colleague Mr. Botz.  Mr. Botz had previously been Mrs. Jackson's direct supervisor.

173.    Mrs. Jackson explained what had occurred with Mr. Conard and how she had tried to call D.M. McGarr unsuccessfully.

174.    Mr. Botz told Mrs. Jackson that D.M. McGarr was on the patio in the pool area.

175.    Mr. Botz was very angry about the incident with Mr. Conard and advised Mrs. Jackson to take the product.

176.    Mr. Botz said it was unfair and cited the fact that everyone was taking the product and that she was the only Scotts representative singled out.

177.    D.M. McGarr returned her call and told her to meet him in the hotel lobby. Mrs. Jackson explained what had occurred and D.M. McGarr appeared to be in shock.

178.    He continued to ask Mrs. Jackson over and over again what had transpired between her and Mr. Conard.

179.    D.M. McGarr stated: "I'm in shock because I saw people leaving the hotel with tons of the stuff in their suitcases. Boxes of stuff I saw them leave with."

180.    Mrs. Jackson expressed to D.M. McGarr that due the actions of Mr. Conard she had been discriminated against.

181.    D.M. McGarr stated that when they get back to New York he would purchase all the Miracle-Gro that she wanted.

182.    But he voiced his concerns that he feared that if she did not put the Miracle-Gro back she would be fired for insubordination.

183.    He further stated that she should apologize to Mr. Conard for taking the Miracle-Gro.

184.    Mrs. Jackson began to cry because the harassment and humiliation had been compounded exponentially as a result of D.M. McGarr's reaction to the discrimination and the disparate treatment she had unfairly experienced.

185.    Nevertheless, she returned the Miracle-Gro and apologized to Mr. Conard for taking the product.

186.    Mr. Conard replied: "It was a wise thing to do because the Scotts Company would not have been available and that other incidents could have arose from the matter had you taken the Miracle-Gro."

187.    It is evident that those in a position to rightfully object to the wrongful and unlawful actions of Mr. Conard chose to act in concert with him by ignoring his blatant acts of discrimination.

188.    Mrs. Jackson was told to provide Mr. Cabanara with a formal report about the racist incident with Mr. Conard.

189.    However, when she broached the matter with him he stated curtly: "I'm not interested and forget the matter."

190.    D.M. McGarr acted in a similar fashion when he snapped: "Forget the entire matter.  Just forget about it."

191.    It is obvious that both Mr. Cabanara and D.M. McGarr covered and condoned the unlawful actions of Mr. Conard.

192.    On or about January 10, 2005 Mrs. Jackson's back went completely out which forced her to go out on short-term disability.

193.    However, unbeknownst to her, sometime during the month of June 2005 she was unceremoniously and unlawfully terminated.

194.    Mrs. Jackson's unlawful termination was contrary to the Company's policies and procedures.

195.    Moreover, the Company failed to provide her with a reasonable accommodation for her work related injury.

196.    *In or about March 2003 during her employment with the Company Mrs. Jackson informed her immediate supervisor Mr. McGarr that she required hernia surgery that was caused by work related lifting.*

197.    *Mr. McGarr commanded that neither Mrs. Jackson nor her co-workers inform the Company of her work related hernia injury.*

198.    *Mrs. Jackson complied with Mr. McGarr's command and did not inform the Company of her work related hernia injury because she feared that she would be terminated.*

199.    *On or about January 8, 2005 when Mrs. Jackson was still an employee of the Company, she injured her back, neck and arm as a result of lifting boxes of Miracle Gro fertilizer, which resulted in her described injuries.*

200.    *Mrs. Jackson remained employed by the Company but the Company and its insurance carrier did not pay for her medical treatment.*

201.    *On or about January 10, 2005 Mrs. Jackson notified her direct supervisor Mr. McGarr of the injuries she suffered on or about January 8, 2005.*

202.    *The Company or its insurer never counseled Mrs. Jackson as to her rights under workers' compensation statutory provisions of the State of New York pursuant to her 2003 or 2005 work related injuries.*

203.    *Based on Mrs. Jackson was hesitant to inquire about her workers' compensation rights because she believed by doing so it would adversely affect her employment.*

204.    On or about February 20, 2008 New York State Workers' Compensation Board took Mrs. Jackson's claim regarding her work related injuries upon learning the circumstances that caused the substantial delay. That her supervisor Mr. McGarr commanded her and her co-worker's not to inform the Company of her said job related injuries.

### AS AND FOR A FIRST CAUSE OF ACTION

**(Discrimination and Harassment
In Violation of New York State Human Rights Law)**

205.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 204, inclusive as if fully set forth herein.

206.    Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York State Human Rights Law by denying to plaintiff equal terms and conditions of employment, including but not limited to failing to provide plaintiff with a reasonable accommodation as a result to plaintiff's disability and subjecting plaintiff to disparate working conditions and performance standards, gender discrimination, denying plaintiff the opportunity to work in an employment setting free of unlawful harassment, denying plaintiff opportunities for professional growth, denying plaintiff compensation and other terms and conditions of employment equal to that of Caucasian employees, and terminating plaintiff unlawfully from plaintiff 's employment with defendant.

207.    Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in

violation of the New York State Human Rights Law by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive racial harassment of plaintiff by plaintiff's superiors.

208.    As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

209.    As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Retaliation in Violation of New York State Human Rights Law)

210.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 209, inclusive, as if fully set forth herein.

211.    Defendant has retaliated against plaintiff by, inter alia, by treating  her with unmitigated contempt when she complained about how she was treated regarding the Mr. Conard/Miracle Gro incident and subjecting plaintiff to wrongful termination,

subjecting plaintiff to an unfair and hostile work environment and failing to provide

plaintiff with a reasonable accommodation pursuant to plaintiff's disability this is clearly

in violation of New York State Human Rights Law for: (a) plaintiff's opposition to

defendant's discriminatory practices; (b) being wrongfully subjected to harassment and a

hostile work environment.

212.    As a direct and proximate result of defendant's unlawful and retaliatory

conduct in violation of the New York State Human Rights Law, plaintiff has suffered and

continues to suffer, monetary and/or economic damages, including but not limited to loss

of past and future income, compensation and benefits for which plaintiff is entitled to an

award of monetary damages and other relief.

213.    As a direct and proximate result of defendant's unlawful retaliatory

conduct in violation of the New York State Human Rights Law, plaintiff has suffered and

continues to suffer, severe mental anguish and emotional distress, including but not

limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem

and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an

award of monetary damages and other relief.


## AS AND FOR A THIRD CAUSE OF ACTION

### (Aiding and Abetting Violations of New York State Human Rights Law)

214.    Plaintiff hereby repeats and re-alleges each and every allegation in

paragraphs 1 through 213, inclusive, as if fully set forth herein.

215.    Defendants knowingly or recklessly aided and abetted the unlawful

employment practices, discrimination, harassment and retaliation against plaintiff in

23

violation of the New York State Human Rights Law by actively participating in the unlawful conduct set forth above.

216.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

217.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

## AS AND FOR A FOURTH CAUSE OF ACTION

**(Discrimination and Harassment
In Violation of New York City Human Rights Law)**

218.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 217, inclusive, as if fully set forth herein.

219.    Defendant has discriminated against plaintiff and subjected plaintiff  to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York City Human Rights Law by denying to plaintiff  equal terms and conditions of employment, including but not limited to, failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability, subjecting plaintiff to

disparate working conditions and performance standards, gender discrimination, economic discrimination, denying plaintiff the opportunity to work in an employment setting free of unlawful harassment, denying plaintiff opportunities for professional growth, denying plaintiff compensation and other terms and conditions of employment equal to that of Caucasian employees, and terminating plaintiff unlawfully from plaintiff's employment at the Defendant's.

220.    Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of her Race and/or Color (African-American/Black), in violation of the New York City Human Rights Law by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive racial harassment of plaintiff by plaintiff's superiors.

221.    As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

222.    As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of damages.

223.    Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Retaliation in Violation of New York City Human Rights Law)

224.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 223, inclusive, as if fully set forth herein.

225.    Defendant retaliated against plaintiff by, inter alia, by treating her with unmitigated contempt when she complained about how she was treated regarding the Mr. Conard/Miracle Gro incident and subjecting plaintiff to wrongful termination, subjecting plaintiff to an unfair and hostile work environment and failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability this is clearly in violation of New York State Human Rights Law for: (a) plaintiff's opposition to defendant's discriminatory practices; (b) being wrongfully subjected to harassment and a hostile work environment.

226.    As a direct and proximate result of defendant's unlawful and retaliatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

227.    As a direct and proximate result of defendant's unlawful retaliatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered and

continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

228.    Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.

## AS AND FOR THE SIXTH CAUSE OF ACTION

### (Aiding and Abetting Violations of New York City Human Rights Law)

229.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 228, inclusive, as if fully set forth herein.

230.    Defendant knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against plaintiff in violation of the New York City Human Rights Law by actively participating in the unlawful conduct set forth above.

231.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

232.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York City Human

Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

233.    Defendants unlawful actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.


## AS AND FOR THE SEVENTH CAUSE OF ACTION

### (Defamation)

234.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 233, inclusive, as if fully set forth herein.

235.    Defendant unlawfully subjected plaintiff to defamation: libel per se and slander per se, placed plaintiff in a false light, and engaged in acts that caused the invasion of plaintiff's privacy.

236.    Defendant knowingly or recklessly subjected plaintiff to defamation: libel per se and slander per se, placed her in a false light, and engaged in acts that caused the invasion of plaintiff's privacy in violation of New York State law.

237.    As a direct and proximate result of defendant's unlawful acts of defamation: libel per se and slander per se, placing plaintiff in a false light, and the invasion of plaintiff's privacy, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income,

compensation and benefits for which plaintiff is entitled to an award of monetary

damages and other relief.

238.    As a direct and proximate result of defendant's unlawful acts of

defamation: libel per se and slander per se, placing plaintiff in a false light, and the

invasion of plaintiff's privacy, plaintiff has suffered, and continues to suffer, severe

mental anguish and emotional distress, including but not limited to depression,

humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence,

and emotional pain and suffering for which plaintiff is entitled to an award of monetary

damages and other relief.

239.    Defendant's unlawful actions constitute malicious, willful and wanton

violations of New York State Law for which plaintiff is entitled to an award of

compensatory and punitive damages and other relief.


## AS AND FOR THE EIGHTH CAUSE OF ACTION

### (Economic Discrimination)

240.    Plaintiff hereby repeats and re-alleges each and every allegation in

paragraphs 1 through 239, inclusive, as if fully set forth herein.

241.    Defendant unlawfully subjected plaintiff to economic discrimination in

violation of New York State Law.

242.    Defendant knowingly or recklessly subjected plaintiff to economic

discrimination in violation of New York State Law.

243.    As a direct and proximate result of the defendant subjecting plaintiff to

economic discrimination, plaintiff has suffered, and continues to suffer, monetary and/or

economic damages, including but not limited to loss of past and future income,

compensation and benefits for which plaintiff is entitled to an award of monetary

damages and other relief.

244.    As a direct and proximate result of the defendant subjecting plaintiff to

economic discrimination, plaintiff has suffered, and continues to suffer, severe mental

anguish and emotional distress, including but not limited to depression, humiliation,

embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional

pain and suffering for which plaintiff is entitled to an award of monetary damages and

other relief.

245.    Defendant's unlawful actions constitute malicious, willful and wanton

violations of New York State Law for which plaintiff is entitled to an award of

compensatory and punitive damages and other relief.


## AS AND FOR THE NINETH CAUSE OF ACTION

### (Breach of Implied Contract to Act in Good Faith)

246.    Plaintiff hereby repeats and re-alleges each and every allegation in

paragraphs 1 through 245, inclusive, as if fully set forth herein.

247.    Defendant unlawfully breached its implied contract to plaintiff to act in

good faith in violation of New York State Law.

248.    Defendant knowingly or recklessly breached its implied contract to

plaintiff to act in good faith in violation of New York State Law.

249.    As a direct and proximate result of defendant's breach of the implied

contract to plaintiff to act in good faith, plaintiff has suffered, and continues to suffer,

monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

250.    As a direct and proximate result of defendant's breach of the implied contract to act in good faith, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

251.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

## AS AND FOR THE TENTH CAUSE OF ACTION

### (Failure to Provide a Reasonable Accommodation)

252.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 251, inclusive, as if fully set forth herein.

253.    Defendant unlawfully failed to provide plaintiff with a reasonable accommodation as a result of plaintiff's work related injury.

254.    Defendant knowingly and/or recklessly failed to provide plaintiff with a reasonable accommodation as a result of plaintiff's work related injury in violation of 9 New York Code of Rules and Regulations (NYCRR) §466.11.

255.    As a direct and proximate result of defendant's failure to provide plaintiff with a reasonable accommodation of plaintiff's work related injury, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

256.    As a direct and proximate result of defendant's failure to provide plaintiff with a reasonable accommodation of her work related injury, plaintiff has suffered, and continues to suffer, severe physical and mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

257.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

## AS AND FOR THE ELEVENTH CAUSE OF ACTION

### (Violation of Equal Protection of Laws)

258.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 257, inclusive, as if fully set forth herein.

259.    Defendant unlawfully violated plaintiff's Equal Protection of Laws rights.

260.    Defendant knowingly or recklessly violated plaintiff's Equal Protection of Laws rights under Article 1 § 11 of the New York State Constitution (Bill of Rights) by

subjecting plaintiff to treatment that no Caucasian employee of the defendants' has been subjected to.

261.    As a direct and proximate result of defendant's violating plaintiff's Equal Protection of Laws, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

262.    As a direct and proximate result of defendant's violating plaintiff's Equal Protection of Laws, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

## *AS AND FOR THE TWELFTH CAUSE OF ACTION*

### *(Violation of New York State Workers' Compensation Rights)*

*263.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 262, inclusive, as if fully set forth herein.*

*264.    Defendant unlawfully violated plaintiff's New York State Workers' Compensation Rights.*

*265.    Defendant knowingly or recklessly violated plaintiff's New York State Workers' Compensation Rights by subjecting plaintiff to treatment that no Caucasian employee of the defendants' has been subjected to.*

266.    As a direct and proximate result of defendant's violating plaintiff's New York State Workers' Compensation Rights, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

267.    As a direct and proximate result of defendant's violating plaintiff's New York State Workers' Compensation Rights, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of defendant complained of herein violate the laws of the State of New York and the City of New York;

B.    An order directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and otherwise unlawful conduct are eliminated and do not continue to affect plaintiff;

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for all monetary and/or economic damages,

including but not limited to, the loss of past and future income, wages, compensation, seniority and other benefits of employment;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for plaintiff's severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by plaintiff in an amount to be determined at trial, plus prejudgment interest;

F.      An award of punitive damages;

G.      An award of costs that plaintiff has incurred in this action, as well as plaintiff's reasonable attorney's fees to the fullest extent permitted by law; and

H.      Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated:  New York, New York
       March 27, 2008

                                  Respectfully submitted,

                                  SANDRA D. FRELIX, P.C.


                                  By: _____
                                       Sandra D. Frelix
                                       Attorney for Plaintiff
                                       110 Wall Street, 11th Floor
                                       New York, New York 10005
                                       Telephone:  212-859-3509
                                       Facsimile:  212-862-8212

## **VERIFICATION**

State of New York     )
                      )  ss.:
County of Queens      )


      MARIA JACKSON, being duly sworn, states:

      I am the Plaintiff in the action herein.  I have read the annexed SUMMONS AND

AMENDED VERIFIED COMPLAINT, know the contents thereof and the same are true

to my knowledge, except those matters therein which, are stated to be alleged on

information and belief, and as to those matters I believe them to be true.


                                _____
                                     MARIA JACKSON


Sworn to before me
this _____ day of March, 2008




_____
        NOTARY PUBLIC

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MARIA JACKSON,

                          Plaintiff,


            -against-                                    08 Civ. 1064 (LAK)


THE SCOTTS COMPANY,

                          Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                          **ORDER**

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/1/08

LEWIS A. KAPLAN, *District Judge.*

            This is an employment discrimination action that was removed from state court on the basis of diversity of citizenship. Plaintiff obviously is unhappy with the fact of the removal and has undertaken repeated and fruitless efforts to return to state court. The matter is before the Court on the latest of these, plaintiff's so-called amended motion and notice of motion to remand.

            Plaintiff initially moved to remand [docket item 7], asserting that the complaint asserted a claim under the New York Worker's Compensation Law. That motion was denied as frivolous on February 21, 2008 on the ground that the complaint did not assert a claim under the Worker's Compensation Law – indeed, it did not even contain the word "worker." [Docket item 9]

            Plaintiff then moved for leave to amend the complaint, evidently to attempt to allege a claim under the Worker's Compensation Law, assuming that such an amendment would require remand. [Docket item 18] That motion too was denied, this one on the grounds that the proposed amended complaint attached to the motion consisted exclusively of a caption, without any text. In the course of denying that motion, the Court expressed skepticism also that an amendment to assert a claim under the Worker's Compensation Law would require remand. [Docket item 21]

            Now plaintiff has filed a so-called amended motion and notice of motion to remand to the state court. [Docket item 23]

            As defendant has not answered the complaint, leave of court is not required to

Case 1:08-cv-01064-LAK    Document 26    Filed 04/01/2008    Page 2 of 2

2

amend.[1]  Accordingly, the Court deems the proposed amended complaint attached to plaintiff's motion to have been served and filed, which takes us to the motion to remand.

The amended complaint differs from its predecessor in that it adds a twelfth cause of action.  It alleges in material part only this: "Defendant knowingly or recklessly violated plaintiff's New York State Workers' Compensation Rights by subjecting plaintiff to treatment that no Caucasian employee of the defendants' [sic] has been subjected to."  Am Cpt ¶ 265.

Racial discrimination in employment is prohibited by the New York State Human Rights Law as well as federal statutes and other provisions of law.  The New York Workers' Compensation Law, however, whatever else it might proscribe, it does not appear to bar discrimination on the basis of race.

Accordingly, plaintiff shall show cause, on or before April 8, 2008, why the twelfth cause of action should not be dismissed for failure to state a claim upon which relief may be granted. Insofar as plaintiff's motion [docket item 23] seeks leave to amend, it is denied as unnecessary. Insofar as it seeks an order remanding the action, it is denied without prejudice to renewal in the event the sufficiency of the twelfth cause of action is sustained.

SO ORDERED.

Dated:        April 1, 2008



_____
Lewis A. Kaplan
United States District Judge

---

[1]    As noted, the Court previously denied plaintiff's prior motion to amend.  In so doing, it mistakenly adopted plaintiff's erroneous assumption that leave to amend was required.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

MARIA JACKSON,                                    Index No. 08 CV 1064 (LAK)

          Plaintiff,

     -against-

THE SCOTTS COMPANY,

          Defendant.
-------------------------------------------------------X

---

## MEMORANDUM OF LAW IN SUPPORT OF NEW YORK WORKERS' COMPENSATION LAW BARS DISCRIMINATION ON THE OF RACE

---

USDC SDNY

SANDRA D. FRELIX, ESQ. (SF-0421)
110 Wall Street
11th Floor
New York, New York 10005
(212) 859-3509
Attorney for Plaintiff

# **TABLE OF CONTENTS**

Table of Authorities………………………………………………………….i

Preliminary Statement……………………………………………………..1

Statement of Facts……………………………………………………1

Procedural History……………………………………………………1

Argument…………………………………………………………….3

    I.      NEW YORK WORKERS' COMPENSATION LAW BARS
             DISCRIMINATION ON THE BASIS OF RACE…………..3

          A.    Legal Standard…………………………………....3

Conclusion…………………………………………………………5

# TABLE OF AUTHORITIES

## FEDERAL STATUTES

Page

28 U.S.C. § 1441(b)....................................................1

28 U.S.C. § 1445(c)...................................................1, 2

Fed.R.Civ.P. 11(b)(2).................................................2

Fed.R.Civ.P. 11(b)(2).................................................3

## NEW YORK STATE STATUTE

McKinney's Workers Compensation Law § 120.............................3, 4

## PRELIMINARY STATEMENT

On February 21, 2008 this court dismissed Plaintiff's Motion and Notice of Motion to Remand Action to State Court under 28 U.S.C.§1445(c) on the grounds that it was not accompanied by a memorandum of law, in violation of S.D.N.Y. Civ.R.7.1. Moreover, this Court assessed the undersigned with sanctions in the amount of $750.00.

## STATEMENT OF FACTS

Maria Jackson ("the Plaintiff") was an employee of The Scotts Company ("the Defendant") from April 2001 until the Defendant unlawfully terminated her in June 2005. As a result of her unlawful termination the Plaintiff filed a summons and verified complaint against the Defendant on December 21, 2007.

## PROCEDURAL HISTORY

On December 21, 2007 Plaintiff filed a summons and complaint in the Supreme Court of the State of New York, County of Bronx. The same was served upon the Defendant on January 4, 2008. The Defendant then moved this Court with a Notice of Removal of Action under 28 U.S.C. §1441(b) dated February 1, 2008. The Plaintiff responded by filing and serving a Motion and Notice of Motion to Remand Action to State Court under 28 U.S.C.§1445(c) on February 20, 2008.

However, during a February 6, 2008 telephone discussion between the undersigned and Craig S. Friedman, Esq. ("Mr. Friedman"), counsel for the Defendant, Mr. Friedman, an attorney of the law firm Jones Day, only requested an extension of time to answer the complaint from February 8, 2008 to March 10, 2008. On February 14,

1

2008 the Honorable Lewis A. Kaplan ("Judge Kaplan") granted the Defendant's Time to Answer, Move or Otherwise Respond to the Complaint to March 10, 2008.

Defendant served Plaintiff with a Partial Motion to Dismiss on March 10, 2008.

The undersigned never received the electronic notice of Judge Kaplan's February 14, 2008 endorsement letter.

As previously stated the undersigned filed and served a Motion and Notice of Motion to Remand Action to State Court under 28 U.S.C.§1445(c) on February 20, 2008. Also, on or about February 20, 2008 the undersigned began to experiencing flu like symptoms that caused the undersigned to fail to acknowledge and respond timely to Judge Kaplan's February 21, 2008 Order denying Plaintiff's Motion to Remand to State Court. The flu suffered by the undersigned lasted for about two (2) weeks.

As an unfortunate result of the undersigned's excusable neglect to respond due to illness, Judge Kaplan found that the undersigned violated Fed.R.Civ.P. 11(b)(2) and 11(b)(3) and sanctioned the undersigned to $750.00 that is to be paid on or before March 19, 2008.

It is worthy to note that the undersigned did not become aware of Judge Kaplan's February 21, 2008 electronic notice until his March 5, 2008 electronic notice.

On March 19, 2008 Plaintiff filed a Motion and Notice of Motion for Relief From Order and a Motion and Notice of Motion for Leave to Amend Pleading both were denied by Judge Kaplan on March 21, 2008.

On April 1, 2008 Judge Kaplan rendered and filed and Order requiring Plaintiff to sustain the sufficiency of the twelfth cause of action in Plaintiff's complaint.

## ARGUMENT

**I.   NEW YORK WORKERS' COMPENSATION LAW BARS DISCRIMINATION ON THE BASIS OF RACE**

### A. The Legal Standard

(1)   McKinney's Workers' Compensation Law §120

"It shall be unlawful for any employer or his or her duly authorized agent to discharge or in any other manner discriminate against an employee as to his or her employment because such employee has claimed or attempted to claim compensation from such employer, or because he or she has testified or is about to testify in a proceeding under this chapter and no other valid reason is shown to exist for such action by the employer."

In regard to the twelfth cause of action in plaintiff's amended complaint, Judge Kaplan in his April 1, 2008 Order states in part that: "Racial discrimination in employment is prohibited by the New York State Human Rights Law as well as federal statutes and other provisions of law. The New York Workers' Compensation Law, however, whatever else it might proscribe, it does not appear to bar discrimination on the basis of race.

However, as stated previously, McKinney's Workers' Compensation Law § 120 ("§ 120") provides in part that: "It shall be unlawful for any employer or his or her duly authorized agent to discharge *or in any other manner discriminate against an employee* (emphasis added) as to his or her employment because such employee has claimed or attempted to claim compensation from such employer, or because he or she has testified or is about to testify in a proceeding under this chapter and no other valid reason is shown to exist for such action by the employer."

3

Therefore, it is the steadfast contention of the Plaintiff and her attorney that the twelfth cause of action must be sustained due to the fact that it does indeed state a claim upon which relief may be granted. The operative language in § 120 that establishes that the twelfth cause of action is sustainable and is supported by a claim upon which relief may be granted is as follows:

"It shall be unlawful for any employer or his or her duly authorized agent to discharge *or in any other manner discriminate against an employee* (emphasis added) as to his or her employment because such employee has claimed or attempted to claim compensation from such employer, … and no other valid reason is shown to exist for such action by the employer."

It is simply irrefutable that § 120 pronounces that it is unlawful to discriminate in **any** manner. As a result of this declaration all brands and types of discrimination are included and represented. Since the declaration does not exclude race discrimination then it is unlawful to discriminate based on race.

Although § 120 further states: "Any complaint alleging such an unlawful discriminatory practice must be filed within two years of the commission of such practice…." The New York State Workers' Compensation Board accepted her Employees' Claim for Compensation on February 20, 2008 due to the egregious conduct of the Defendant. Currently, the New York State Workers' Compensation Board is investigating her claims. (Exhibit 1)

Accordingly, the twelfth cause of action absolutely makes a charge against the Defendant based on race under Workers' Compensation Law § 120. Furthermore, said

charge is sustainable and must not be dismissed for failure to state a claim upon which

relief may be granted.

## CONCLUSION

Based on the foregoing we earnestly pray that the Court will grant Plaintiff's

remand motion together with such other and further relief as to this Court may deem just

and proper.


Dated:  New York, New York
        April 8, 2008



                                        Yours, etc.,


                                        SANDRA D. FRELIX, ESQ.



                                        By:___/s/ Sandra D. Frelix_____
                                                Sandra D. Frelix, Esq. (SF-0421)
                                                110 Wall Street
                                                11th Floor
                                                New York, New York 10005
                                                (212) 859-3509

                                                ATTORNEY FOR PLAINTIFF

To: Craig S. Friedman, Esq. (CF-1988)
    Matthew W. Lampe, Esq. (Pro Hac Vice application pending)
    JONES DAY
    322 East 41st Street
    New York, New York 10017

    ATTORNEY FOR DEFENDANT

# EXHIBIT INDEX
## FOR PLAINTIFF'S MEMORANDUM OF LAW

1.    Plaintiff's Employee's Claim for Compensation dated February 20, 2008.

**EXHIBIT 1**

## WORKERS' COMPENSATION BOARD
## EMPLOYEE'S CLAIM FOR COMPENSATION

IMPORTANT: Your Social Security Number Must Be Entered:
IMPORTANTE: El Numero de su Seguro Social Debe Ser Indicado:

| 0 | 5 | 6 | 6 | 4 | 2 | 8 | 6 |
|---|---|---|---|---|---|---|---|

ANSWER ALL QUESTIONS FULLY - TYPE OR PRINT CLEARLY

WCB Case No. (If known) _____     Carrier Case No.(if known) _____

| | |
|---|---|
| **A.** Injured Person | 1. Name *MARIA* (First Name)   *L.* (Middle Name)   *Jackson* (Last Name) |
| | 2. Mailing Address *184-12 144 Road   Springfield Gardens   NY   11413* (Number and Street (include Apartment No.) City State Zip Code) |
| | 3. Residential Address (if different from mailing address) |
| | 4. Sex ☐ Male ☑ Female   Date of Birth *04-09-61*   Telephone No. ( *718* ) *525-6637* |
| | 5. Do you speak English? ☑ Yes ☐ No   If no, what language do you speak? |
| | 6. Name of union and local number, if member... *N/A* |
| | 7. State what your regular work/occupation was *Sales Merchandise Manager (SMM)* |
| | 8. Wages or average earnings per day, including overtime, board, rent and other allowances. *650.00 Weekly Net* |
| | 9. Were you paid full wages for the day of injury? ☑ Yes ☐ No |
| | 10. Your work week at time of injury was ☐ Five day ☐ Six day ☐ Seven day ☑ Other *6½ day per week* |
| **B.** Employer(s) | 1. Employer *The Scotts Company*   Telephone No. (*800*) *221-1760* |
| | 2. Employer's Address *1114 Scottslawn Road* |
| | 3. Were you employed by any other employer or employers at the time of your injury/illness? ☐ Yes ☑ No |
| | 4. If yes, did you lose time from work at this other employment as a result of your injury/illness? ☐ Yes ☐ No |
| **C.** Place/Time | 1. Address where injury occurred *Home Depot   Hempstead L.I.*   County *Nassau* |
| | 2. Date of Injury *1-8-05*   at *7:00* o'clock. ☑ AM ☐ PM |
| **D.** The Injury | 1. How did injury/illness occur? *While I was lifting Boxes of Miracle Gro Fertilizer I felt a pop and then a pulling in my back, then pain in my lower back* |
| | 2. Did anyone witness the injury? ☐ Yes ☑ No If yes, name(s) |
| | 3. Is the injury the result of the use or operation of a motor vehicle? ☐ Yes ☑ No If Yes, ☐ your vehicle ☐ employer's vehicle   If your vehicle was involved, give name & address of your motor vehicle (No-Fault) insurance carrier. |
| **E.** Nature and Extent of Injury/Illness | 1. State fully the nature of your injury/illness, including all parts of body injured *L 3-4-5-6-7 Herniated Disk Lumbar My LowerBack, Right ARM, Neck Disc Bulges* |
| | 2. Date you stopped work because of this injury/illness? |
| | 3. Have you returned to work? ☐ Yes ☑ No   If yes, on what date? |
| | 4. Does injury/illness keep you from work? ☑ Yes ☐ No |
| | 5. Have you done any work during period of disability? ☐ Yes ☑ No |
| | 6. Have you received any wages since your injury/illness? ☐ Yes ☑ No |
| **F.** Medical Benefits | 1. Did you receive or are you now receiving medical care? ☑ Yes ☐ No |
| | 2. Are you now in need of medical care? ☑ Yes ☐ No |
| | 3. Name of attending doctor *Richard Matteo, James Liguori, Richard OBEDIAN* |
| | Doctor's address |
| | 4. If you were in a hospital, give the dates hospitalized *NO* |
| | Name of hospital |
| | Hospital's Address |
| **G.** Comp. Payments | 1. Have you received or are you now receiving workers' compensation payments for the injury reported above? ☐ Yes ☑ No |
| | 2. Do you claim further workers' compensation payments? ☑ Yes ☐ No |
| **H.** Notice | 1. Have you given your employer (or supervisor) notice of injury? ☑ Yes ☐ No |
| | 2. If yes, notice was given ☑ orally ☐ in writing, on *1-10-05*   to *Patrick Mc Garr   Direct Supervisor* |

I hereby present my claim to the Chair, Workers' Compensation Board, for compensation for disability resulting from an accidental injury or occupational disease arising out of and in the course of my employment and not occasioned by my willful intention or solely through intoxication, and in support of it I make the foregoing statement of facts.

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD PRESENTS, CAUSES TO BE PRESENTED, OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO, OR BY AN INSURER, OR SELF INSURER, ANY INFORMATION CONTAINING ANY FALSE MATERIAL STATEMENT OR CONCEALS ANY MATERIAL FACT SHALL BE GUILTY OF A CRIME AND SUBJECT TO SUBSTANTIAL FINES AND IMPRISONMENT.

Signed by *Maria Jackson* (Claimant)     Dated *2-10-08*

SEE OTHER SIDE FOR IMPORTANT INFORMATION - VEASE AL DORSO PARA INFORMACION DE IMPORTANCIA
THE WORKERS' COMPENSATION BOARD EMPLOYS AND SERVES PEOPLE WITH DISABILITIES WITHOUT DISCRIMINATION
LA JUNTA DE COMPENSACION OBRERA EMPLEA Y SIRVE A PERSONAS INCAPACITADAS SIN DISCRIMINAR

C-3 (11-06)     www.wcb.state.ny.us

# ON-THE-JOB INJURY OR OCCUPATIONAL DISEASE:

1. Immediately tell your employer or supervisor when, where and how you were injured.
2. Secure medical care immediately.
3. Tell your doctor to file medical reports with the Board and with your employer or its insurance carrier.
4. Make out this claim for compensation and send it to the nearest Workers' Compensation Board Office. (See below.) Failure to file within two years after the date of injury may result in your claim being denied. If you need help in completing this form, telephone or visit the nearest Workers' Compensation Board Office listed below.
5. Go to all hearings when notified to appear.
6. Go back to work as soon as you are able; compensation is never as high as your wage.

## YOUR RIGHTS:

1. Generally, you are entitled to be treated by a doctor of your choice, provided she is authorized by the Board. If your employer is involved in a preferred provider organization (PPO) arrangement, you must obtain initial treatment from the preferred provider organization which has been designated to provide health care services for workers' compensation injuries.
2. DO NOT pay your doctor or hospital. Their bills will be paid by the insurance carrier if your case is not disputed. If your case is disputed, the doctor or hospital must wait for payment until the Board decides your case. In the event you fail to prosecute your case or the Board decides against you, you will pay the doctor or hospital.
3. You are also entitled to be reimbursed for drugs, crutches, or other aids properly prescribed by your doctor and for carfares or other necessary expenses in going to and from your doctor's office or the hospital. (Get receipts for such expenses.)
4. You are entitled to compensation if your injury keeps you from work for more than seven days, compels you to work at lower wages, or results in permanent disability to any part of your body.
5. Compensation is payable directly and without waiting for an award, except when the claim is disputed.
6. You are entitled to a hearing. You are not required to obtain anyone to represent you at a hearing, but you have the right to be represented by an attorney or licensed representative, if you so choose. If you obtain representation, do not pay your attorney or representative directly. When the Workers' Compensation Board rules on your case, the attorney's or representative's fee will be set by the Board and paid to him or her by your employer or by your employer's insurance carrier. The amount so paid will be deducted from your award.
7. If you need help returning to work, or with family or financial problems because of your injury, contact the Workers' Compensation Board office nearest you and ask for a rehabilitation counselor or social worker.

# CASO DE LESION O ENFERMEDAD OCUPACIONAL:

1. Avise inmediatamente a su patrono ó a su supervisor cuando, donde y como sufrio la lesión.
2. Obtener atención médica inmediatamente.
3. Pedirle a su médico que presente informes a la Junta y a su patrono, ó a la compañía de seguros.
4. Llenar esta forma de reclamación para compensación y enviarla a la oficina mas cercana de la Junta de Compensación. (vease abajo.) El no presentar reclamación dentro de dos años a partir de la fecha de la lesión puede ser motivo de que se rechace la reclamación. Si necesita que le ayuden a llenar esta forma, llame por telefono ó vaya a la oficina mas cercana de la Junta de Compensación Obrera.
5. Acuda a todas las audiencias cuando se le notifique que comparezca.
6. Volver a su trabajo lo mas pronto que le sea posible; la compensación nunca es tan alta como su sueldo.

## SUS DERECHOS:

1. Por lo general usted tiene derecho a ser atendido por el médico de su preferencia, siempre y cuando esté autorizado por la Junta. Si su patrono está participando en un acuerdo de organización de proveedores con preferencia (P.P.O.) su tratamiento inicial deberá obtenerlo de la entidad que su patrono haya designado para proveer cuidado médico para lesiones relacionadas con la compensación obrera.
2. NO PAGUE NADA a su médico ni al hospital. Esas facturas seran pagadas por la compañía de seguros si su caso no ha sido cuestionado. Si el caso es disputado entonces el médico ó el hospital deberan esperar hasta que la Junta decida el caso. Si usted deja de procesar su caso o si la Junta falla en su contra, le corresponde pagar al médico ó al hospital.
3. Tampoco tiene usted derecho a ser reembolsado por gastos de medicamentos, muletas, o cualquier aparato apropriadamente prescrito por su médico y por transportación, u otros gastos necesarios para visitar el consultorio de su médico ó el hospital. (Obtenga comprobantes de esos gastos.)
4. Usted tiene derecho a compensación si su lesión le deja impedido de trabajar por mas de siete dias, o le obliga a trabajar a sueldo mas bajo ó resulta con incapacidad permanente en alguna parte de su cuerpo.
5. La compensación es pagadera directamente si no tiene que esperar la decisión, excepto cuando se cuestione la reclamación.
6. Usted tiene derecho a una audiencia. Usted no está obligado a conseguir quien le represente en la audiencia, pero tiene derecho a ser representado por un abogado ó por un representante licenciado, si usted lo prefiere. En caso de obtener usted representación, no pague nada directamente a su abogado o representante. Cuando la Junta de Compensación Obrera decida su caso los honorarios de su abogado o representante seran fijados por la Junta y seran pagados por el patrono ó por la compañía de seguros. La suma pagada en esta forma sera deducida de la cantidad adjudicada a usted.
7. Si necesita ayuda para volver al trabajo ó si tiene problemas familiares o economicos por motivo de su lesion, comuniquese con la oficina de la Junta de Compensacion Obrera que le quede mas cerca y pida una reunion con un consejero de rehabilitacion ó con un trabajador social.

## 'WORKERS' COMPENSATION BOARD DISTRICT OFFICES AND COUNTIES SERVED
## OFICINAS DE DISTRITO DE LA JUNTA DE COMPENSACION OBRERA Y LOS CONDADOS SERVIDOS

**ALBANY 12241** - 100 Broadway, Menands. (866) 750-5157. For all accidents in following counties: Albany, Clinton, Columbia, Dutchess, Essex, Franklin, Fulton, Greene, Hamilton, Montgomery, Rensselaer, Saratoga, Schenectady, Schoharie, Ulster, Warren, Washington

**BINGHAMTON 13901** - State Office Building, 44 Hawley Street. (866) 802-3604. For all accidents in following counties: Broome, Chemung, Chenango, Cortland, Delaware, Otsego, Schuyler, Sullivan, Tioga, Tompkins.

**BUFFALO 14202** - Statler Towers, 107 Delaware Ave. (866) 211-0645. For all accidents in following counties: Cattaraugus, Chautauqua, Erie, Niagara, Orleans, Seneca, Steuben, Wayne, Wyoming, Yates.

**ROCHESTER 14614** - 130 Main Street West. (866) 211-0644. For all accidents in following counties: Allegany, Genesee, Livingston, Monroe, Ontario,

**SYRACUSE 13203** - 935 James Street. (866) 802-3730. For all accidents in following counties: Cayuga, Herkimer, Jefferson, Lewis, Madison, Oneida, Onondaga, Oswego, St. Lawrence

**DOWNSTATE CENTRALIZED MAILING** (for New York City, Hempstead, Hauppauge & Peekskill district offices) - PO Box 5205, Binghamton, NY 13902-5205. NYC (800) 877-1373. Hemp. (866) 805-3630. Haup. (866) 681-5354. Peek. (866) 746-0552. For all accidents in following counties: Bronx, Kings, Nassau, New York, Orange, Putnam, Queens, Richmond, Rockland, Suffolk, Westchester.

(Claims for compensation, inquiries, medical and other reports should be sent to the District Office of the County in which the accident occurred. Be sure to notify this office of any change in your address.)

(Reclamaciones para compensación, preguntas, informes medicos y de otra naturaleza deben enviarse a la oficina de distrito del condado donde ocurrio el accidente. No deje de avisar a esta oficina acerca de cambios en su dirección.)

### Notification Pursuant to the New York Personal Privacy Protection Law (Public Officers Law Article 6-A) and the Federal Privacy Act of 1974 (5 U.S.C. Sec. 552a).

The Workers' Compensation Board's ("Board") authority to request personal information from claimants is derived from Sections 20 and 142 of the Workers' Compensation Law. This information is collected to assist the Board in processing claims in an efficient manner and to help it maintain accurate claim records.

The Board is strongly committed to protecting the confidentiality of all personal information that it collects. Such information will be disclosed within the agency only to Board personnel and agents in furtherance of their official duties. Personal information will be disclosed outside the agency only in accordance with applicable state and federal law.

The Board's Director of Operations, located at 100 Broadway, Menands, New York 12241 (518-474-6674), is primarily responsible for the maintenance of agency records containing personal claimant information.

Failure to provide the information requested on this form will not result in the denial of your claim, but may. The processing of your claim may be delayed. The voluntary release of your social security number enables the Board to ensure that information is associated with, and quick action is taken on, your claim.

### HIPAA Notice

In order to adjudicate a workers' compensation claim, WCL 13-a(4)(a) and 12 NYCRR 325-1.3 require health care providers to regularly file medical reports of treatment with the Board and the carrier and employer. Pursuant to 45 CFR 164.512 these legally required medical reports are exempt from HIPAA's restrictions on disclosure of health information.

The Workers' Compensation Board assures hearing locations accessible to the disabled. Contact the nearest Board office if you have special accessibility needs.

### Notificación conforme a la Ley de Protección de la Privacidad de Nueva York (Ley de Servidores Publicos 6-A) y el Acta Federal de Privacidad de 1974 (5 U.S.C. Sec.552a).

La autoridad de la Junta de Compensación Obrera para requerir información personal de los reclamantes surge de las Secciones 20 y 142 de la Ley de Compensación Obrera. Esta información se utiliza para ayudar a la Junta a procesar reclamaciones en forma eficiente y mantener expedientes precisos.

La Junta guarda celosamente la información confidencial de la información personal que requiere. Esa información solo se compartirá con personal de la Junta y sus agentes en relación al cumplimiento de sus deberes oficiales. Información personal requerida por la Junta solo sera compartida con personas o entidades fuera de la Junta cuando sea requerido por leyes estatales o federales.

El Director de Operaciones de la Junta con oficinas en 100 Broadway, Menands, New York 12241 (518-474-6674), es responsable directo del mantenimiento de los expedientes de la agencia que contienen información personal de los reclamantes.

Si usted no suministra la información requerida en esta forma, esto no quiere decir que su reclamación sera denegada, pero puede retrasar el procesamiento de su caso. El liberar su seguro social permite a la Junta tomar acción rápida en todo lo concerniente a la información relacionada con su reclamación.

### Aviso de HIPAA

Como requisito para adjudicar una reclamación, la ley de compensación obrera WCL 13-a(4) (a) y 12 NYCRR 325-1.3 requiere a los proveedores de salud radicar regularmente ante la Junta, el patrono informes sobre el tratamiento medico. Conforme a 45CFR 164.512 estos informes medicos requeridos por ley estan exentos de las restricciones sobre información medica impuestos por HIPAA

Proveemos locales accesibles para la vista de sus casos. Comunicate con nuestra oficina mas cercana si tienes algun requerimiento especial de acceso.

C-3 (11-06) Reverse

DOWNSTATE CENTRALIZED MAILING
(for New York City & Long Island Districts)
PO Box 5205  Binghamton, NY 13902-5205
NYC (800)877-1373 / Hemp. (866)805-3630 / Haup. (866)681-5354 / Peek (866)746-0552 (866) 750-5157
100 Broadway-Menands
44 Hawley Street  107 Delaware Ave. 130 Main Street W  935 James St.
ALBANY 12241 BINGHAMTON 13901 BUFFALO 14202 ROCHESTER 14614 SYRACUSE 13203
(866) 802-3604    (866) 211-0645    (866) 211-0644    (866) 802-3730

## State of New York
## WORKERS' COMPENSATION BOARD

# CLAIMANT'S AUTHORIZATION TO DISCLOSE WORKERS' COMPENSATION RECORDS

(Pursuant to Workers' Compensation Law Section 110-a)

## PLEASE COMPLETE ALL ITEMS. AN INCOMPLETE FORM WILL DELAY THE PROCESSING OF YOUR REQUEST.

| Claimant's Name | Claimant's Social Security No | Case Number and/or Date of Accident □WCB □DB □Discrimination |
|---|---|---|
| MARIA L. Jackson | 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 | |

IF RELEASE IS AUTHORIZED FOR ADDITIONAL CASE FILE(S) IDENTIFY BELOW BY WCB/DB/DC CASE NUMBER AND/OR DATE OF ACCIDENT(S)

**CLAIMANT IS PROHIBITED FROM AUTHORIZING RELEASE OF WORKERS' COMPENSATION INFORMATION TO PROSPECTIVE EMPLOYERS OR IN CONNECTION WITH ASSESSING FITNESS OR CAPABILITY OF EMPLOYMENT.**

**INSTRUCTIONS:**
Submit original to the Workers' Compensation Board and retain a copy for your records. *Authorization for disclosure of records for certain purposes is not valid under the law. See excerpt of WCL Section 110-a on the reverse of this form. This authorization is effective until it is revoked by the claimant. Claimant may revoke this authorization at any time upon written notice to the Workers' Compensation Board.*
**THIS AUTHORIZATION DOES NOT PERMIT eCASE ACCESS.**

Pursuant to Section 110-a of the Workers' Compensation Law, I, *Maria Jackson*,
Claimant's Name

represent that I am a person who is/was the subject of the Workers' Compensation case(s) indicated above,

and I authorize the Workers' Compensation Board to discuss the above-referenced Workers' Compensation

Board records with and/or release a copy of the above-referenced records to

*Sandra D. Freix ESQ. 110 Wall Street 11 Fl N.Y. N.Y. 10005*, at
Name of a Specific Person, Corporation, Association or Public or Private Entity

*110 Wall Street New York, NY 10005 11 Fl*
Address

I understand that the requesting party may be required to pay a statutory fee prior to being provided copies of

these records by the Workers' Compensation Board.

*Maria Jackson*                    *2-20-08*
Claimant's Signature (ink only)          Date

Failure to provide the information requested on this form will not result in the denial of your authorization, but may delay the processing of your request. The voluntary release of your social security number enables the Board to ensure that information is associated with, and quick action is taken on, your request.

3. Individual authorization.   Notwithstanding the restrictions on disclosure set forth under subdivision one of this section, a person who is the subject of a workers' compensation record may authorize the release, re-release or publication of his or her record to a specific person not otherwise authorized to receive such record, by submitting written authorization for such release to the board on a form prescribed by the chair or by a notarized original authorization specifically directing the board to release workers' compensation records to such person.   However, in accordance with section one hundred twenty-five of this article, no such authorization directing disclosure of records to a prospective employer shall be valid; nor shall an authorization permitting disclosure of records in connection with assessing fitness or capability for employment be valid, and no disclosure of records shall be made pursuant thereto. It shall be unlawful for any person to consider for the purpose of assessing eligibility for a benefit, or as the basis for an employment-related action, an individual's failure to provide authorization under this subdivision.

4. It shall be unlawful for any person who has obtained copies of board records or individually identifiable information from board records to disclose such information to any person who is not otherwise lawfully entitled to obtain these records.

5. Any person who knowingly and willfully obtains workers' compensation records which contain individually identifiable information under false pretenses or otherwise violates this section shall be guilty of a class A misdemeanor and shall be subject upon conviction, to a fine of not more than one thousand dollars.

6. In addition to or in lieu of any criminal proceeding available under this section, whenever there shall be a violation of this section, application may be made by the attorney general in the name of the people of the state of New York to a court or justice having jurisdiction by a special proceeding to issue an injunction, and upon notice to the defendant of not less than five days, to enjoin and restrain the continuance of such violations; and if it shall appear to the satisfaction of the court or justice that the defendant has, in fact, violated this section, an injunction may be issued by such court or justice, enjoining and restraining any further violation, without requiring proof that any person has, in fact, been injured or damaged thereby. In any such proceeding, the court may make allowances to the attorney general as provided in paragraph six of subdivision (a) of section eighty-three hundred three of the civil practice law and rules, and direct restitution. Whenever the court shall determine that a violation of this section has occurred, the court may impose a civil penalty of not more than five hundred dollars for the first violation, and not more than one thousand dollars for the second or subsequent violation within a three year period. In connection with any such proposed application, the attorney general is authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules.

OC-110A (12-03) Reverse

# EXHIBIT H

Case 1:08-cv-01064-LAK    Document 40    Filed 04/30/2008    Page 1 of 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MARIA JACKSON,

                          Plaintiff,

        -against-                                                    08 Civ. 1064 (LAK)

THE SCOTTS COMPANY,

                          Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/30/08

## ORDER

LEWIS A. KAPLAN, *District Judge.*

        By memorandum and order dated March 27, 2008, I granted defendant's motion for partial dismissal of the original complaint and dismissed the Fourth through Eleventh Claims, and the claims for declaratory relief, punitive damages and attorney's fees, in their entirety and dismissed also the First through the Third claims to the extent they are based on events prior to December 21, 2004. Plaintiff subsequently filed an amended complaint which, apart from the addition of a twelfth claim for relief that already has been dismissed, was identical in all material respects to the original complaint. Defendant now moves to dismiss the portions of the amended complaint that correspond to those dismissed by the March 27, 2008 order. As has occurred on the motion to dismiss part of the original complaint, plaintiff has filed no opposition to this motion.

        "The law of the case doctrine precludes reconsideration of . . . question[s previously determined] here absent 'cogent or compelling reasons.'" *In re Garlock,* 463 F. Supp.2d 478, 480 (S.D.N.Y. 2006) (citing cases). The only possible reason for reconsidering the previous ruling is that plaintiff defaulted on the motion to dismiss the amended complaint in consequence of having agreed upon an extension of time within which to respond to the motion, but then failing to file or obtain approval of the extension. This sort of failure is not sufficient. In any case, given plaintiff's default on the present motion, she certainly has failed to demonstrate any reason whatever for reaching a different result.

        Accordingly, defendant's motion for partial dismissal of the amended complaint is granted in all respects. The Fourth through Eleventh Claims, and the claims for declaratory relief, punitive damages and attorney's fees, are dismissed in their entirety. The First through the Third claims are dismissed to the extent they are based on events prior to December 21, 2004.

        SO ORDERED.

Dated:        April 30, 2008

                                                    _____
                                                    Lewis A. Kaplan
                                                    United States District Judge

# EXHIBIT I



KAПAN,S.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/11/08

RECEIVED
APR 11 2008
JUDGE KAPLAN'S CHAMBER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARIA JACKSON,                                    08 Civ. 1064 (LAK)

       Plaintiff,

   -against-

THE SCOTTS COMPANY

      Defendant.

<u>Consent Scheduling Order</u>

     Upon consent of the parties, it is hereby
ORDERED as follows:

1.    No additional parties may be joined after May 12, 2008.

2.    No amendments to the pleadings will be permitted after May 12, 2008.

3.    The parties shall make required Rule 26(a)(2) disclosures with respect to:

    (a)    expert witnesses on or before June 9, 2008;

    (b)    rebuttal expert witnesses on or before July 14, 2008.

4.    All discovery, including any depositions of experts, shall be completed on or before September 5, 2008.

5.    A joint pretrial order in the form prescribed in Judge Kaplan's individual rules shall be filed on or before October 10, 2008.

6.    No motion for summary judgment shall be served after the deadline fixed for submission of the pretrial order. The filing of a motion for summary judgment does not relieve the parties of the obligation to file the pretrial order on time.

7.    If any party claims a right to trial by jury, proposed voir dire questions and jury instructions shall be filed with the joint pretrial order.

8.    Each party or group of parties aligned in interest shall submit not less than ten (10) days prior to trial (a) a trial brief setting forth a summary of its contentions and dealing with



any legal and evidentiary problems anticipated at trial, and (b) any motions in limine.

9.  This scheduling order may be altered or amended only on a showing of good cause not foreseeable at the date hereof. Counsel should not assume that extensions will be granted as a matter of routine.

Dated: April 11, 2008

_____
Lewis A. Kaplan
United States District Judge

CONSENTED TO:

SANDRA D. FRELIX, ESQ.                    JONES DAY

By: _____              By: _____
Sandra D. Frelix (SF-0421)                    Craig S. Friedman (CF-1988)
110 Wall Street, 11th Floor                   Matthew W. Lampe (pro hac vice
New York, New York 10005                          application pending)
(212) 859-3509                                222 East 41st Street
                                              New York, New York 10017
                                              (212) 326-3939

*Attorneys for Plaintiff*                     *Attorneys for Defendant*

# EXHIBIT J

8529JACA

Doc# 43

1

U.S. DISTRICT COURT
FILED
MAY    9
S. D. OF N.Y.

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   - - - - - - - - - - - - - - - - - - - - - - - - - -x

3   MARIA JACKSON,

4                   Plaintiff,

5          v.                              08 CV 1064 (LAK)

6   THE SCOTTS COMPANY,

7                   Defendant.

8   - - - - - - - - - - - - - - - - - - - - - - - - - -x

9                                          New York, N.Y.
                                           May 2, 2008
10                                         9:30 a.m.

11  Before:

12                      HON. LEWIS A. KAPLAN,

13                                              District Judge

14                          APPEARANCES

15  SANDRA FRELIX, P.C.
          Attorney for Plaintiff

16  MATTHEW W. LAMPE
          Attorney for Defendant

17

18

19

20

21

22

23

24

25

8529JACA

1          (Case called)

2          THE COURT:  Well, Ms. Frelix, you said you wanted to

3   make an oral argument so I'm here to listen.  Would you use the

4   lecturn, please.

5          MS. FRELIX:  Yes, your Honor.  Good morning, your

6   Honor.

7          THE COURT:  Good morning.

8          MS. FRELIX:  Your Honor, pursuant to your April 17,

9   2008 order, which basically states in part that you will hear

10  an oral argument from me and any testimony that I might wish to

11  present on the sanctions issues on May 2, today, at 9:30

12  provided that's Ms. Frelix notifies chambers in writing no

13  later than April 24, 2008, I did send you a letter indicating

14  that I wanted to make an oral argument regarding the sanctions

15  issue.  And the argument that I'd like to make, your Honor, is

16  that sanctions is a very harsh remedy.  And it stems from my --

17  it stems from your April 9 order in which you impose sanctions

18  upon me.  In that order, you stated that I was not -- that I

19  had not --

20         THE COURT:  Excuse me.  Did I impose sanctions on you

21  at the April 9 order?  I didn't think so.  Maybe I'm mistaken.

22  I think there was an earlier order.

23         I directed that you show cause why you shouldn't be

24  sanctioned on April 9.

25         But you can go ahead.

8529JACA

1      MS. FRELIX:  Thank you.  In my April 16 motion and

2  notice of motion for relief from order and the accompanying

3  memorandum of law, I stated the reasons why I should not be

4  subject to sanctions.  In my memorandum of law I made the

5  argument that I made a reasonable inquiry prior to submitting

6  plaintiff's April 8, 2008 motion and memorandum of law.  Prior

7  to submitting April -- said memorandum of law, I did research

8  the issue.  And by researching the issue I came up with eight

9  cases that are indicated in the memorandum of law that I

10  submitted.

11      THE COURT:  But none of those cases even remotely

12  supports your position, not one.  They are not even close.  And

13  I don't understand how you could have thought otherwise.

14      MS. FRELIX:  When I did the research and when I found

15  the cases, I saw that the New York State Workers' Compensation

16  Board didn't allow, pursuant to Section 120, that it

17  established race and retaliation as presented by the plaintiffs

18  in those cases.

19      THE COURT:  No, it didn't.  Not one.  There was a

20  claim in one case that the workers' compensation judge who had

21  made the initial decision had done so because he was biased.

22  That's a very different proposition from saying there's a

23  remedy under workers' compensation law for an employee who is

24  subjected to racial discrimination.

25      Others dealt with the question of whether various



8529JACA



1    kinds of mental or physical conditions, which were said to have

2    been caused by discrimination in the workplace, were workplace

3    injuries, or things of that nature.

4        But not a single one of them says anything at all,

5    that I could see, to the effect that discrimination in and of

6    itself violates the workers' compensation law.  Not one.

7        Did I miss something?

8        Did I?

9        MS. FRELIX:  Well, what I'm here to discuss is that --

10   and to argue is that I did make a reasonable inquiry into

11   whether or not my argument with respect to race discrimination

12   and the New York State workers' compensation board, whether or

13   not there was some type of nexus between them.

14       THE COURT:  Well, look, I'll assume for the sake of

15   this discussion that you went and you read those cases.

16       Now, I've read those cases.  And those cases come

17   about as close to supporting your argument as a case reviewing

18   somebody's tax assessment on their house.  They have nothing to

19   do with it.  They don't support your argument.

20       So, I am left with the unhappy choice between deciding

21   that you were incapable of reading those cases and you went

22   ahead thinking they said something that they clearly didn't,

23   wrongly, and not even remotely reasonably; or that you read and

24   understood them and you went ahead anyway.  That's what it

25   amounts to, isn't it?





5

8529JACA

1          Do you not understand that if an employee makes a
2   claim and says, for the sake of discussion:  I suffer from an
3   injury.  Stomach acid has eaten away at my esophagus because I
4   have been so upset because someone discriminated against me in
5   the workplace and I, therefore, should be able to recover
6   because my injury to my stomach and my esophagus is an injury
7   sustained in the workplace and, therefore, is compensable under
8   workers' comp is a very, very different thing from saying:  I
9   was a victim of discrimination in the workplace.  Pay me.
10          That's a perfectly good claim under the human rights
11  law, but it is not a claim under the workers' compensation law.
12          Don't you understand that?
13          MS. FRELIX:  Your Honor, when I did my research, I
14  looked at those cases and I felt that the cases that I found --
15  the eight cases that I found were comparable and that they
16  provided a basis for the argument that I made.
17          THE COURT:  Can you explain to me at all what process
18  of logic led you to that conclusion because I don't see it.
19          I'm not picking on you.  I just don't get it.
20          MS. FRELIX:  I don't take it that way.  I appreciate
21  this exchange, and I don't take it personally.
22          THE COURT:  Good.  Because it's not meant that way.
23          Can you explain it to me?
24          MS. FRELIX:  The only thing I can say is that based on
25  my research, I found that the workers' compensation law,

8529JACA

```
 1    Section 120, established a race base retaliation.  That's the
 2    information that I was able to glean from the cases.
 3              THE COURT:  Did you ever think about why it would make
 4    any sense at all for the New York State legislature to adopt
 5    such a rule given that they already bar employment
 6    discrimination under the human rights law.  They've set up a
 7    state agency to deal with complaints under that law.  They've
 8    given individuals who claim they suffered from employment
 9    discrimination the right to sue in court.  If they had done all
10    that, what sense would it make for them also to put it under
11    the workers' compensation law?  Why bother?
12              Did you think about that?
13              I guess not.
14              MS. FRELIX:  Your Honor, I guess all this stems from
15    the fact that it's our position that Ms. Jackson should be --
16    this case should be remanded back to Bronx Supreme Court.
17              THE COURT:  I suspected that we were going to get
18    around to that.  I want you to explain to me why I shouldn't
19    look at the case this way.  Before I go to that question,
20    remind me, please, which county this started in.
21              MS. FRELIX:  Bronx County.
22              THE COURT:  Okay.  It's been obvious to me from the
23    beginning that the goal here has been to try this case to a
24    Bronx jury and you know why and I know why.  And the defendant
25    removed it.
```



8529JACA



1        And why shouldn't I look at the matter this way?  When

2  the removal came along, it surprised you.  You began to see

3  whether you could figure out any possible way of getting out of

4  the federal court and back to a Bronx jury and a Bronx judge

5  because you view that as a much more favorable forum.  And you

6  came up with this workers' compensation idea, for which I give

7  full points for creativity the first time you thought of it.

8  It wouldn't have occurred to me, frankly.  And so you made that

9  motion to remand on the ground that there was a workers'

10 compensation case.  But, in fact, it wasn't a workers'

11 compensation case.  The words didn't even appear in the

12 complaint.  So, I denied your motion.



13        Now, that first motion was inappropriate because there

14 was no workers' comp claim in the complaint and when you said

15 there was, that wasn't true.  So then you came along and you

16 said, Aha, I'm going to try to amend.  You filed an amended

17 complaint that said:  The plaintiff was treated by her employer

18 in a way that the employer wouldn't have treated a white

19 person.

20        Well, if that happened, it's a terrible thing; and if

21 it happened, it probably violates the state human rights law.

22 But there's nothing in it about workers' compensation.  There

23 is no workers' compensation claim.  And it's not like you

24 hadn't been warned.

25        So, you came in with this crazy claim, and I dismissed

8529JACA



1  that too. And here we are talking about sanctions and, you

2  know, I give any lawyer the benefit of the doubt if I possibly

3  can. So, I'm going to assume that you went and read those

4  cases first. I'm not so sure it happened, but I'm going to

5  assume it.

6          But I can't see how you could possibly say those

7  cases, in any degree whatsoever, support your position.

8          MS. FRELIX: I'd like to say one thing, your Honor.

9  You indicated that -- you just stated that -- I found out about

10  her workers' compensation situation late, very late, after we

11  had filed the papers, that she had not been afforded the

12  protections of workers' compensation.

13          THE COURT: What does that mean?

14          MS. FRELIX: Well, what I'm saying is that it's not

15  like something I created. And we have documentation where it

16  shows that Scotts did not file a workers' compensation claim.

17  I think it's part of my --

18          THE COURT: But it's not up to Scotts to file it.

19  It's up to your client.

20          MS. FRELIX: According to the workers' compensation

21  board, it is up to Scotts to file the necessary papers for the

22  plaintiff -- I mean for the worker, the injured worker. It's

23  called the C3C2 forms. It's the employer's obligation to make

24  sure that those papers are filed.

25          I went to the workers' compensation board office in



8529JACA



1    Brooklyn, and they gave me a document stating that there was

2    never anything filed on behalf of Mrs. Jackson that was

3    submitted by Scotts.  Scotts never submitted any documents.

4         THE COURT:  There's nothing about anything like this

5    in your complaint.  This is brand new.  I never heard this

6    before.

7         What your complaint says is that they treated her in a

8    way they wouldn't have treated a white person, therefore, it's

9    workers' compensation.

10        Now whatever else that might be, that's not a workers'

11   compensation claim.

12        MS. FRELIX:  With respect to the fact they never filed

13   the papers for her.  They never filed the papers for

14   Ms. Jackson.

15        THE COURT:  Look, there's nothing about this in your

16   complaint.  We're talking about your complaint and the motion

17   you filed.  That's all I can deal with.  If you're telling me

18   maybe you want to amend the complaint again, that's maybe

19   another matter.

20        MS. FRELIX:  I would like to amend the complaint

21   again.

22        THE COURT:  Well, look, unless your adversary

23   consents, you're going to have to make another motion.

24        MS. FRELIX:  He's here now.  Would you be willing to

25   consent to me amending my complaint?



8529JACA

1        MR. LAMPE:  No.  We would oppose a motion on your

2   client's behalf to amend the complaint.

3        THE COURT:  You're going to have to move.

4        MS. FRELIX:  I will move.

5        THE COURT:  But that doesn't address the question of

6   whether or not you should be sanctioned for what you filed

7   already.

8        MS. FRELIX:  Well, as I stated earlier is that

9   sanctions are a very harsh and -- sanctions are a very harsh

10  and strident remedy.  And of course I've already been

11  sanctioned based on the fact that I did have the flu.  I had

12  the flu --

13        THE COURT:  You were not sanctioned for having the

14  flu.

15        MS. FRELIX:  Well that was the reason why I did not

16  get the -- that was my reason why I wasn't able to respond in a

17  timely manner.

18        THE COURT:  Look, you defaulted on the order to show

19  cause why you shouldn't be sanctioned in the first place.  Then

20  you filed a motion for relief from the sanctions order -- I

21  take that back.  You didn't do that.  You moved for relief from

22  something else.

23        MS. FRELIX:  I did --

24        THE COURT:  I think.

25        MS. FRELIX:  No, I believe I did.



1    THE COURT:  Perhaps you're right.  But I now have my

2    order of March 21 in front of me.  And having considered what

3    you submitted to me, I concluded that the sanctions were

4    properly imposed, that you really had no answer to it, even

5    after I considered your late answer.  You drew my attention to

6    paragraphs 47 to 50 and 62 and 63 of the complaint.

7    MS. FRELIX:  Yes.

8    THE COURT:  And I looked at them, and I reached the

9    conclusion that nothing in them even remotely suggested

10   anything that would give rise to a claim under the workers'

11   comp law.

12   So you did not get sanctioned for having the flu and



13   it's really -- well, I won't say anymore about that.

14   Okay.  If there's anything else you want to add, I'll

15   certainly hear it, and I'll think about what you've said.

16   MS. FRELIX:  At this point I feel that I've already

17   been sanctioned.

18   THE COURT:  But you keep on doing it.  That's the

19   problem.  That's the point.

20   Apart from one case in which, under the securities

21   laws, a judge is required to impose sanctions in defined

22   circumstances, I don't think I've imposed sanctions on anybody

23   in at least ten years.  I don't like to do it.  I don't want to

24   do it.  There's nothing personal about it.



25   But, you have come in here with an argument that goes





1    beyond being lame, way beyond it. And you're entitled to

2    disagree with my ruling, but you're not entitled to ignore it,

3    and you just keep on coming. And you have taken up a lot of my

4    time because of it. And if I let it go, it would take up even

5    more time of defense counsel. And it's not just your interests

6    that's involved here. It's the Court's interests and there's

7    the defendant.

8            If you've got a legitimate workers' compensation

9    claim, you can move to amend to insert it. And if it really is

10   legitimate and it's asserted and if that really requires

11   remand, sobeit. I don't care. But up to now, not a single

12   thing you have said on paper and not a single thing you have

13   told me today in defense of what you've said on paper makes any

14   of the pleadings to which I have taken exception remotely

15   defensible. I just don't see it.

16           MS. FRELIX:  Are you saying none of my papers?

17           THE COURT:  No.  I'm saying that insofar as your

18   attempts to assert a workers' comp claim are concerned, I see

19   nothing that makes any of those assertions responsible.

20   Nothing.  That's not to say there isn't something else out

21   there that I haven't seen in your pleadings yet, but that

22   doesn't change the fact that you filed some pleadings that are

23   really, in my view, indefensible.

24           I know no lawyer wants to be sanctioned.  I don't know

25   any judges who like to sanction lawyers.  And I'll take into

85JUJACA

1    account everything you've said.

2              Is there anything else?

3              MS. FRELIX:  No.  I have nothing else to say, you

4    Honor.

5              THE COURT:  Defense have anything?

6              MR. LAMPE:  No, your Honor.

7              THE COURT:  Okay.  Thank you.

8              MS. FRELIX:  Thank you.

9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT K

SANDRA D. FRELIX, ESQ. (0421)
110 Wall Street
11th Floor
New York, New York 10005
(212) 859-3509
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

MARIA JACKSON,                        Index No. 08 CV 1064 (LAK)

　　　　　　　　Plaintiff,              MOTION AND NOTICE OF
                                      MOTION FOR LEAVE TO
                                      AMEND COMPLAINT AND
　　　　-against-                       REMAND ACTION TO
                                      STATE COURT
THE SCOTTS COMPANY,

　　　　　　　　Defendant.
-----------------------------------------------------------X

　　　　PLEASE TAKE NOTICE that on a date to be determined by this Court, or as

soon thereafter as counsel can be heard, plaintiff will move the Court, at Courtroom No.

12D, United States Courthouse, 500 Pearl Street, New York, New York 10007, for an

order granting leave to amend the complaint and remanding this action to state court.

This motion with its memorandum of law and its attached exhibits is based on Federal

Rule of Civil Procedure 15 and 28 U.S.C.A. §1445(c).

　　　　1.　　Rule 15 states in part: "… Otherwise a party may amend the

　　　　　　　party's pleading only by leave of court or by written consent of the

　　　　　　　adverse party; and leave shall be freely given when justice so requires.…"

　　　　2.　　28 U.S.C.A. §1445(c) provides: "A civil action in any State court arising

　　　　　　　under the workmen's compensation laws of such State may not be

　　　　　　　removed to any district court of the United States."

3.     The plaintiff has a civil action and an open claim arising under the
workmen's compensation laws of New York State.

4.     The Defendant successfully claimed a basis to have this matter removed
from the State Supreme Court of New York, Bronx County to the
Southern District of New York.

5.     This Court therefore has no original jurisdiction over this action.
Plaintiff will also move this Court for an order directing defendant to pay
all costs plaintiff has incurred as a result of defendant's removal of this
action. The original complaint is attached to this motion (Exhibit 1) and
the amended complaint (Exhibit 2).

Dated: New York, New York
       May 20, 2008

                        Respectfully submitted,

                        SANDRA D. FRELIX, ESQ.


                        By:   /s/ Sandra D. Frelix
                              Sandra D. Frelix, Esq. (SF-0421)
                              110 Wall Street, 11th Floor
                              New York, NY 10005
                        Telephone: (212) 859-3509
                        Facsimile:  (212) 862-8212

                        ATTORNEY FOR PLAINTIFF


To:    Craig S. Friedman, Esq. (CF-1988)
       Matthew W. Lampe, Esq. (*pro hac vice* application pending)
       JONES DAY
       322 East 41st Street
       New York, New York 10017

       ATTORNEYS FOR DEFENDANT


                              2

# EXHIBIT L



**SANDRA D. FRELIX, ESQ. (SF-0421)**
110 Wall Street
11th Floor
New York, New York 10005
(212) 859-3509
(212) 862-8212 (facsimile)
**Attorney for Plaintiff**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

MARIA JACKSON,                                    Index No. 08 CV 1064 (LAK)

              **Plaintiff,**                    **PROPOSED**
                                     **AMENDED**
       -against-                          **VERIFIED**
                                     **COMPLAINT**

THE SCOTTS COMPANY,

              **Defendant.**
-------------------------------------------------------X

       Plaintiff, MARIA JACKSON ("Mrs. Jackson", "Plaintiff" or "plaintiff"), by and

through her attorney, SANDRA D. FRELIX, for her Complaint against THE SCOTTS

COMPANY ("the Company", "Defendant Scotts", "Defendant" or "defendant"), thereby

states and alleges as follows:

### NATURE OF THE CLAIMS

      1.    This action is for declaratory, injunctive and equitable relief, as well as

monetary damages, to redress Defendant's unlawful employment practices and retaliation

against Plaintiff, including the discriminatory treatment, racial harassment, and retaliation

against Plaintiff due to her Race and/or Color (African-American/Black), gender,

deprivation of property without due process of law and equal protection of laws, in

violation of the New York State Human Rights Law, New York Executive Law §§ 290 <u>et</u>

seq.: and the New York City Human Rights Law, Administrative Code of the City of New York §§ 8-101 et seq. and the New York State Constitution. Additionally, Mrs. Jackson was subjected to defamation: slander per se and libel per se, being placed in a false light and was forced to endure the breach of an implied contract to act in good faith in violation of New York State Law. Moreover, the defendant caused her to suffer economic discrimination and failed to provide her a reasonable accommodation pursuant to her disability in violation of 9 New York Code of Rules and Regulations (NYCRR) §466.11.

## JURISDICTION AND VENUE

2.      The Court has personal jurisdiction over Defendant pursuant to Sections 301 and/or 302 of the New York Civil Practice Law and Rules ("CPLR") in that the Defendant transacts and/or solicits business within the state from which they derive substantial revenues.

3.      The Court has personal jurisdiction over Defendant because a significant portion of the unlawful employment practices and events giving rise to the claims herein occurred in New York.

4.      The Court has subject matter jurisdiction over this action by virtue of the New York State Human Rights Law, New York Executive Law § 279(9); the New York City Human Rights Law, Administrative Code of the City of New York § 8-502(a); and the Constitution of the State of New York.

5.    Venue is proper in this county pursuant to CPLR § 503(c) because the Defendant conducted business in Bronx County at the relevant times described in this Complaint and continues to conduct business in Bronx County.

6.    Prior to the commencement of this action, a copy of this Complaint was served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

## PARTIES

7.    Plaintiff Maria Jackson is an African-American citizen female who resides in Springfield Gardens, New York.  At all relevant times, Plaintiff has met the definition of an "employee" under all applicable statutes.

8.    Defendant Scotts conducts business throughout New York State as well as in all the other forty-nine states and internationally.

9.    The Scotts Company is located at 14111 Scottslawn Road, Marysville, OH 43041.

## FACTUAL ALLEGATIONS

10.    Defendant hired Mrs. Jackson in April 2001 as a Seasonal Merchandiser.

11.    She was immediately promoted to the position of Sales Merchandising Manager on or about December 14, 2001.

12.    Mrs. Jackson worked diligently for the Company for four (4) years at the time of her June 2005 unlawful termination.

13.    Mrs. Jackson excelled at her responsibilities pursuant to each of her positions.

3

14.    Mrs. Jackson also received exemplary job performance appraisals.

15.    In the Spring of 2002 Mrs. Jackson suffered extreme embarrassment and humiliation when District Manager Patrick McGarr ("D.M. McGarr") stated that: "Maria's not Black she is Italian!"

16.    This incident took place at the Liberty Diner in Farmingdale, N.Y.

17.    There was never an occasion witnessed by Mrs. Jackson where a white person's core identity was challenged and violated.

18.    In the spring of 2002 Mrs. Jackson became aware that the Defendant was being sued for discrimination for not hiring women in the 04 region.

19.    She further learned that the Defendant had specifically directed D.M. McGarr to hire a black woman.

20.    D.M. McGarr shared this information with James Fitch ("Mr. Fitch"), a Sales Merchandising Manager ("SMM").

21.    Mr. Fitch wanted D.M. McGarr to hire his friend, a Caucasian male, who had previously resigned from the Defendant but wanted his old position back.

22.    At the December 2002 conference in Naples, Florida Mrs. Jackson, D.M. McGarr, and co-workers were attending a class.

23.    Mrs. Jackson went the ladies room upon her return the seats were taken in her class' section.

24.    The only seat available in the section with her co-workers was located at the far end of the table where her co-workers were seated.

25.    The closest unoccupied seat was located in an area occupied by another district.

26.    The district manager of that region Patrick Flagherty ("D.M. Patrick Flagherty) stated that she could sit with his district.

27.    However, D.M. McGarr tapped her on the shoulder and told her that she could not sit there.

28.    D.M. McGarr then signaled one of their co-workers to move down so she could sit with them.

29.    Mrs. Jackson then heard Mr. Flagherty state to his SMM's: "What is this? Is she too good to sit with us?  Oh yeah, that's right that's Pat's token."

30.    This racist comment was not only hurtful but it was extremely embarrassing to Mrs. Jackson.

31.    Another area where Mrs. Jackson was subjected to disparate treatment pertains to storage facilities.

32.    Point of Purchase is advertising that is sent to managers in great quantity.

33.    Therefore, it is customary for the Company to pay for the storage facility utilized by the managers to house and maintain the advertising materials.

34.    Unfortunately, Mrs. Jackson was informed in no uncertain terms by D.M. McGarr that his budget did not permit him to go over the $75.00 per month for storage.

35.    Consequently, she was forced to store the materials in her home, which greatly inconvenienced her family.

36.    Mrs. Jackson eventually learned that D.M. McGarr paid well over $100.00 for storage for Mrs. Jackson's co-workers who operated in eastern Long Island.

37.    This is an undeniable illustration of the humiliating, embarrassing, disparate as well as racist treatment imposed upon Mrs. Jackson by the Company.

38.    Moreover, even though D.M. McGarr was absolutely aware that Mrs. Jackson was out on a work related disability (herniated and bulging discs) he still spitefully sent Point of Purchase advertising materials to her home.

39.    In the spring of 2003 Ivy Acres held its annual flower show and invited the Company along with other lawn and garden professionals.

40.    The event is held on Long Island and after the showing a lavish luncheon is provided for those in attendance.

41.    All of Mrs. Jackson's colleagues were allowed to take the day off and attend the event and the luncheon that followed.

42.    However, Mrs. Jackson was not allowed to attend the event.

43.    But, the Company invited a white woman from an entirely different district (Philadelphia, PA) to attend the event and luncheon with all her expenses paid by the Company.

44.    This incident was extremely insulting to Mrs. Jackson and it too displayed the grossly disparate treatment she was subjected to.

45.    Mrs. Jackson was a dedicated and loyal employee of the Company.

46.    Her act of dedication and loyalty was demonstrated in March of 2003 when she was scheduled to have a hernia operation in March 2003.

47.    Mrs. Jackson's hernia injury was the result of work related lifting.

48.    Mrs. Jackson called D.M. McGarr from the Gunhill Road Home Depot store located in the Bronx in February 2003 to inform him that she needed to have hernia surgery in March 2003.

6

49.     During the same telephone conversation D.M. McGarr said no to the timing of her March 2003 hernia surgery and they would discuss the matter later.

50.     Mrs. Jackson also told D.M. McGarr that she was in pain. But D.M. McGarr flippantly told her that she would have to get the job done.

51.     However, Mike Garbiele ("Mr. Garbiele"), a co-worker of Mrs. Jackson, required medical treatment for a torn rotor cup in his arm.

52.     D.M. McGarr not only allowed Mr. Garbiele time off for medical treatment of his injury but also provided coverage for his stores.

53.     Clearly, D.M. McGarr treated Mrs. Jackson disparately from Mr. Garbiele.

54.     D.M. McGarr did not require Mr. Garbiele to postpone his treatment.

55.     Additionally, D.M. McGarr provided coverage for Mr. Garbiele and allowed him time off for his treatment.

56.     Prior to learning about how D.M. McGarr accommodated Mr. Garbiele she decided to postpone it to accommodate D.M. McGarr even though her physician advised her against postponing the operation.

57.     D.M. McGarr requested that she delay the surgery because the season had just begun and he could not afford to have her out.

58.     D.M. McGarr finally agreed that she could have her surgery in June 2003.

59.     Although Mrs. Jackson has been totally dedicated and loyal to the Company these sentiments were not reciprocated back to her.

60.     Two days after her surgery D.M. McGarr called Mrs. Jackson on her hospital bedside telephone to discuss Scotts' business.

7

61.    Mrs. Jackson's physician Matthew Kilgo, M.D. answered her hospital bedside telephone and upon learning that D.M. McGarr wanted to discuss Scotts' business he told D.M. McGarr to call back.

62.    D.M. McGarr told Mrs. Jackson and her co-workers that they should not inform corporate that she's out recovering from surgery.

63.    Thus, Mrs. Jackson's surgery was never reported to the Company's human resources department.

64.    During her surgery she had an emergency blood transfusion and was hospitalized once again in July 2003.

65.    Mrs. Jackson was not only forced to submit to a hostile work environment and disparate treatment but she had to bear the indignity of inhumane treatment as well.

66.    The inhumane treatment manifested itself while she was at home recuperating from surgery and the relapse.

67.    D.M. McGarr had the unmitigated audacity to continue to burden Mrs. Jackson by having the Point of Purchase advertising material sent to her home.

68.    D.M. McGarr demanded that she follow-up on reports.

69.    D.M. McGarr also demanded that she answer calls on her cell phone from her home while she was recovering.

70.    Upon Mrs. Jackson's return to work in October 2003 D.M. McGarr was undaunted and unfazed by the fact that she had major surgery four months earlier.

71.    D.M. McGarr insisted that she work at the same level and pace that she worked at prior to her surgery.

8

72.     D.M. McGarr's actions were so detrimental to her recovery that in 2004 Mrs. Jackson's surgeon wrote two letters addressed to D.M. McGarr requesting a reasonable accommodation for his patient, Mrs. Jackson.

73.     The physician clearly expressed that lifting for Mrs. Jackson was unacceptable.

74.     D.M. McGarr failed to give Mrs. Jackson a reasonable accommodation.

75.     D.M. McGarr expected Mrs. Jackson to perform in the same manner that she had prior to her major surgery.

76.     D.M. McGarr informed Mrs. Jackson in no uncertain terms that she would have to find a way to get the job done.

77.     Another instance of discrimination against Mrs. Jackson occurred in the spring of 2004 when she requested to take her son to the dentist for a serious procedure.

78.     D.M. McGarr denied Mrs. Jackson's request to take her son to the dentist for the serious procedure.

79.     However, D.M. McGarr allowed Mrs. Jackson's co-worker, Jimmy Fitch, to take his son to a baseball game.

80.     Mrs. Jackson was also a victim of economic discrimination.

81.     During her October 2003 yearly evaluation D.M. McGarr raved about her performance and she was given a $900.00 raise.

82.     D.M. McGarr informed her that he had to fight to get her and her colleagues the $900.00 raises from Mike Carbanara ("Mr. Carbanara") the Regional Sales Director.

83.     D.M. McGarr requested that Mrs. Jackson not discuss her raise with her Caucasian male co-workers because he had gotten her a little more based on the fact that she was assigned to the Jericho Home Depot.

84.     However, shortly thereafter, she learned that her Caucasian male co-workers had each received a $1500.00 raise.

85.     This too illustrates the economic discrimination and disparate treatment she was subjected to and the hostile environment she worked in.

86.     It also demonstrates that D.M. McGarr acted in bad faith with Mrs. Jackson.

87.     The discriminatory and disparate treatment continued in that in the spring of 2004 Mrs. Jackson was servicing nine (9) Home Depots stores.

88.     She was firmly instructed that the Jericho Home Depot was to have one (1) dedicated merchandiser whose job was to service that store only.

89.     The individual who was the dedicated merchandiser to the Jericho Home Depot was a Caucasian male named Dominic Balducci ("Mr. Balducci").

90.     Mrs. Jackson was responsible for servicing eight (8) other Home Depot stores.

91.     However, she was assigned only one merchandiser to service the other eight Home Depot stores his name was Tyrone Jackson, ("Mr. Jackson") an African-American male.

92.     Mrs. Jackson's Caucasian male co-workers were assigned six to seven Home Depot stores.

10

93.    Moreover, her Caucasian male co-workers were assigned as many as four (4) merchandisers to service the stores they were responsible for.

94.    In 2003 Mr. Carbanara allocated Mrs. Jackson an additional twenty (20) hours of merchandising.

95.    But, D.M. McGarr instructed Mrs. Jackson to assign all the twenty (20) hours to the Jericho Home Depot store.

96.    During the gardening season of 2004 Mr. Balducci was prone to make many mistakes.

97.    Mrs. Jackson counseled him regarding his poor and disruptive work habits on numerous occasions, but to no avail.

98.    Mr. Balducci's poor and disruptive work habits included stealing time from the Company.

99.    Furthermore, Mr. Balducci threatened to cause bodily harm to department heads at Home Depot because someone borrowed "his" jack.

100.    Mr. Balducci was known to use perverted language and engaged in inappropriate discussions about his girlfriend's sex life in the presence of customers.

101.    Additionally, Mrs. Jackson received numerous calls from Home Depot management about his violent behavior.

102.    Mr. Balducci has been banished from three (3) other Home Depot stores and was sternly instructed not to return.

103.    D.M. McGarr's response to the foregoing was: "Dominic did not have to go back to those Home Depots that put him out and that they did not deserve his services to begin with."

11

104.    It is quite obvious that D.M. McGarr placed the personal feelings he had for Mr. Balducci before his obligations to the Company.

105.    However, Mrs. Jackson by sharing the real threat that Mr. Balducci posed with D.M. McGarr shows that she recognized that Mr. Balducci's unprofessional and violent behavior had a negative reflection on the Company as well as exposed the Company to unnecessary and avoidable liability.

106.    Moreover, Mrs. Jackson understood that he had clearly become a present liability and that the Company had been placed on notice about his unprofessional and violent behavior.

107.    The liability that D.M. McGarr exposed the Company to is enormous.

108.    It is common knowledge that Mr. Balducci had to attend court ordered anger management courses for threatening to kill his neighbor over a parking space.

109.    But, D.M. McGarr remained a staunch supporter of Mr. Balducci without considering the legal ramifications such blinding support could have on the Company or to Mrs. Jackson's safety and well-being.

110.    D.M. McGarr refused to re-hire Henry Williams ("Mr. Williams"), a black man, who worked for the Company for more than five years.

111.    The grounds that D.M. McGarr refused Mr. Williams employment was that he allegedly was not present in the store at a particular time.

112.    D.M. McGarr mercilessly defamed Mr. Williams with the tag "the Phantom" and often made jokes about him during meetings in the presence of a number of co-workers.

12

113.    Clearly, D.M. McGarr's disparate treatment of Mr. Williams and the unwavering support of Mr. Balducci were based on race and color.

114.    Mrs. Jackson was again forced to endure and witness this racially motivated injustice creating a hostile work environment.

115.    The discrimination and abuse suffered by Mrs. Jackson was unrelenting, discriminatory and racist.

116.    In 2004 Mr. Carbanara gave Mrs. Jackson an additional twenty (20) hours to service her other home depot stores.

117.    Mr. Carbanara realized that she was overwhelmed with servicing each of the Home Depot stores under her authority.

118.    Mrs. Jackson hired Ms. Snow in 2004 and Mr. Jackson was hired in 2001 to assist her servicing the other Home Depot stores she was responsible for.

119.    Based on information and belief there were no black merchandisers until Mrs. Jackson hired Kisha Snow ("Ms. Snow") and Mr. Jackson.

120.    Mrs. Jackson's sales numbers were growing by an incredible rate in her other Home Depot stores.

121.    Her sales numbers were increasing so rapidly that the Vice President of Miracle Gro flew in from Ohio to verify her sales numbers.

122.    However, Mr. McGarr transferred Ms. Snow and Mr. Jackson to the Jericho Home Depot store to help Mr. Balducci.

123.    The hours attributed to Ms. Snow and Mr. Jackson were the additional hours that Mr. Carbanara provided Mrs. Jackson with to service her seven (7) other Home Depot stores.

124.    This unfortunate arrangement allowed Mr. Balducci six (6) additional hours or more on a daily basis.

125.    Based on information and belief Mr. Balducci engaged in stealing time from the Company and Mrs. Jackson's budget by working in other departments at the Jericho Home Depot store.

126.    By reassigning hours specifically designated to Mrs. Jackson's seven (7) other Home Depot stores, Mr. McGarr methodically set her up to fail.

127.    Mrs. Jackson took pride in her job and used her creative skills when it was necessary.

128.    In 2003 the Company provided Mrs. Jackson and her colleagues with displays known as Cakes.

129.    The specs for the Cakes did not fit in the area they were to be displayed.

130.    Therefore, Mrs. Jackson took it upon herself to successfully re-configure and redesign the Cakes.

131.    Her efforts were so successful that D.M. McGarr gave her a $100.00 incentive for each Cake she built in her stores.

132.    D.M. McGarr instructed Mrs. Jackson to build the Cake displays in her co-workers' stores.

133.    However, Mrs. Jackson received no compensation or incentives for building the Cake displays in her co-workers stores.

134.    Another instance of unfair and disparate treatment Mrs. Jackson suffered occurred with the building of the Field Goal Post contest in 2004.

135.    Mrs. Jackson was the first of her Caucasian male co-workers to e-mail photos of her completed Field Goal Post to D.M. McGarr.

136.    D. M. McGarr admitted that Mrs. Jackson was the first to complete the Field Goal Post contest.

137.    D.M. McGarr further stated that he knew that she would be the first to complete the contest based on previous incentive driven assignments.

138.    However, D.M. McGarr insisted that she resubmit the photos because there was a piece of cardboard in one of the photos she sent.

139.    The piece of cardboard was the property of Home Depot and placed there by a Home Depot employee.

140.    Due to other commitments Mrs. Jackson was unable to resubmit the photos immediately.

141.    Another co-worker, Mike Gabriele won the $100.00 contest.

142.    Mike Gabriele won even though he sent his photos in after Mrs. Jackson sent her photos in.

143.    Mrs. Jackson in 2004 created and designed the Bookcase display.

144.    The Book Case display was created and designed by Mrs. Jackson specifically for the Miracle Gro product line.

145.    At the December 2004 National Conference, those in attendance were encouraged to adopt and use the Book Case display.

146.    Even though Mrs. Jackson created and designed the Book Case display concept, the raise she received was less than the raise received by her Caucasian male co-workers.

15

147.    The events surrounding the December 2004 National Conference in Naples, Florida were particularly public, brutal and extremely humiliating for Mrs. Jackson.

148.    At the conference the Company's employees were encouraged to take the Miracle-Gro since there were several new items in the product line.

149.    Mrs. Jackson began taking one of each sku and realized that Keith Conard ("Mr. Conard"), Regional Vice President, was watching her.

150.    A short time later, Mr. Conard approached Mrs. Jackson and asked her: "What are you doing with the Miracle-Gro?"

151.    Mrs. Jackson, although perplexed by his peculiar inquiry, respectfully explained: "It is my understanding that we could take the Miracle-Gro, everyone is taking the product."

152.    Mr. Conard responded by stating: "Yes we were told we could take it, however, you can not because you are going on an airplane and will not be allowed on the flight with the product."

153.    Mrs. Jackson approached Rob Lamp ("Mr. Lamp") to obtain clarification on airline travel constraints associated with the Miracle-Gro.

154.    Mr. Lamp stated: "I have been addressing that issue all morning and you can take the Miracle-Gro but you must check it in and not take it in your carry-on luggage.

155.    Mr. Lamp then escorted Mrs. Jackson to the Miracle-Gro table and began assisting her with boxing up the products.

16

156.    Mr. Conard continued to watch Mrs. Jackson's every move from a distance.

157.    Mr. Lamp carried the box to the elevator and waited with her until the elevator arrived.

158.    When the elevator arrived she stepped on the elevator and he handed her the box and said: "Farewell, until next year."

159.    Prior to the elevator doors closing Mr. Conard stepped onto the elevator.

160.    Mr. Conard then asked Mrs. Jackson: "Have you ever been thrown into jail?"

161.    There were other representatives from the Company on the elevator having a conversation.

162.    But, all discussions ceased when Mr. Conard singled out Mrs. Jackson and asked her that question.

163.    He further stated that: "If you take the Miracle-Gro you are going to be thrown into jail and Scotts is not going to be here in Naples to get you out of jail."

164.    He then said: "What are you going to do?"

165.    Mrs. Jackson was shocked and flabbergasted by such a question.

166.    She immediately felt that Mr. Conard was motivated by racism since she was the only Company representative he made this inquiry to.

167.    Mrs. Jackson responded by stating that: "If I am arrested Marion Silber of Gordon & Silber will represent me."

168.    Flippantly, Mr. Conard said: "Is that right?"

169.    Mrs. Jackson steeled herself in order to hold back the tears.

17

170.    When she got to her room she cried hysterically due to the unbearable embarrassment and humiliation Mr. Conard had subjected her to.

171.    Mrs. Jackson called D.M. McGarr but was far too upset to leave a message the first time she called but called again and left a message.

172.    She then called her colleague Mr. Botz.  Mr. Botz had previously been Mrs. Jackson's direct supervisor.

173.    Mrs. Jackson explained what had occurred with Mr. Conard and how she had tried to call D.M. McGarr unsuccessfully.

174.    Mr. Botz told Mrs. Jackson that D.M. McGarr was on the patio in the pool area.

175.    Mr. Botz was very angry about the incident with Mr. Conard and advised Mrs. Jackson to take the product.

176.    Mr. Botz said it was unfair and cited the fact that everyone was taking the product and that she was the only Scotts representative singled out.

177.    D.M. McGarr returned her call and told her to meet him in the hotel lobby. Mrs. Jackson explained what had occurred and D.M. McGarr appeared to be in shock.

178.    He continued to ask Mrs. Jackson over and over again what had transpired between her and Mr. Conard.

179.    D.M. McGarr stated: "I'm in shock because I saw people leaving the hotel with tons of the stuff in their suitcases.  Boxes of stuff I saw them leave with."

180.    Mrs. Jackson expressed to D.M. McGarr that due the actions of Mr. Conard she had been discriminated against.

18

181.   D.M. McGarr stated that when they get back to New York he would purchase all the Miracle-Gro that she wanted.

182.   But he voiced his concerns that he feared that if she did not put the Miracle-Gro back she would be fired for insubordination.

183.   He further stated that she should apologize to Mr. Conard for taking the Miracle-Gro.

184.   Mrs. Jackson began to cry because the harassment and humiliation had been compounded exponentially as a result of D.M. McGarr's reaction to the discrimination and the disparate treatment she had unfairly experienced.

185.   Nevertheless, she returned the Miracle-Gro and apologized to Mr. Conard for taking the product.

186.   Mr. Conard replied: "It was a wise thing to do because the Scotts Company would not have been available and that other incidents could have arose from the matter had you taken the Miracle-Gro."

187.   It is evident that those in a position to rightfully object to the wrongful and unlawful actions of Mr. Conard chose to act in concert with him by ignoring his blatant acts of discrimination.

188.   Mrs. Jackson was told to provide Mr. Cabanara with a formal report about the racist incident with Mr. Conard.

189.   However, when she broached the matter with him he stated curtly: "I'm not interested and forget the matter."

190.   D.M. McGarr acted in a similar fashion when he snapped: "Forget the entire matter. Just forget about it."

19

191.    It is obvious that both Mr. Cabanara and D.M. McGarr covered and condoned the unlawful actions of Mr. Conard.

192.    On or about January 10, 2005 Mrs. Jackson's back went completely out which forced her to go out on short-term disability.

193.    However, unbeknownst to her, sometime during the month of June 2005 she was unceremoniously and unlawfully terminated.

194.    Mrs. Jackson's unlawful termination was contrary to the Company's policies and procedures.

195.    Moreover, the Company failed to provide her with a reasonable accommodation for her work related injury.

196.    *Defendant unlawfully violated plaintiff's New York State Workers' Compensation Rights.*

197.    *The New York State Workers' Compensation Board requires employers to file Form C-2, Employer's Report of Accident/Occupational Disease within ten (10) days of the work related accident.*

266.    *Plaintiff suffered a work related injury in February 2003 and in January 2005.*

196.    *In or about March 2003 during her employment with the Company Mrs. Jackson informed her immediate supervisor Mr. McGarr that she required hernia surgery that was caused by work related lifting.*

197.    *Mr. McGarr commanded that neither Mrs. Jackson nor her co-workers inform the Company of her work related hernia injury.*

20

198.    Mrs. Jackson complied with Mr. McGarr's command and did not inform the Company of her work related hernia injury because she feared that she would be terminated.

199.    On or about January 8, 2005 while Mrs. Jackson was still an employee of the Company, she injured her back, neck and arm as a result of lifting boxes of Miracle Gro fertilizer, which resulted in her described injuries.

200.    Mrs. Jackson remained employed by the Company, but the Company and its insurance carrier did not pay for her medical treatment.

201.    On or about January 10, 2005 Mrs. Jackson notified her direct supervisor Mr. McGarr of the injuries she suffered on or about January 8, 2005.

202.    The Company and its insurer never counseled Mrs. Jackson as to her rights under workers' compensation statutory provisions of the State of New York pursuant to her 2003 or 2005 work related injuries.

203.    Based on her 2003 work related injury, Mrs. Jackson was hesitant to inquire about her workers' compensation rights because she believed by doing so it would adversely affect her employment.

204.    Defendant knowingly or recklessly violated Plaintiff's New York State Workers' Compensation Rights by failing to file the mandatory C-2 Workers' Compensation form when she suffered work related injuries in February 2003 and January 2005.

205.    On February 20, 2008 Mrs. Jackson visited the Kings County Workers' Compensation office to ascertain whether or not the Defendant had filed the required C-2 forms on her behalf for her February 2003 and January 2005 work related injuries.

206.    *On February 20, 2008 the Kings County Workers' Compensation office checked its files and found that the Defendant had not filed a C-2 form for Plaintiff's March 2003 or January 2005 work related injuries.*

207.    *On or about February 20, 2008 New York State Workers' Compensation Board took Mrs. Jackson's claim regarding her work related injuries upon learning the circumstances that caused the substantial delay. Specifically, Mrs. Jackson's supervisor Mr. McGarr commanded her and her co-worker's not to inform the Company of her said job related injuries.*

## AS AND FOR A FIRST CAUSE OF ACTION

### (Discrimination and Harassment
### In Violation of New York State Human Rights Law)

208.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 207, inclusive as if fully set forth herein.

209.    Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York State Human Rights Law by denying to plaintiff equal terms and conditions of employment, including but not limited to failing to provide plaintiff with a reasonable accommodation as a result to plaintiff's disability and subjecting plaintiff to disparate working conditions and performance standards, gender discrimination, denying plaintiff the opportunity to work in an employment setting free of unlawful harassment, denying plaintiff opportunities for professional growth, denying plaintiff compensation and other terms and conditions of employment equal to that of

22

Caucasian employees, and terminating plaintiff unlawfully from plaintiff's employment with defendant.

210.   Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York State Human Rights Law by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive racial harassment of plaintiff by plaintiff's superiors.

211.   As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

212.   As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of damages.

23

## AS AND FOR A SECOND CAUSE OF ACTION

### (Retaliation in Violation of New York State Human Rights Law)

213.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 212, inclusive, as if fully set forth herein.

214.    Defendant has retaliated against plaintiff by, inter alia, by treating her with unmitigated contempt when she complained about how she was treated regarding the Mr. Conard/Miracle Gro incident and subjecting plaintiff to wrongful termination, subjecting plaintiff to an unfair and hostile work environment and failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability this is clearly in violation of New York State Human Rights Law for: (a) plaintiff's opposition to defendant's discriminatory practices; (b) being wrongfully subjected to harassment and a hostile work environment.

215.    As a direct and proximate result of defendant's unlawful and retaliatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

216.    As a direct and proximate result of defendant's unlawful retaliatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

24

## AS AND FOR A THIRD CAUSE OF ACTION

### (Aiding and Abetting Violations of New York State Human Rights Law)

217.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 216, inclusive, as if fully set forth herein.

218.    Defendants knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law by actively participating in the unlawful conduct set forth above.

219.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

220.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Discrimination and Harassment
### In Violation of New York City Human Rights Law)

221.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 220, inclusive, as if fully set forth herein.

222.    Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York City Human Rights Law by denying to plaintiff equal terms and conditions of employment, including but not limited to, failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability, subjecting plaintiff to disparate working conditions and performance standards, gender discrimination, economic discrimination, denying plaintiff the opportunity to work in an employment setting free of unlawful harassment, denying plaintiff opportunities for professional growth, denying plaintiff compensation and other terms and conditions of employment equal to that of Caucasian employees, and terminating plaintiff unlawfully from plaintiff's employment at the Defendant's.

223.    Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of her Race and/or Color (African-American/Black), in violation of the New York City Human Rights Law by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive racial harassment of plaintiff by plaintiff's superiors.

224.    As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, plaintiff

26

has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

225.     As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of damages.

226.     Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Retaliation in Violation of New York City Human Rights Law)

227.     Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 226, inclusive, as if fully set forth herein.

228.     Defendant retaliated against plaintiff by, inter alia, by treating her with unmitigated contempt when she complained about how she was treated regarding the Mr. Conard/Miracle Gro incident and subjecting plaintiff to wrongful termination, subjecting plaintiff to an unfair and hostile work environment and failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability this is clearly in violation of New York State Human Rights Law for: (a) plaintiff's opposition to defendant's

27

discriminatory practices; (b) being wrongfully subjected to harassment and a hostile work environment.

229.    As a direct and proximate result of defendant's unlawful and retaliatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

230.    As a direct and proximate result of defendant's unlawful retaliatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

231.    Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.


## AS AND FOR THE SIXTH CAUSE OF ACTION

### (Aiding and Abetting Violations of New York City Human Rights Law)

232.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 231, inclusive, as if fully set forth herein.

233.    Defendant knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against plaintiff in

28

violation of the New York City Human Rights Law by actively participating in the unlawful conduct set forth above.

234.   As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

235.   As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

236.   Defendants unlawful actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.

## AS AND FOR THE SEVENTH CAUSE OF ACTION

### (Defamation)

237.   Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 236, inclusive, as if fully set forth herein.

238.    Defendant unlawfully subjected plaintiff to defamation: libel per se and slander per se, placed plaintiff in a false light, and engaged in acts that caused the invasion of plaintiff's privacy.

239.    Defendant knowingly or recklessly subjected plaintiff to defamation: libel per se and slander per se, placed her in a false light, and engaged in acts that caused the invasion of plaintiff's privacy in violation of New York State law.

240.    As a direct and proximate result of defendant's unlawful acts of defamation: libel per se and slander per se, placing plaintiff in a false light, and the invasion of plaintiff's privacy, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

241.    As a direct and proximate result of defendant's unlawful acts of defamation: libel per se and slander per se, placing plaintiff in a false light, and the invasion of plaintiff's privacy, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

242.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

## AS AND FOR THE EIGHTH CAUSE OF ACTION

### (Economic Discrimination)

243.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 242, inclusive, as if fully set forth herein.

244.    Defendant unlawfully subjected plaintiff to economic discrimination in violation of New York State Law.

245.    Defendant knowingly or recklessly subjected plaintiff to economic discrimination in violation of New York State Law.

246.    As a direct and proximate result of the defendant subjecting plaintiff to economic discrimination, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

247.    As a direct and proximate result of the defendant subjecting plaintiff to economic discrimination, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

248.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

## AS AND FOR THE NINETH CAUSE OF ACTION

### (Breach of Implied Contract to Act in Good Faith)

249.     Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 248, inclusive, as if fully set forth herein.

250.     Defendant unlawfully breached its implied contract to plaintiff to act in good faith in violation of New York State Law.

251.     Defendant knowingly or recklessly breached its implied contract to plaintiff to act in good faith in violation of New York State Law.

252.     As a direct and proximate result of defendant's breach of the implied contract to plaintiff to act in good faith, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

253.     As a direct and proximate result of defendant's breach of the implied contract to act in good faith, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

254.     Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

32

## AS AND FOR THE TENTH CAUSE OF ACTION

### (Failure to Provide a Reasonable Accommodation)

255.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 254, inclusive, as if fully set forth herein.

256.    Defendant unlawfully failed to provide plaintiff with a reasonable accommodation as a result of plaintiff's work related injury.

257.    Defendant knowingly and/or recklessly failed to provide plaintiff with a reasonable accommodation as a result of plaintiff's work related injury in violation of 9 New York Code of Rules and Regulations (NYCRR) §466.11.

258.    As a direct and proximate result of defendant's failure to provide plaintiff with a reasonable accommodation of plaintiff's work related injury, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

259.    As a direct and proximate result of defendant's failure to provide plaintiff with a reasonable accommodation of her work related injury, plaintiff has suffered, and continues to suffer, severe physical and mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

260.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

33

## AS AND FOR THE ELEVENTH CAUSE OF ACTION

### (Violation of Equal Protection of Laws)

261.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 260, inclusive, as if fully set forth herein.

262.    Defendant unlawfully violated plaintiff's Equal Protection of Laws rights.

263.    Defendant knowingly or recklessly violated plaintiff's Equal Protection of Laws rights under Article 1 § 11 of the New York State Constitution (Bill of Rights) by subjecting plaintiff to treatment that no Caucasian employee of the defendants' has been subjected to.

264.    As a direct and proximate result of defendant's violating plaintiff's Equal Protection of Laws, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

265.    As a direct and proximate result of defendant's violating plaintiff's Equal Protection of Laws, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

34

## AS AND FOR THE TWELFTH CAUSE OF ACTION

### (Violation of New York State Workers' Compensation Rights)

266.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 265, inclusive, as if fully set forth herein.

267.    Defendant unlawfully violated plaintiff's New York State Workers' Compensation Rights.

268.    The New York State Workers' Compensation Board requires employers to file Form C-2, Employer's Report of Accident/Occupational Disease within ten (10) days of the work related accident.

269.    Plaintiff suffered work related injuries in February 2003 and January 2005.

270.    Defendant knowingly or recklessly violated plaintiff's New York State Workers' Compensation Rights by subjecting plaintiff to treatment that no Caucasian employee of the defendants' has been subjected to.

271.    As a direct and proximate result of defendant's violating plaintiff's New York State Workers' Compensation Rights, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

272.    As a direct and proximate result of defendant's violating plaintiff's New York State Workers' Compensation Rights, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence.

*and emotional pain and suffering for which plaintiff is entitled to an award of monetary*

*damages and other relief.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of defendant complained of herein violate the laws of the State of New York and the City of New York;

B.    An order directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and otherwise unlawful conduct are eliminated and do not continue to affect plaintiff;

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, seniority and other benefits of employment;

D.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for plaintiff's severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

36

E.    An award of damages for any and all other monetary and/or non-monetary

losses suffered by plaintiff in an amount to be determined at trial, plus prejudgment

interest;

F.    An award of punitive damages;

G.    An award of costs that plaintiff has incurred in this action, as well as

plaintiff's reasonable attorney's fees to the fullest extent permitted by law; and

H.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  New York, New York
       May 20, 2008

                                Respectfully submitted,

                                SANDRA D. FRELIX, P.C.

                        By: _____
                                Sandra D. Frelix
                                Attorney for Plaintiff
                                110 Wall Street, 11th Floor
                                New York, New York 10005
                                Telephone:  212-859-3509
                                Facsimile:  212-862-8212

37

## VERIFICATION

State of New York    )
                        ) ss.:
County of Queens    )


MARIA JACKSON, being duly sworn, states:

I am the Plaintiff in the action herein. I have read the annexed SUMMONS AND

AMENDED VERIFIED COMPLAINT, know the contents thereof and the same are true

to my knowledge, except those matters therein which, are stated to be alleged on

information and belief, and as to those matters I believe them to be true.


_____<br>MARIA JACKSON


Sworn to before me
this _____ day of May, 2008



_____
      NOTARY PUBLIC

**EXHIBIT 2**