SANDRA D. FRELIX, ESQ. (SF-0421)
110 Wall Street
11th Floor
New York, New York 10005
(212) 859-3509
(212) 862-8212 (facsimile)
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

MARIA JACKSON,                                     Index No. 08 CV 1064 (LAK)

                    Plaintiff,                     MOTION AND NOTICE OF
                                                    MOTION FOR LEAVE
                                                   TO AMEND PLEADING

        -against-

THE SCOTTS COMPANY,

                    Defendant.
-----------------------------------------------------------X

To:   Craig S. Friedman, Esq. (CF-1988)
      Matthew W. Lampe, Esq. (*pro hac vice* application pending)
      Attorneys for Defendant
      Jones Day
      222 East 41st Street
      New York, New York 10017-6702
      (212) 326-3939
      (212) 755-7306 (facsimile)

        PLEASE TAKE NOTICE that on a date to be determined by this Court, or as

soon thereafter as counsel can be heard, Plaintiff will move the Court, at Courtroom No.

12D, United States Courthouse, 500 Pearl Street, New York, New York 10007, for leave

for a Second Amended Complaint pursuant Federal Rules of Civil Procedure, Rule 15 (a)

(2) and other applicable law.  This motion will be made on the grounds that:

        1.      The amendment is necessary to repair and clarify allegations as well as

add claims.

        2.      The amendment will not prejudice any party to this action.

     3.     Included are Plaintiff's EEOC Charge (Exhibit 1), Plaintiff's Right to Sue letter (Exhibit 2), the Second Amended Complaint (Exhibit 3) and Judge Kaplan's March 27, 2008 Memorandum and Order (Exhibit 4) are attached to the accompanied Memorandum of Law in support of this motion.

Dated: New York, New York
       July 11, 2008

                   Respectfully submitted,

                   SANDRA D. FRELIX, ESQ.

                   By:    /s/ Sandra D. Frelix
                         Sandra D. Frelix, Esq. (SF-0421)
                         110 Wall Street, 11th Floor
                         New York, NY  10005
                   Telephone:  (212) 859-3509
                   Facsimile:   (212) 862-8212

                   ATTORNEY FOR PLAINTIFF

To:  Craig S. Friedman, Esq. (CF-1988)
     Matthew W. Lampe, Esq. (Pro Hac Vice Attorney)
     JONES DAY
     222 East 41st Street
     New York, New York 10017

     ATTORNEYS FOR DEFENDANT

### MEMORANDUM OF LAW

Plaintiff, MARIA JACKSON, by and through his undersigned counsel, and pursuant to Federal Rules of Civil Procedure, Rule 15 (a) (2) and other applicable law, hereby respectfully moves for leave of court to file the attached Second Amended Complaint, and as grounds for this Motion, states:

Plaintiff's Second Amended Complaint, in accordance with this Court's Order dismissing certain Causes of Action, strikes and does not amend or re-assert original Causes of Action 5, 7, 8, 9 and 11.  Plaintiff's Second Amended Complaint amends and reasserts original Causes of Action 1, 2, 3, 4, 6, and 10, which are accordingly re-numbered and in so amending corrects any legal deficiency in said Causes of Action.

More specifically, Plaintiff's Second Amended Complaint asserts and alleges that the Plaintiff filed an administrative complaint regarding the alleged disparate treatment by Defendant with the EEOC on March 28, 2006 and received her Right to Sue letter from the EEOC on December 15, 2006.  (Exhibits 1 and 2 Respectively)  Pursuant to New York law, the filing of the complaint tolled the statute of limitations during the time that the complaint was pending with the EEOC.  *See Sundram v. Brookhaven National Laboratories*, 424 F. Supp. 2d 545, 565 - 566 (E.D.N.Y. 2006) (Because of the tolling provisions of New York law, however, the period between April 21, 1992 ("when the plaintiff filed his complaint with the EEOC) and January 27, 1994 (when the EEOC terminated its proceedings with the issuance of a right to sue letter)--a total of 646 days-- is excluded. The effective date of the statute of limitation is thus backdated 646 days from May 12, 1991, which yields a new effective date of August 4, 1989. Claims under the Human Rights Law based on events occurring after August 4, 1989 are therefore

timely, and those preceding that date are barred."). Thus, the claims under New York State Human Rights Law (hereinafter "NYSHRL") were tolled for 263 days and therefore all acts of discrimination occurring after April 4, 2004 are timely.

Additionally, the Second Amended Complaint clarifies that a substantial portion of the discriminatory acts and disparate treatment did occur within the New York City limits and as such the Plaintiff's claims arising under New York City Human Rights Law (hereinafter "NYCHRL") do state a cause of action. Specifically, the Plaintiff's job was primarily servicing seven to eight Home Depot stores located within New York City limits. The allegations of the complaint that address both the disparate treatment she received regarding the services of her stores in comparison with other white male employees as well as her termination from her job all are acts occurring in New York City. *See, e.g., Launer v. Buena Vista Winery, Inc.*, 916 F.Supp. 204, 213 (E.D.N.Y.1996) (sustaining City HRL claims where plaintiff maintained office in New York City boundaries, defendant faxed plaintiff memorandum with discriminatory remarks to plaintiff's New York office and plaintiff was fired in New York).

In determining "the location of the discrimination, courts have looked to the location of the impact of the offensive conduct." *Salvatore v. KLM Royal Dutch Airlines*, No. 98 Civ 2450 (LAP), 1999 WL 796172 (S.D.N.Y. 1999). Thus, where the Plaintiffs job is in New York City, as is clarified in the Second Amended Complaint, then the impact is employment discrimination and termination in within the boundaries of New York City. *See, e.g, Casper v. Lew Lieberbaum & Co., Inc*., No. 97 Civ. 3016, 1998 WL 150993, at *5 (S.D.N.Y. Mar. 31, 1998) (dismissing claims under the NYCHRL as not arising in New York City where plaintiffs were employed and worked in Garden City but

sexually explicit comments made in New York City); *Duffy v. Drake Beam Morin*, No. 96 Civ. 5606, 1998 WL 252063, at * 12 (S.D.N.Y. May 19, 1998) (dismissing NYCHRL claim as not arising within New York City where the decision to fire the plaintiffs was made in New York City but the plaintiffs worked outside New York City, as the impact of the decision was not within New York City).

Justice requires that the Plaintiff, MARIA JACKSON, be permitted to file and pursue said Second Amended Complaint in order that this suit be appropriately decided on its merits.

A true and correct copy of the Second Amended Complaint is attached hereto and incorporated herein as Exhibit "3".

The Federal Rules of Civil Procedure authorize the amendment of a pleading, with leave of court, "when justice so requires." *See* Fed. R. Civ. P. 15 (a) (2). It is well settled that such leave to amend should be liberally granted and that the request should generally be granted. *See Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 123 (2d Cir. 1991) (holding that it is rare that leave to amend should be denied especially where there has been no prior amendment); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir.1988) (holding that "when a complaint is dismissed pursuant to Rule 12(b)(6) and the plaintiff requests permission to file an amended complaint, that request should ordinarily be granted"); *Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993) ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.").

As was specifically explained by the Second Circuit in *Ricciutti*:

> When the plaintiff has submitted a proposed
> amended complaint, the district judge may

review that pleading for adequacy and need not allow its filing if it does not state a claim upon which relief can be granted. The adequacy of the proposed amended complaint, however, is to be judged by the same standards as those governing the adequacy of a filed pleading. Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), and is designed to permit the defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery, see, e.g., 2A Moore's Federal Practice 8.13, at 8-73 (2d ed. 1991). Thus, the court should not dismiss the complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-102, 2 L.Ed.2d 80 (1957), and it should not deny leave to file a proposed amended complaint unless that same rigorous standard is met. This principle should be applied with particular strictness when the plaintiff seeks to file an amended complaint charging a violation of his civil rights.

941 F.2d at 123. Plaintiff's Second Amended Complaint states claims under both NYSHRL and NYCHRL and corrects those deficiencies upon which the initial motion to dismiss was granted.

Plaintiff recognizes that the deadline for amending pleading pursuant to this Court's Scheduling Order was May 12, 2008. Until just recently on July 2, 2008, Plaintiff had pending before this Court a Motion to Remand the case. Thus, Plaintiff had good cause for the failure to comply with this Court's Scheduling Order and the delay in the filing of an Amended Complaint. *See Parker v.*

*Columbia Pictures Industries*, 204 F.3d 326 (2d Cir. 2000) (joining other Circuits in "holding that despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause.").  The filing of this Motion at the time that this Court had pending before it Plaintiff's Motion for Remand would have been inconsistent with said Motion and a fruitless expenditure of this Court's time and resources if the case were to be remanded to state court.  Now that this Court has denied Plaintiff's Motion for Remand, this case will accordingly remain in federal court.  While Plaintiff's counsel recognizes that this Court has granted sanctions against Plaintiff's counsel for filing the Motion to Remand, the filing of another amended complaint and raising additional issues would not have assisted the parties in resolving the merits of the remand issue and would have only served to cause further confusion and delay.

The present action is just beginning into the discovery phase and the Defendant will not be unduly prejudiced by the allowing the amendment.  Moreover, the Second Circuit prefers "adjudication of cases on their merits rather than on the basis of formalities. . ."  *Salahuddin*, 861 F.2d at 42 (2d Cir.1988).

The Plaintiff has re-asserted her claim of being denied a reasonable accommodation.  The Second Amended Complaint demonstrates that the Plaintiff has met "the initial burden of alleging that … she proposed and was refused, an objectively reasonable accommodation" and otherwise came within this aspect of the NYSHRL, *Hispanic AIDS Forum v. Estate of Bruno,* 16 M.3d 960, 966, 839 N.Y.S.2d 691, 696

(Sup. Ct. N.Y. Co. 2007), this claim is now legally sufficient.

WHEREFORE, the Plaintiff, MARIA JACKSON, respectfully requests that she be granted leave of Court to amend the current Complaint, and that the attached Second Amended Complaint be deemed filed as of the date of the Order granting this Motion.

Dated:  New York, New York
       July 11, 2008

Yours, etc.,

SANDRA D. FRELIX, ESQ.

By:    /s/ Sandra D. Frelix        
       Sandra D. Frelix, Esq. (SF-0421)
       110 Wall Street
       11th Floor
       New York, New York 10005
       (212) 859-3509

       ATTORNEY FOR PLAINTIFF

To:  Craig S. Friedman, Esq. (CF-1988)
    Matthew W. Lampe, Esq. (Pro Hac Vice application pending)
    JONES DAY
    222 East 41st Street
    New York, New York 10017

    ATTORNEY FOR DEFENDANT

# EXHIBIT INDEX
# FOR PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF SECOND AMENDED COMPLAINT

1.    Plaintiff's EEOC Charge;
2.    Plaintiff's Right to Sue Letter;
3.    The Second Amended Complaint;
4.    Judge Kaplan's March 27, 2008 Memorandum and Order.

### Supplement to EEOC Charge

### Maria Jackson v. The Scotts Company

1.  I am an African-American female whose employment was unlawfully terminated by The Scotts Company. As a result of the unlawful termination my civil rights were violated under Title VII based on race, color, gender, retaliation and disability. I was also subjected to economic discrimination.

2.  I started as a Seasonal Merchandiser in April 2001 and in December 14, 2001 I was promoted to Sales Merchandising Manager.

3.  During a breakfast meeting in the spring of 2002 I experienced extreme embarrassment and humiliation when my District Manager, Patrick McGarr ("D.M. McGarr") indicated that I was not black, but that I was Italian. I never witnessed a Caucasian co-worker's core identity challenged in such a manner while I was employed by The Scotts Company.

4.  I was further subjected to disparate treatment in that D.M. McGarr stated that he could only allot to me $75.00 per month for storage. However, I later found out that D.M. McGarr paid well over $100.00 to my co-workers for their storage facilities. This forced me to use my home as a storage facility. Based on information and belief my co-workers were not forced to use their homes as storage facilities.

5.  In the spring of 2003 all my co-workers were allowed to take the day off and were invited to attend an event and a lavish luncheon at Ivy Acres. However, I was not invited. But, a Caucasian female from Philadelphia, PA was invited and did attend the event and luncheon.

6.  D.M. McGarr forced me to postpone my hernia operation for three months. Unbelievably, upon my return he expected me to perform at the level that I performed at prior to my surgery. He refused to provide me with a reasonable accommodation. His actions were so despicable that my surgeon was compelled to write him instructing him that I was not to performing any lifting duties.

7.  I was also discriminated against economically. This manifested itself when D.M. McGarr stated to me in October 2003 that he had to fight to get me a $900 raise. However, shortly thereafter I learned that my fellow co-workers had each been awarded with a $1500.00 raise.

8.  The disparate treatment continued in the spring of 2004 when I was provide with only one merchandiser (helper) to service nine (9) Home Depot stores.

Supplement to EEOC Charge
Maria Jackson v. The Scotts Company
Page 2

9.  At the December 2004 National Conference in Naples, Florida I was forced to endure the most extreme and blatant racism and discrimination I have ever faced in my entire life. It is worthy to note that I was the only African-American female at the conference and all of The Scott's Company employees were encouraged to take the several new items in the Miracle-Gro product line. However, Keith Conrad, a Regional Vice President, publicly forced me and only me to return the items. None of my Caucasian colleagues were subjected to this brand of humiliation and embarrassment.

10. On or about January 10, 2005 I went out on short-term disability and in June 2005 The Scotts Company retaliated against me by terminating me while I was still on disability.

11. The Scotts Company has violated my civil rights under Title VII based on race, color, retaliation, gender and disability.

Maria Jackson                           3/28/06
_____          _____
        Maria Jackson                        Date

ALLAN HERZLICH
NOTARY PUBLIC State of New York
NO. 68-6320
QUALIFIED IN QUEENS COUNTY
Commission Expires Dec. 31, 20 06

Sworn to me on this the 28th day of March 2006.

MAR 27,2006 09:32P                                    page 4

EEOC Form 161 (3/98)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: Maria Jackson<br>184-12 144th Road<br>Springfield Gardens, NY 11413 | From: New York District Office - 520<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | Telephone No. |
|---|---|---|---|
| EEOC Charge No. | EEOC Representative | | |
| 520-2006-01284 | Patricia M. Araujo,<br>Investigator | | (212) 336-3681 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

- [ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.
- [ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.
- [ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.
- [ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge
- [ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.
- [ ] While reasonable efforts were made to locate you, we were not able to do so.
- [ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.
- [X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.
- [ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.
- [ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Spencer H. Lewis, Jr.,
Director

12/15/06
(Date Mailed)

Enclosures(s)

cc:  THE SCOTTS COMPANY
62 Gainsborough Rd.
Holtsville, NY 11742 c/o Ivan Smith

Sandra D. Frelix, Esq.
67 Wall Street, Suite 2211
New York, NY 10005

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
MARIA JACKSON

                               *Plaintiff,*                        **SECOND
AMENDED**

     **-against-**                                            **COMPLAINT**

**THE SCOTTS MIRACLE-GRO COMPANY**           **CASE No.: 08 Civ. 1064 (LAK)**

                             *Defendant*.
-------------------------------------------------------------------------X

       Plaintiff, MARIA JACKSON ("Mrs. Jackson", "Plaintiff" or "plaintiff"), by and

through her attorney, SANDRA D. FRELIX, for her Complaint against THE SCOTTS

MIRACLE-GRO COMPANY ("the Company", "the Scotts Company" "Defendant

Scotts", "Defendant" or "defendant"), thereby states and alleges as follows:

## NATURE OF THE CLAIMS

       1.      This action is for injunctive and equitable relief, as well as monetary

damages, to redress Defendant's unlawful employment practices and retaliation against

Plaintiff, including the discriminatory treatment, racial harassment, hostile work

environment and retaliation against Plaintiff due to her Race and/or Color (African-

American/Black), gender in violation of the New York State Human Rights Law, New

York Executive Law §§ 290 et seq.: and the New York City Human Rights Law,

Administrative Code of the City of New York §§ 8-101 et seq.  Moreover, the Defendant

failed to provide her a reasonable accommodation pursuant to her disability in violation

of 9 New York Code of Rules and Regulations (NYCRR) §466.11.

EXHIBIT 3

## JURISDICTION AND VENUE

2.    The Court has personal jurisdiction over Defendant pursuant to Sections 301 and/or 302 of the New York Civil Practice Law and Rules ("CPLR") in that the Defendant transacts and/or solicits business within the state from which they derive substantial revenues.

3.    The Court has personal jurisdiction over Defendant because the substantial part of the unlawful employment practices and events giving rise to the claims herein occurred in New York.

4.    The Court has subject matter jurisdiction over this action by virtue of the New York State Human Rights Law, New York Executive Law § 279(9); the New York City Human Rights Law, Administrative Code of the City of New York § 8-502(a).

5.    Venue is proper in this county pursuant to the successful Notice of Removal filed by the Defendant on February 1, 2008.  This case was removed from Bronx County Supreme Court.

6.    Prior to the commencement of this action, a copy of this Complaint was served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

7.    Plaintiff filed a Charge with the EEOC on March 28, 2006 regarding the unlawful and discriminatory employment practices and events giving rise to the claims herein.  Attached as Exhibit 1.  Plaintiff was issued a Right To Sue Letter on December 15, 2004.  Attached as Exhibit 2.  The filing of the EEOC Complaint tolled the statute of

limitations under the New York State Human Rights Law during the time that the Complaint was pending before the EEOC.

## PARTIES

8.      Plaintiff Maria Jackson is an African-American citizen female who resides in Springfield Gardens, New York.  At all relevant times, Plaintiff has met the definition of an "employee" under all applicable statutes.

9.      Defendant Scotts conducts business throughout New York State as well as in all the other forty-nine states and internationally.

10.     The Scotts Company is located at 14111 Scottslawn Road, Marysville, OH 43041.

## FACTUAL ALLEGATIONS

11.     Defendant hired Mrs. Jackson in April 2001 as a Seasonal Merchandiser.

12.     She was immediately promoted to the position of Sales Merchandising Manager on or about December 14, 2001.

13.     Mrs. Jackson worked diligently for the Company for four (4) years at the time of her June 2005 unlawful termination.

14.     Mrs. Jackson excelled at her responsibilities pursuant to each of her positions.

15.     Mrs. Jackson also received exemplary job performance appraisals.

16.     In the spring of 2002 Mrs. Jackson became aware that the Defendant was being sued for discrimination for not hiring women in the 04 region.

17.     She further learned that the Defendant had specifically directed D.M. McGarr to hire a black woman.

18.    D.M. McGarr shared this information with James Fitch ("Mr. Fitch"), a Sales Merchandising Manager ("SMM").

19.    Mr. Fitch wanted D.M. McGarr to hire his friend, a Caucasian male, who had previously resigned from the Defendant but wanted his old position back.

20.    Another area where Mrs. Jackson was subjected to disparate treatment pertains to storage facilities.

21.    Point of Purchase is advertising that is sent to managers in great quantity.

22.    Therefore, it is customary for the Company to pay for the storage facility utilized by the managers to house and maintain the advertising materials.

23.    Unfortunately, Mrs. Jackson was informed in no uncertain terms by D.M. McGarr that his budget did not permit him to go over the $75.00 per month for storage.

24.    Consequently, she was forced to store the materials in her home, which greatly inconvenienced her family.  This was an ongoing issue for the duration of her employment with the Defendant.

25.    Mrs. Jackson eventually learned that D.M. McGarr paid well over $100.00 for storage for Mrs. Jackson's co-workers who operated in eastern Long Island.

26.    Moreover, even though D.M. McGarr was absolutely aware that Mrs. Jackson was out on a work related disability (herniated and bulging discs) he still sent Point of Purchase advertising materials to her home.

27.    D.M. McGarr requested that she delay the surgery because the season had just begun and he could not afford to have her out.

28.    D.M. McGarr finally agreed that she could have her surgery in June 2003.

29.     Upon Mrs. Jackson's return to work in October 2003 D.M. McGarr was undaunted and unfazed by the fact that she had major surgery four months earlier.

30.     D.M. McGarr insisted that she work at the same level and pace that she worked at prior to her surgery.

31.     In 2003 Mike Carbanara ("Mr. Carbanara") the Regional Sales Director allocated Mrs. Jackson an additional twenty (20) hours of merchandising.

32.     But, D.M. McGarr instructed Mrs. Jackson to assign all the twenty (20) hours to the Jericho Home Depot store.

33.     Mrs. Jackson made reasonable accommodation requests on numerous occasions by asking for additional merchandisers to assist her with her store duties.

34.     Specifically, in May of 2004 she again requested a reasonable accommodation by way of asking for additional merchandisers to assist her with her duties.

35.     D.M. McGarr denied her request and stated: "Get the job done even if you have to use Home Depot's employees".

36.     In May of 2004 Mr. Carbanara called Mrs. Jackson and stated that: "I heard that you are having a difficult time and I am going to give you twenty (20) additional merchandising hours for your stores other than Jericho".

37.     Immediately after speaking with Mr. Carbanara D.M. McGarr called Mrs. Jackson and asked her what did she and Mr. Carbanara talk about Mrs. Jackson informed D.M. McGarr that Mr. Cabanara had allocated her an additional twenty hours for her stores other than the Jericho Home Depot store.

38.    D.M. McGarr instructed Mrs. Jackson that those additional twenty (20) hours would go to the Jericho Home Depot store.

39.    In late May or early June 2004 Mrs. Jackson hired and trained Keisha Snow ("Ms. Snow") to work as a merchandiser hoping that she would assist her in the other Home Depot stores she managed.

40.    Mrs. Jackson pursuant to D.M. McGarr's instruction sent Mr. Carbanara an email thanking him for the additional twenty (20) merchandising hours.  In that email Mrs. Jackson informed Mr. Carbanara that D.M. McGarr re-allocated Ms. Snow to the Jericho Home Depot store.  Mike did not respond to her email and Keisha Snow remained at the Jericho Home Depot store.

41.    Moreover, since the Jericho Home Depot store was a priority store, Mr. Carbarnara was aware of the fact that Ms. Snow was shifted to the Jericho store because he "walked" or inspected the Jericho Home Depot store regularly.

42.    D.M. McGarr's actions were so detrimental to her recovery that in or about late April 2004 Mrs. Jackson's physicians wrote two letters addressed to D.M. McGarr requesting a reasonable accommodation for his patient, Mrs. Jackson.

43.    The physician clearly expressed that lifting for Mrs. Jackson was unacceptable.

44.    D.M. McGarr failed to give Mrs. Jackson a reasonable accommodation.

45.    D.M. McGarr expected Mrs. Jackson to perform in the same manner that she had prior to her major surgery.

46.    Another instance of discrimination against Mrs. Jackson occurred in the spring of 2004 when she requested to take her son to the dentist for a serious procedure.

47.     D.M. McGarr denied Mrs. Jackson's request to take her son to the dentist for the serious procedure.

48.     However, D.M. McGarr allowed Mrs. Jackson's co-worker, Jimmy Fitch, to take his son to a baseball game.

49.     The discriminatory and disparate treatment continued in that, in the spring of 2004 Mrs. Jackson was servicing (8) eight Home Depots stores, (3) three of the Home Depot stores were located within New York City, the other (5) five stores was located on Long Island.

50.     The New York City Home Depot stores that Mrs. Jackson managed for the Defendant included: Starrett City and Mill Basin, both located in Brooklyn; and Springfield Gardens located in Queens.

51.     The Long Island Home Depot stores that Mrs. Jackson managed for the Defendant included: Jericho, Huntington, Freeport, Hempstead, and Valley Stream.

52.     Throughout her tenure as a Sales Merchandising Manager and until her January 2005 work related injury Mrs. Jackson was constantly instructed and forced by D.M. McGarr to remove undamaged Points of Purchase ("POP") materials from the less affluent Home Depot stores located in minority communities and place the undamaged POP materials in the affluent Home Depot stores.

53.     POP materials inform the customers of product use and application and was used for advertisements and displays to promote the Defendant's products in Home Depot stores.

54.    The affluent Home Depot store was located in Jericho, L.I.  It regularly received the POP from the less affluent Home Depot stores located in minority communities.

55.    The Huntington, L.I. was also considered an affluent Home Depot store and it also received undamaged POP materials from less affluent Home Depot stores located in minority communities when its POP materials were damaged.  But, the emphasis was placed on the Jericho, L.I. Home Depot store.

56.    Mrs. Jackson never experienced a situation where undamaged POP materials were taken from the more affluent Home Depot stores to replace the damaged POP materials in the less affluent Home Depot stores located in minority communities.

57.    The less affluent Home Depot stores were located in lower income minority communities.  They included: the Springfield Gardens, Queens Home Depot store, the Starrett City Home Depot store located in Brooklyn, the Freeport, L.I. Home Depot store, and the Hempstead, L.I. Home Depot store.

58.    The affluent Home Depot stores were located in Jericho, L.I. and Huntington, L.I.

59.    Based on information and belief Home Depot's corporate office authorized and signed off on all of the Defendant's POP materials advertised or displayed in any of its Home Depot stores.

60.    Based on information and belief the Home Depot's corporate office strongly discouraged the removing of POP materials from one Home Depot store to place it in another Home Depot store.  This practice is commonly known as "signage flipping".

The Home Depot policy and procedure was to re-order and replace the damaged POP materials.

61.    Mrs. Jackson was aware of the Home Depot policy and procedure pursuant to damaged POP materials.

62.    In late April of 2004 D.M. McGarr instructed Mrs. Jackson to replace the damaged POP material in the Jericho Home Depot store by discreetly taking undamaged POP material out of one of the Home Depot stores she managed located in a less affluent minority community.

63.    Mrs. Jackson respectfully suggested that they should re-order the damaged POP to replace it.

64.    D.M. McGarr refuted her by stating: "Jericho is a priority store and that Jimmy Hagedorn popped in and out of the Jericho store at random it would take too long to order and replace the POP material."

65.    D.M. McGarr retaliated against her by stating that if she did not discreetly take the POP material from one of her less affluent Home Depot stores located in the minority community she could "Do It Or Pack It In".

66.    Mrs. Jackson believed that D.M. McGarr's statement "Do It Or Pack It In" meant that if she did not engage in "signage flipping" she would be terminated.

67.    Mrs. Jackson believes that she was discriminated and retaliated against and used by the Defendant to engage in the discreet removal of undamaged POP materials in the less affluent Home Depot stores located in minority communities to replace the damaged POP materials located in the affluent Home Depot stores based on her race, color and gender.

68.    Mrs. Jackson believes that the Defendant discriminated and retaliated against as well as used her to go into the less affluent Home Depot stores located in minority communities to engage in "signage flipping" because she too was a minority and it would be difficult to prove that a minority was discriminating against a minority community.

69.    She was firmly instructed that the Jericho Home Depot was to have one (1) dedicated merchandiser whose job was to service that store only.

70.    The individual who was the dedicated merchandiser to the Jericho Home Depot was a Caucasian male named Dominic Balducci ("Mr. Balducci").

71.    Mrs. Jackson was responsible for servicing seven (7) other Home Depot stores.

72.    However, she was assigned only one merchandiser to service the other eight Home Depot stores his name was Tyrone Jackson, ("Mr. Jackson") an African-American male.

73.    Mrs. Jackson's Caucasian male co-workers were assigned six to seven Home Depot stores.

74.    Moreover, her Caucasian male co-workers were assigned as many as four (4) merchandisers to service the stores they were responsible for.

75.    During the gardening season of 2004 Mr. Balducci was prone to make many mistakes.

76.    Mrs. Jackson counseled him regarding his poor and disruptive work habits on numerous occasions, but to no avail.

77.    Mr. Balducci's poor and disruptive work habits included stealing time from the Company.

78.    Furthermore, Mr. Balducci threatened to cause bodily harm to department heads at Home Depot because someone borrowed "his" jack.

79.    Mr. Balducci was known to use perverted language and engaged in inappropriate discussions about his girlfriend's sex life in the presence of customers.

80.    Additionally, Mrs. Jackson received numerous calls from Home Depot management about his violent behavior.

81.    Mr. Balducci has been banished from three (3) other Home Depot stores and was sternly instructed not to return.

82.    D.M. McGarr's response to the foregoing was: "Dominic did not have to go back to those Home Depots that put him out and that they did not deserve his services to begin with."

83.    It is quite obvious that D.M. McGarr placed the personal feelings he had for Mr. Balducci before his obligations to the Company.

84.    However, Mrs. Jackson by sharing the real threat that Mr. Balducci posed with D.M. McGarr shows that she recognized that Mr. Balducci's unprofessional and violent behavior had a negative reflection on the Company as well as exposed the Company to unnecessary and avoidable liability.

85.    Moreover, Mrs. Jackson understood that he had clearly become a present liability and that the Company had been placed on notice about his unprofessional and violent behavior.

86.    The liability that D.M. McGarr exposed the Company to is enormous.

87.     It is common knowledge that Mr. Balducci had to attend court ordered anger management courses for threatening to kill his neighbor over a parking space.

88.     But, D.M. McGarr remained a staunch supporter of Mr. Balducci without considering the legal ramifications such blinding support could have on the Company or to Mrs. Jackson's safety and well-being.  D.M. McGarr subjected Mrs. Jackson to discriminatory and disparate treatment in how he dealt with the Balducci situation.  D.M. McGarr refused to support Mrs. Jackson thereby usurping her authority as manager over Mr. Balducci.  D.M. McGarr's wrongful actions against Mrs. Jackson were discriminatorily based on her race, color and gender.

89.     D.M. McGarr refused to re-hire Henry Williams ("Mr. Williams"), a black man, who worked for the Company for more than five years.

90.     The grounds that D.M. McGarr refused Mr. Williams employment was that he allegedly was not present in the store at a particular time.

91.     D.M. McGarr mercilessly defamed Mr. Williams with the tag "the Phantom" and often made jokes about him during meetings in the presence of a number of co-workers.

92.     Clearly, D.M. McGarr's disparate treatment of Mr. Williams and the unwavering support of Mr. Balducci were based on race and color.

93.     Mrs. Jackson was again forced to endure and witness this racially motivated injustice creating a hostile work environment.

94.     The discrimination and abuse suffered by Mrs. Jackson was unrelenting, discriminatory and racist.

95.     Based on information and belief there were no black merchandisers until Mrs. Jackson hired Kisha Snow ("Ms. Snow") in May/June of 2004 and Mr. Jackson in 2001.

96.     Mrs. Jackson's sales numbers were growing by an incredible rate in her other Home Depot stores.

97.     Her sales numbers were increasing so rapidly that the Vice President of Miracle Gro flew in from Ohio to verify her sales numbers.

98.     However, Mr. McGarr transferred Ms. Snow and Mr. Jackson to the Jericho Home Depot store to help Mr. Balducci.

99.     The hours attributed to Ms. Snow and Mr. Jackson were the additional hours that Mr. Carbanara provided Mrs. Jackson with to service her seven (7) other Home Depot stores.

100.    This unfortunate arrangement allowed Mr. Balducci six (6) additional hours or more on a daily basis.

101.    Based on information and belief Mr. Balducci engaged in stealing time from the Company and Mrs. Jackson's budget by working in other departments at the Jericho Home Depot store.

102.    Mrs. Jackson was subjected to a hostile work environment, discriminatory and disparate treatment do to the fact that by reassigning hours specifically designated to Mrs. Jackson's seven (7) other Home Depot stores Mr. McGarr methodically set her up to fail.   None of Mrs. Jackson's Caucasian male co-workers were treated in the same manner.

103.    Mrs. Jackson took pride in her job and used her creative skills when it was necessary.

104.    One instance of unfair and disparate treatment Mrs. Jackson suffered occurred with the building of the Field Goal Post contest in 2004.

105.    Mrs. Jackson was the first of her Caucasian male co-workers to e-mail photos of her completed Field Goal Post to D.M. McGarr.

106.    D. M. McGarr admitted that Mrs. Jackson was the first to complete the Field Goal Post contest.

107.    D.M. McGarr further stated that he knew that she would be the first to complete the contest based on previous incentive driven assignments.

108.    However, D.M. McGarr insisted that she resubmit the photos because there was a piece of cardboard in one of the photos she sent.

109.    The piece of cardboard was the property of Home Depot and placed there by a Home Depot employee.

110.    Due to other commitments Mrs. Jackson was unable to resubmit the photos immediately.

111.    Another co-worker, Mike Gabriele won the $100.00 contest.

112.    Mike Gabriele won even though he sent his photos in after Mrs. Jackson sent her photos in.  This occurrence also demonstrates disparate treatment and a hostile work environment that Mrs. Jackson was forced to work under.

113.    Mrs. Jackson in 2004 created and designed the Bookcase display.

114.    The Book Case display was created and designed by Mrs. Jackson specifically for the Miracle Gro product line.

115.    At the December 2004 National Conference, those in attendance were encouraged to adopt and use the Book Case display.

116.    Even though Mrs. Jackson created and designed the Book Case display concept, the raise she received was less than the raise received by her Caucasian male co-workers.

117.    The events surrounding the December 2004 National Conference in Naples, Florida were particularly public, brutal and extremely humiliating for Mrs. Jackson.

118.    At the conference the Company's employees were encouraged to take the Miracle-Gro since there were several new items in the product line.

119.    Mrs. Jackson began taking one of each sku and realized that Keith Conard ("Mr. Conard"), Regional Vice President, was watching her.

120.    A short time later, Mr. Conard approached Mrs. Jackson and asked her: "What are you doing with the Miracle-Gro?"

121.    Mrs. Jackson, although perplexed by his peculiar inquiry, respectfully explained: "It is my understanding that we could take the Miracle-Gro, everyone is taking the product."

122.    Mr. Conard responded by stating: "Yes we were told we could take it, however, you can not because you are going on an airplane and will not be allowed on the flight with the product."

123.    Mrs. Jackson approached Rob Lamp ("Mr. Lamp") to obtain clarification on airline travel constraints associated with the Miracle-Gro.

124.    Mr. Lamp stated: "I have been addressing that issue all morning and you can take the Miracle-Gro but you must check it in and not take it in your carry-on luggage.

125.    Mr. Lamp then escorted Mrs. Jackson to the Miracle-Gro table and began assisting her with boxing up the products.

126.    Mr. Conard continued to watch Mrs. Jackson's every move from a distance.

127.    Mr. Lamp carried the box to the elevator and waited with her until the elevator arrived.

128.    When the elevator arrived she stepped on the elevator and he handed her the box and said: "Farewell, until next year."

129.    Prior to the elevator doors closing Mr. Conard stepped onto the elevator.

130.    Mr. Conard then asked Mrs. Jackson: "Have you ever been thrown into jail?"

131.    There were other representatives from the Company on the elevator having a conversation.

132.    But, all discussions ceased when Mr. Conard singled out Mrs. Jackson and asked her that question.

133.    He further stated that: "If you take the Miracle-Gro you are going to be thrown into jail and Scotts is not going to be here in Naples to get you out of jail."

134.    He then said: "What are you going to do?"

135.    Mrs. Jackson was shocked and flabbergasted by such a question.

136.    She immediately felt that Mr. Conard was motivated by racism since she was the only Company representative he made this inquiry to.

137.    Mrs. Jackson responded by stating that: "If I am arrested Marion Silber of Gordon & Silber will represent me."

138.    Flippantly, Mr. Conard said: "Is that right?"

139.    Mrs. Jackson steeled herself in order to hold back the tears.

140.    When she got to her room she cried hysterically due to the unbearable embarrassment and humiliation Mr. Conard had subjected her to.

141.    Mrs. Jackson called D.M. McGarr but was far too upset to leave a message the first time she called but called again and left a message.

142.    She then called her colleague Mr. Botz.  Mr. Botz had previously been Mrs. Jackson's direct supervisor.

143.    Mrs. Jackson explained what had occurred with Mr. Conard and how she had tried to call D.M. McGarr unsuccessfully.

144.    Mr. Botz told Mrs. Jackson that D.M. McGarr was on the patio in the pool area.

145.    Mr. Botz was very angry about the incident with Mr. Conard and advised Mrs. Jackson to take the product.

146.    Mr. Botz said it was unfair and cited the fact that everyone was taking the product and that she was the only Scotts representative singled out.

147.    D.M. McGarr returned her call and told her to meet him in the hotel lobby. Mrs. Jackson explained what had occurred and D.M. McGarr appeared to be in shock.

148.    He continued to ask Mrs. Jackson over and over again what had transpired between her and Mr. Conard.

149.    D.M. McGarr stated: "I'm in shock because I saw people leaving the hotel with tons of the stuff in their suitcases.  Boxes of stuff I saw them leave with."

150.    Mrs. Jackson expressed to D.M. McGarr that due the actions of Mr. Conard she had been discriminated against.

151.    D.M. McGarr stated that when they get back to New York he would purchase all the Miracle-Gro that she wanted.

152.    But he voiced his concerns that he feared that if she did not put the Miracle-Gro back she would be fired for insubordination.

153.    He further stated that she should apologize to Mr. Conard for taking the Miracle-Gro.

154.    Mrs. Jackson began to cry because the harassment and humiliation had been compounded exponentially as a result of D.M. McGarr's reaction to the discrimination and the disparate treatment she had unfairly experienced.

155.    Nevertheless, she returned the Miracle-Gro and apologized to Mr. Conard for taking the product.

156.    Mr. Conard replied: "It was a wise thing to do because the Scotts Company would not have been available and that other incidents could have arose from the matter had you taken the Miracle-Gro."

157.    It is evident that those in a position to rightfully object to the wrongful and unlawful actions of Mr. Conard chose to act in concert with him by ignoring his blatant acts of discrimination.

158.    Mrs. Jackson was told to provide Mr. Cabanara with a formal report about the racist incident with Mr. Conard.

159.    However, when she broached the matter with him he stated curtly: "I'm not interested and forget the matter."

160.    D.M. McGarr acted in a similar fashion when he snapped: "Forget the entire matter.  Just forget about it."

161.    It is obvious that both Mr. Cabanara and D.M. McGarr covered and condoned the unlawful actions of Mr. Conard.

162.    On or about January 10, 2005 Mrs. Jackson's back went completely out which forced her to go out on short-term disability.

163.    However, unbeknownst to her, sometime during the month of June 2005 she was unceremoniously and unlawfully terminated form her job services the New York City Home Depot stores and the Jericho Home Depot Store.  She was not offered any other position with the Defendant.

164.    Mrs. Jackson's unlawful termination was contrary to the Company's policies and procedures.  While Mrs. Jackson was not working at the time of termination she was on disability and was continuing to be paid by the Defendant for her position. The Defendant terminated Mrs. Jackson because she was Black.  Any offered reason by the Defendant for that termination is pretextual.

165.    Moreover, the Company failed to provide her with a reasonable accommodation for her work related injury.

166.    D.M. McGarr engaged in a continuous pattern and practice of treating Mrs. Jackson differently from her Caucasian male co-workers, such that she felt isolated and causing her mental anguish.

167.    Mrs. Jackson's performance and sales numbers were competitive with her Caucasian male co-workers and in some instances she exceeded them.  Yet, she was still subjected to a hostile work environment and disparate treatment.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Discrimination and Harassment
### In Violation of New York State Human Rights Law)

168.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 167, inclusive as if fully set forth herein.

169.    Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York State Human Rights Law by denying to plaintiff equal terms and conditions of employment, including but not limited to failing to provide plaintiff with a reasonable accommodation as a result to plaintiff's disability and subjecting plaintiff to disparate working conditions and performance standards, gender discrimination, denying plaintiff  the opportunity to work in an employment setting free of unlawful harassment, denying  plaintiff  opportunities for professional growth, denying plaintiff  compensation and other terms and conditions of employment equal to that of Caucasian employees, and terminating plaintiff unlawfully from plaintiff 's employment with defendant.

170.    Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York State Human Rights Law by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive racial harassment of plaintiff by plaintiff's superiors.

171.    As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

172.    As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Retaliation in Violation of New York State Human Rights Law)

173.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 172, inclusive, as if fully set forth herein.

174.    Defendant has retaliated against plaintiff by, <u>inter alia</u>, by treating her with unmitigated contempt when she complained to her supervisors in New York about how she was treated regarding the Mr. Conard/Miracle Gro incident and subjecting plaintiff to wrongful termination from her position servicing the New York Home Deport stores, subjecting plaintiff to an unfair and hostile work environment and failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability this is clearly in violation of New York State Human Rights Law for: (a) plaintiff's opposition to defendant's discriminatory practices; (b) being wrongfully subjected to harassment and a hostile work environment.

175.    As a direct and proximate result of defendant's unlawful and retaliatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

176.    As a direct and proximate result of defendant's unlawful retaliatory conduct in violation of the New York State Human Rights Law, plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

## AS AND FOR A THIRD CAUSE OF ACTION

**(Aiding and Abetting Violations of New York State Human Rights Law)**

177.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 176, inclusive, as if fully set forth herein.

178.    Defendants knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law by actively participating in the unlawful conduct set forth above.

179.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

180.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York State Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

## AS AND FOR A FOURTH CAUSE OF ACTION

**(Discrimination and Harassment
In Violation of New York City Human Rights Law)**

181.     Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 180, inclusive, as if fully set forth herein.

182.     Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of plaintiff's Race and/or Color (African-American/Black), in violation of the New York City Human Rights Law by denying to plaintiff equal terms and conditions of employment, including but not limited to, failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability, subjecting plaintiff to disparate working conditions and performance standards, gender discrimination, economic discrimination, denying plaintiff the opportunity to work in an employment setting free of unlawful harassment, denying plaintiff opportunities for professional growth, denying plaintiff compensation and other terms and conditions of employment equal to that of Caucasian employees, and terminating plaintiff unlawfully from plaintiff's employment at the Defendant's.

183.     Defendant has discriminated against plaintiff and subjected plaintiff to harassment on the basis of her Race and/or Color (African-American/Black), in violation of the New York City Human Rights Law by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive racial harassment of plaintiff by plaintiff's superiors.

184.     The substantial part of the disparate treatment and discriminatory practices occurred within the New York City limits.  Specifically, the eight Home Deport stores,

other than the Jericho store, were located in New York City.  Plaintiff's termination was from her position with the Defendan, which involved servicing the New York City Home Depot stores.

185.    As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

186.    As a direct and proximate result of defendant's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of damages.

187.    Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Retaliation in Violation of New York City Human Rights Law)

188.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 187, inclusive, as if fully set forth herein.

189.    Defendant retaliated against plaintiff by, <u>inter alia</u>, by treating her with unmitigated contempt when she complained in New York City to her supervisors about how she was treated regarding the Mr. Conard/Miracle Gro incident and subjecting plaintiff to wrongful termination from her position servicing the New York City Home Depot stores, subjecting plaintiff to an unfair and hostile work environment and failing to provide plaintiff with a reasonable accommodation pursuant to plaintiff's disability this is clearly in violation of New York State Human Rights Law for: (a) plaintiff's opposition to defendant's discriminatory practices; (b) being wrongfully subjected to harassment and a hostile work environment.

190.    As a direct and proximate result of defendant's unlawful and retaliatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

191.    As a direct and proximate result of defendant's unlawful retaliatory conduct in violation of the New York City Human Rights Law, plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

192.    Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.

## AS AND FOR THE SIXTH CAUSE OF ACTION

### (Aiding and Abetting Violations of New York City Human Rights Law)

193.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 192, inclusive, as if fully set forth herein.

194.    Defendant knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against plaintiff which occurred in substantial part within the New York City limits, in violation of the New York City Human Rights Law by actively participating in the unlawful conduct set forth above.

195.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

196.    As a direct and proximate result of defendant's unlawful discrimination, harassment and retaliation against plaintiff in violation of the New York City Human Rights Law, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

197.    Defendants unlawful actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which plaintiff is entitled to an award of punitive damages.

## AS AND FOR THE TENTH CAUSE OF ACTION

### (Failure to Provide a Reasonable Accommodation)

198.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 197, inclusive, as if fully set forth herein.

Plaintiff specifically requested that the Defendant provide her a reasonable accommodation regarding the lifting of objects over sixty pounds.

199.    Defendant unlawfully failed to provide plaintiff with a reasonable accommodation as a result of plaintiff's work related injury.

200.    Defendant knowingly and/or recklessly failed to provide plaintiff with a reasonable accommodation as a result of plaintiff's work related injury in violation of 9 New York Code of Rules and Regulations (NYCRR) §466.11.

201.    As a direct and proximate result of defendant's failure to provide plaintiff with a reasonable accommodation of plaintiff's work related injury, plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits for which plaintiff is entitled to an award of monetary damages and other relief.

202.    As a direct and proximate result of defendant's failure to provide plaintiff with a reasonable accommodation of her work related injury, plaintiff has suffered, and continues to suffer, severe physical and mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which plaintiff is entitled to an award of monetary damages and other relief.

203.    Defendant's unlawful actions constitute malicious, willful and wanton violations of New York State Law for which plaintiff is entitled to an award of compensatory and punitive damages and other relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against

A.    An order directing the Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and otherwise unlawful conduct are eliminated and do not continue to affect plaintiff;

B.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, seniority and other benefits of employment;

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for plaintiff's severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

D.    An award of damages for any and all other monetary and/or non-monetary losses suffered by plaintiff in an amount to be determined at trial, plus prejudgment interest;

E.      An award of punitive damages;

F.      An award of costs that plaintiff has incurred in this action, as well as

plaintiff's reasonable attorney's fees to the fullest extent permitted by law; and

G.      Such other and further relief as the Court may deem just and proper.


## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated:  New York, New York
       July 11, 2008

                        Respectfully submitted,

                        SANDRA D. FRELIX, P.C.


By:    /s/ Sandra D. Frelix
          Sandra D. Frelix
          Attorney for Plaintiff
          110 Wall Street, 11th Floor
          New York, New York 10005
          Telephone:  212-859-3509
          Facsimile:   212-862-8212

## <u>VERIFICATION</u>

State of New York     )
                      )  ss.:
County of Queens      )


  MARIA JACKSON, being duly sworn, states:

  I am the Plaintiff in the action herein.  I have read the annexed VERIFIED

AMENDED COMPLAINT, know the contents thereof and the same are true to my

knowledge, except those matters therein which, are stated to be alleged on information

and belief, and as to those matters I believe them to be true.


              _____

               MARIA JACKSON


Sworn to before me
this _____ day of July, 2008



_____
   NOTARY PUBLIC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MARIA JACKSON,

               Plaintiff,

         -against-                                  08 Civ. 1064 (LAK)

THE SCOTTS COMPANY,

               Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/27/08

### MEMORANDUM AND ORDER

LEWIS A. KAPLAN, *District Judge.*

          This is an employment discrimination action. The complaint contains eleven claims for relief. The first six are for discrimination and retaliation in violation, and aiding and abetting violations, of the New York State and New York City Human Rights Laws (the "NYSHRL" and "NYCHRL," respectively. The next three are for common law defamation, "economic discrimination in violation of New York State law," and breach of an implied contract to act in good faith. The last two are for disability discrimination and denial of equal protection in violation of the State Constitution. Defendant moves to dismiss the Fourth through Eleventh Claims as well as plaintiff's prayers for a declaratory judgment, punitive damages and attorneys fees, on various grounds. It moves also to dismiss so much of plaintiff's NYSHRL and NYCHRL claims as are based on events prior to December 21, 2004. Plaintiff has not responded to the motion.

         1.     The Fourth through Sixth Claims all rest on the NYCHRL and appear to allege disparate treatment and a hostile work environment ("HWE"), retaliation, and aiding and abetting the foregoing, respectively.

         In order to state a claim under the NYCHRL, "a plaintiff must allege that he was discriminated against by the defendant within New York City." *Starr v. Time Warner, Inc.,* No. 07 Civ. 5871 (DC), 2007 WL 4144627, at *5 (S.D.N.Y. Nov. 21, 2007) (internal quotation marks and citation omitted). Where a complaint asserts some acts within an some without the City, the complaint must allege that at least "a substantial part of the discrimination occurred" here. *See Salvatore v. KLM Royal Dutch Airlines,* No. 98 Civ. 2450 (LAP), 1999 WL 796172, at *17 (S.D.N.Y. Sept. 30, 1999). In this case, the complaint alleges only three isolated events in New York City while alleging many that occurred elsewhere. *Compare* Cpt ¶¶ 35, 48, 67 *with id.* ¶¶ 15-17, 22-30, 39-44, 47,-48, 81-85, 87-95, 96-109. As the complaint does not allege that a substantial part of

2

the discrimination occurred here, and alleges nothing in New York City with respect to her retaliation claim, the Fourth through Sixth Claims must be dismissed.

2.      The Seventh Claim, after incorporating by reference the 224 preceding paragraphs of this prolix complaint, alleges generally that defendant defamed plaintiff. There appears to be nothing in those 224 paragraphs, however, that alleges defamation. Even if there were, the complaint alleges that plaintiff left defendant's employ in June 2005, far more than one year prior to the commencement of this action. There is no allegation of a defamatory statement within one year prior to the commencement of this action. Accordingly, the Seventh Claim is barred by N.Y. CPLR § 215, subd. 3, New York's one year statute on defamation claims.

3.      The Eighth Claim alleges that defendant "subjected plaintiff to economic discrimination in violation of New York state law." The problem with this claim, however, is that there is no basis whatever for supposing that "economic discrimination," whatever precisely plaintiff may mean by that, is unlawful in New York. To the extent that plaintiff's grievance is alleged discrimination on the basis of race, she is at liberty to pursue her claims under the NYSHRL.

4.      The Ninth Claim purports to allege breach of a duty, implied in the contract of employment, to act in good faith. But there is nothing in the complaint that suggests that plaintiff was anything other than an employee-at-will. In the absence of such an allegation, plaintiff is presumed to be an at-will employee. *Feeney v. Marine Midland Banks, Inc.,* 180 A.D.2d 477, 478, 579 N.Y.S.2d 670, 672 (1st Dept. 1992). New York law not recognize such a cause of action for at-will employees. *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 304-05 (1983).

5.      The Tenth Claim asserts that defendant failed to provide plaintiff with a reasonable accommodation of a work related injury. But there is no allegation that plaintiff ever requested such an accommodation. As plaintiff has "the initial burden of alleging that . . . she proposed and was refused, an objectively reasonable accommodation" and otherwise came within this aspect of the NYSHRL, *Hispanic AIDS Forum v. Estate of Bruno,* 16 M.3d 960, 966, 839 N.Y.S.2d 691, 696 (Sup. Ct. N.Y. Co. 2007), this claim is legally insufficient.

6.      The Eleventh Claim purports to allege that defendant violated the Equal Protection Clause of the New York Constitution. N.Y. Const., art. I, § 11. The New York Equal Protection Clause, however, like its federal counterpart, requires state action. *People v. Kern,* 75 N.Y.2d 638, 653 (1990). There is no allegation of state action in the complaint.

7.      There is no basis for a declaratory judgment here in view of the existence of adequate alternative coercive remedies.

8.      Punitive damages and attorneys' fees are not available under the NYSHRL, which is the only surviving basis for the complaint.

3

9.      This action was commenced on December 21, 2007. The statute of limitations under the NYSHRL is three years. N.Y. CPLR § 214, subd. 2. Accordingly, plaintiff's NYSHRL claim, to the extent it is based on events prior to December 21, 2004, is time-barred.

Accordingly, defendant's motion is granted in all respects. The Fourth through the Eleventh Claims, as well as the claims for declaratory relief, punitive damages, and attorneys fees, all are dismissed. The First through the Third Claims, to the extent they are based on events prior to December 21, 2004 also are dismissed.

SO ORDERED.

Dated:      March 27, 2008

_____
Lewis A. Kaplan
United States District Judge